# UNITED STATES  DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| United States of America, ex. rel.,<br>Eric Johnson | THE FALSE CLAIMS ACT |
| | FIRST AMENDED QUI TAM<br>COMPLAINT PURSUANT TO<br>31 U.S.C. §3729<br>AND JURY DEMAND |
| V. | |
| AmeriHealth Insurance Company of<br>New Jersey; AmeriHealth HMO, Inc.<br>Independence Holdings, Inc. | DOCKET # 1:17-CV-11646-RBK-JS |
| Defendants | |

## FIRST AMENDED QUI TAM COMPLAINT PURSUANT TO
## THE  FALSE  CLAIMS  ACT, 31 U.S.C. §3729 ET SEQ.

TABLE OF CONTENTS

I.   Background and Introduction .............................. 1

II.  The Parties .......................................... 5

    A.  Plaintiff/Relator ................................... 5

    B.  Defendants ........................................ 6

        1. AmeriHealth Insurance Company of New Jersey ..... 6

        2. AmeriHealth HMO, Inc. ........................ 7

        3. Independence Holdings, Inc ..................... 8

    C.  The United States ................................. 8

III. Jurisdiction ........................................ 10

IV.  Venue ............................................. 9

V.   The Patient Protection and Affordable Care Act ............... 9

    A.  Overview ........................................ 9

    B.  The ACA Minimum Cost Sharing Threshold ............ 12

    C.  The Insurance Exchanges .......................... 14

    D.  The Subsidy System .............................. 15

        1. Advanced Premium Tax Credits (APTC) ........... 16

        2. Cost Sharing Reductions (CSR) ................. 17

        3. Subsidy Based on The Federal Poverty Level ....... 18

        4. The "Silver Plan" and The Actual Subsidy .......... 20

        5. Insurers Receive Advance Payments of Cost-Sharing
           Reduction Subsidies ........................... 21

        6. ACA's Reinsurance Program For High Cost Enrollees   23

    E.  QHP Issuer Required Certification .................... 24

VI.  QHP Certification Process ............................. 25

VII. The New Jersey Minimum Cost Sharing Threshold ......... 28

VIII. The Defendants Qualified Health Plans in New Jersey ...... 29

IX.  Defendant's Fraudulent Cost Sharing Violates New Jersey
    Standards ...........................................33

    A.  Defendants Violation of N.J.A.C.11:22-5.5(a)11 Relating to
        Physical Therapy, Speech Therapy, Occupational Therapy
        and Chiropractic Services .......................... 33

B.  Defendants Were Aware of The Violations Since 2011 . . . . .  34

C.  Certifications in QHP Applications by Defendants to CMS
Were False . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

D.  The 2014 Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

E.  The 2015 Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

X.  Defendant's Violation of the False Claims Act . . . . . . . . . . . . . . .  42

A.  The False Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

1. The FCA And False Certification . . . . . . . . . . . . . . . . .  42

2. AmeriHealth's Failure to Comply With N.J.A.C.11:22-
5.5(a)(11) Was Material to the Government's Payment
Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

3. Factors to Consider In Natural Tendency Test  . . . . . .  46

4. Damages Under the False Claims Act  . . . . . . . . . . . . .  54

B.  Defendant's Implied Certification . . . . . . . . . . . . . . . . . . . . .  55

C.  Defendant's Express Certification . . . . . . . . . . . . . . . . . . . . .  56

XI.  Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  56

A.  Count One          31 U.S.C. § 3729(a)(1)(A). . . . . . . . . . . . . . .  56
B.  Count Two          31 U.S.C. § 3729(a)(1)(B). . . . . . . . . . . . . . .  57
C.  Count Three        31 U.S.C. § 3729(a)(1)©. . . . . . . . . . . . . . .  57

XII.  Relief  Requested. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  58

## I. BACKGROUND AND INTRODUCTION

1.     Plaintiff/Relator Eric Johnson ("Relator") hereby files this First Amended Complaint[1] (herein "FAC") pursuant to The False Claims Act, Section 31 U.S.C. Title 3729 and 3730, under which a civil action may be brought for violations of 31 U.S.C. Section 3729 ("FCA") regarding false claims on behalf of the United States Government.

2.     The purpose of this Amended Complaint is to, inter alia, incorporate certain allegations and evidence voluntarily submitted to the United States by Relator in supplemental disclosures since the filing of the original Complaint.  The facts and allegations set forth in respective footnotes herein are intended be incorporated in the relevant paragraphs as if more fully forth at length therein.

3.     Defendants AmeriHealth Insurance Company of New Jersey, a New Jersey licensed insurer, and AmeriHealth HMO, Inc., a Pennsylvania corporation (both subsidiaries of Independence Blue Cross's Holding Company) are licensed to sell health insurance in New Jersey. After receiving approval from the State of New Jersey to qualify and certify several of it's proposed health insurance plans[2] (collectively, the "Plans"), both applied for approval from the Center for Medicare and Medicare Services (CMS) for the Plans to be certified as Federal Qualified

---

[1] The Original Complaint was filed under seal on November 17, 2017 and was served on the United States on November 20, 2017.

[2] Plans are those submitted and are described herein at ¶ 75.

Health Plans[3] (QHP) and offered through a Federal Facilitated Exchange (FFE) under the provisions of the Patient Protection and Affordable Care Act (ACA).

4.    In order to qualify as a QHP, and therefore be eligible for subsidies and reimbursements pursuant to the ACA, applicants such as Defendants herein are required to certify in their application to CMS that its proposed health insurance plans have been approved by the relevant State Agency. In addition, the ACA requires that plans must meet both applicable State insurance laws[4] and regulations and all Federal QHP requirements and certification standards. This includes the New Jersey State regulatory requirement that the network co-payments for certain services, such as physical therapy, speech therapy, occupational therapy and chiropractic, be no more than 50 percent or more of the aggregate risk for the service or supply to which the copayment is applied.  In other words, the Insurer must be responsible for at least fifty per cent (50%) of the cost.

---

[3] Qualified health plan or QHP means a health plan that has in effect a certification that it meets the standards described 45 C.F.R part 156 issued or recognized by each Exchange through which such plan is offered in accordance with the process described in 45 C.F.R. part 155.

[4] 45 C.F.R. 156.200(d) states: . . . (d) State requirements. A QHP issuer certified by an Exchange must adhere to the requirements of this subpart and any provisions imposed by the Exchange, or a State in connection with its Exchange, that are conditions of participation or certification with respect to each of its QHPs [emphasis added]

5.   Defendants knew that the New Jersey State regulation[5] mandating that the network co-pay requirement be no more than 50 percent or more of the aggregate risk for the service or supply was material to obtaining QHP status and eligibility to submit claims for and receive ACA subsidies and payments.  In this action, Relator alleges that Defendants knowingly violated the False Claims Act and committed fraud (i) knowingly submitting and certifying false claim information and cost data to the New Jersey Department of Banking and Insurance (DOBI) to order receive approval for its Plans as qualified health plans or QHP status, (ii) by charging co-pay amounts in excess of the statutory maximum ($50 and above) to its members for chiropractic, physical therapy, occupational therapy, and speech therapy services for certain Qualified Health Plan in contract years 2014 and 2015 that exceeded 50% of its average cost for these services and (iii) reporting and certifying the same false data to CMS during the reconciliation as they did during the initial qualification and certification of their Plans.

6.   As an Insurer certified by CMS, both AmeriHealth Insurance Company of New Jersey and AmeriHealth HMO, Inc. through their QHPs received significant subsidies from the Federal Government to reduce the enrollees' monthly premium payments for insurance plans, cost share reduction subsidies to offset copays,

---

[5] N.J.A.C. 11:22–5.5 Network Co-payment states: (a) Network copayments in health benefit plans and stand-alone prescription drug plans may not exceed the following . . . (11). For any other services and supplies, the copayment is to be determined so that the carrier insures 50 percent or more of the aggregate risk for the service or supply to which the copayment is applied. (This section would be the operative requirement involving the services at issue here, i.e., physical therapy, occupational therapy, speech therapy and chiropractic services.)

-3-

deductible, and coinsurance to low income members and reinsurance to offset high cost members. During 2014 and 2015, these subsidies totaled over 133 million dollars. [See Exhibit F]

7.     Defendants AmeriHealth Insurance Company of New Jersey and AmeriHealth HMO, Inc. knowingly and falsely certified that they were in compliance with New Jersey's network co-pay regulation N.J.A.C. 11:22–5.5(a)(11) . In contract year 2014, which submission was made in 2013, Defendants, in reckless disregard of the DOBI, QHP and CMS regulations and requirements, did not even test their Plans for compliance. In contract year 2015, Defendants had actual knowledge that the Plans were not compliant in that they knew their combined average cost was $93.69 and they were charging copays of $50, $60 and $75 dollars (putting them all above the 50% threshold). Specifically, for 2014, the copay amounts in their Plans of $50, $60 and $75 were in violation. For 2015, the copays of $60 and $75 in their Plans were in violation. Notwithstanding the foregoing, they continued to submit and certify claims to CMS for subsidies and or payments knowing they were not in compliance.

8.     Had the New Jersey Department of Banking and Insurance (DOBI) known that the Defendants submitted untested and false data in order to "show" compliance it would not have certified or approved Defendants health insurance Plans as qualified health plans.

9.     Had the United States and the Department of Health and Human Services ("HHS"), and its Centers for Medicare & Medicaid Services ("CMS"), who

are the administrators and the Government payers of the ACA known that the
Defendants fraudulently obtained QHP certification from New Jersey DOBI for its
Plans, it would not, and as a matter of law, could not, pay Defendants subsidies or
reimbursements for claims submitted by them.

      10.    This action is brought under the FCA against Defendants for
knowingly presenting or causing to be presented to the United States (i) false or
fraudulent claim for payment, and (ii)  making, using, or causing to be used or
made, a false record or statement to get a false or fraudulent claim paid.

## II.  THE PARTIES

A. Plaintiff/Relator

      11.    Relator Eric Durand Johnson  resides at 1237 E. Durham Street,
Philadelphia, PA., 19150.  He is currently employed at Independence Blue Cross
(IBC) as an Actuarial Analyst III within the Actuarial Department.

      12.    Relator is the original source of the allegations in this FAC. The
allegations are not based upon publicly disclosed information. Prior to filing the
original Complaint and this FAC, Relator has provided the United States with
Disclosure Statements as part of Relator's obligation to provide the government
with material information prior to filing a Complaint in accordance with 31 U.S.C. §
3730(b)(2).

      13.    Since 2011, Relator's duties include performing monthly cost share
reduction estimates for the ACA and assisted in creating annual filings to CMS,
preparing simulation results for the ACA risk adjustment program, and setting

-5-

monthly reserve estimates for prescription drug rebates. Relator is not in a managerial function and has no decision-making abilities at IBC-AmeriHealth. Beginning in 2005 through until 2006, Relator worked at UHG - AmeriChoice in Philadelphia, PA as a Sr. Financial Analyst, assisted in preparing rate filings for both Medicare and Medicaid plans (including data analysis for unit cost and utilization trends) and developing database utility (in MS Access) used to compile and analyze CMS premium payments for reconciliation and reserve estimates.

14.     From 2006 until 2011, Relator worked as a Medicare Lead Actuarial Analyst. His primary duties included designing CMS payment software (in MS Access / SQL Server) to reconcile and track CMS member risk score, payment, and eligibility status for accuracy based on retroactive submissions. This included designing automated reporting (paid / incurred basis) process to show changes in incurred risk scores (Part C and D) based on CMS restatements; CMS risk score and payment summaries by Contract, PBP, County, and Eligibility status; CMS capitation triangles to monitor the amount of retroactivity by month; and the preparation of Medicare BID filings.

B.   Defendants.

1. AmeriHealth Insurance Company of New Jersey

15.     Defendant AmeriHealth Insurance Company of New Jersey, is a stock health insurance corporation[6] organized under the laws of the State of New Jersey

---

[6] Independence Insurance Benefits Company was incorporated under the laws of New Jersey on April 4, 1994.  On March 10, 1995 the name was changed from Independence Insurance Benefits

("AMNJ"). It's principal office is located at 1901 Market Street, Philadelphia, PA.,

19103. In New Jersey, AMNJ sold individual, small group and large group health

insurance plans on and off the federal exchanges. In the individual market in New

Jersey, AMNJ had 79,447 enrollees in 2014 and 38,354 enrollees in 2015.

> 2.   AmeriHealth HMO, Inc[7].

16.   AmeriHealth HMO, Inc. (AMHMO) is a Pennsylvania corporation,

authorized and formed to provide health care services to people in New Jersey,

Delaware, and Pennsylvania.

17.   AMHMO offers an HMO, a preferred provider organization plan,

traditional coverage, for the senior market and health insurance coverage to

employers and individuals. AmeriHealth HMO offers one of the largest provider

networks with nearly 9,500 primary care physicians, over 24,000 specialists, and

---

Company to AmeriHealth Insurance Company of New Jersey (AMNJ).   AMNJ was authorized to transact business pursuant to N.J.S.A. 17B:18-42 on June 6, 1995.   Thereafter AMNJ became a wholly owned subsidiary of Independence Blue Cross.   Through subsequent reorganizations and restructuring that occurred, AmeriHealth Insurance Company of New Jersey is now wholly owned by Independent Holding, Inc., the corporate holding company for many Independence Blue Cross affiliates.

[7] Greater Delaware Valley Healthcare was an HMO incorporated under the laws of Pennsylvania on February 18, 1976.   On December 23, 1986 all issued and outstanding stock of the Greater Delaware Valley Healthcare was acquired by AmeriHealth Integrated Benefits, Inc., a wholly-owned subsidiary of AmeriHealth, Inc. which in turn was a wholly-owned subsidiary of Independence Blue Cross (hereinafter referred to as "IBC").   The name was changed to Delaware Valley HMO, Inc. (AMHMO) on July 11, 1988 and the name was changed again to AmeriHealth HMO, Inc. on July 1, 1995.   AMHMO became authorized to operate in New Jersey pursuant to N.J.S.A.-26:2J-1 et seq., (the Health Maintenance Organization Act) on May 9, 1995. Through a series of corporate reorganizations and restructuring that took place in 2013, AMHMO is now a wholly-owned subsidiary of Independence Holdings, Inc. the corporate holding company for many Independence Blue Cross affiliates.

over 230 hospitals in New Jersey and Delaware, and Southeastern Pennsylvania. It's principal office is located at 1901 Market Street, Philadelphia, PA., 19103. In the individual market in New Jersey, AMHMO had 25,373 enrollees in 2014 and 13,003 enrollees in 2015.

           3.  Independence Holdings, Inc.,

    18.     Independence Holdings, Inc., and its affiliated entities (hereinafter trading as Independence Blue Cross or Independence Blue Cross Family of Companies ("IBC") is the sole shareholder and holding company for AMNJ and AMHMO. IBC provides shared services and support to AMNJ and AMHMO in connection with management.   It's principal office is located at 1901 Market Street, Philadelphia, PA., 19103. Collectively, AMNJ, AMHMO and IBC are hereinafter referred to as Defendants.

    C.  The United States

    19.     The United States of America is a real party in interest pursuant to the FCA, and specifically on behalf of several United States' agencies: the Department of Health and Human Services ("HHS"); its Centers for Medicare & Medicaid Services ("CMS"),  as CMS administers the Affordable Care Act which the Defendants' unlawful and fraudulent actions harmed.

## III. JURISDICTION

20.     This action arises under the FCA, 31 U.S.C. §§3729 et seq., and the

Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331

and 1345.

## IV. VENUE

21.     Venue in this district is proper pursuant to 31 U.S.C. §3732(a)

and 28 U.S.C. §1391(b) and ( c) since one or more of the Defendants transact

business in this district and/or one or more of the acts at issue occurred in this

district.

## V. THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

A. Overview

22.     The Patient Protection and Affordable Care Act (Pub. L. 111-148) was

enacted on March 23, 2010. The Health Care and Education Reconciliation Act of

2010 (Pub. L. 111-152), which amended and revised several provisions of the Patient

Protection and Affordable Care Act, was enacted on March 30, 2010.  These two

statutes are collectively referred to as the "Affordable Care Act" or "ACA."

23.     The ACA allows each State the opportunity to establish or participate in

an Affordable Insurance Exchange[8] (the "Exchange(s)"), which is designed to help

---

[8] Pursuant to 45 C.F.R. 155.20, Exchange means a governmental agency or non-profit entity that meets the standards described 45 C.F.R part 156 and makes QHPs available to qualified individuals and/or qualified employers. Unless otherwise identified, this term includes an Exchange serving the individual market for qualified individuals regardless of whether the Exchange is established and operated by a State (including a regional Exchange or subsidiary Exchange) or by HHS

-9-

individuals and small employers purchase affordable health insurance coverage.
Exchanges (see below) are intended to allow individuals and eligible employers to
compare and select from qualified health plans (QHPs) that meet all Federal
requirements of the ACA as well as all related minium insurance requirements of
the respective States in which the QHP is offered.

24.     The ACA requires non-grand fathered health plans in the individual
and small group markets to cover essential health benefits (EHB), which include
items and services in the following ten benefit categories: (1) ambulatory patient
services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care;
(5) mental health and substance use disorder services including behavioral health
treatment; (6) prescription drugs; (7) rehabilitative and habilitative services[9] and
devices; (8) laboratory services; (9) preventive and wellness services and chronic
disease management; and (10) pediatric services, including oral and vision care.

25.     Health and Human Services (HHS) regulations implementing the ACA
define EHB based on state-specific EHB benchmark plans. 45 C.F.R. 156.100. The
Benchmark Plan selected by New Jersey for 2014 and 2015 is the Horizon HMO
Access HSA Compatible. Habilitation services (which encompasses physical therapy,
occupational therapy and speech therapy) are included in this plan. A copy of the
full NJ Benchmark Plan is attached hereto as Exhibit A.

---

[9] Health care services that help you keep, get back, or improve skills and functioning for daily
living that have been lost or impaired because you were sick, hurt, or disabled. These services may
include physical and occupational therapy, speech-language pathology, and psychiatric rehabilitation
services in a variety of inpatient and/or outpatient settings.

26.    The highlights of the ACA include the following provisions:

- Requires most U.S. citizens and legal residents to have health insurance[10]. The ACA creates Exchanges through which individuals can purchase coverage, with premium and cost sharing credits available to individuals/families with income between 133-400% of the federal poverty level and creates separate Exchanges through which small businesses can purchase coverage[11].

- Expands Medicaid to 133% of the federal poverty level.

- Provides refundable and advanceable premium credits to eligible individuals and families with incomes between 100-400% of the Federal Poverty Level (FPL) to purchase insurance through the Exchanges. The premium credits are tied or "benchmarked" to the "second lowest cost silver plan" in the State and will be set on a sliding scale such that the premium contributions are limited to a percentage of income.  Provisions related to the premium and cost-sharing subsidies went into effect January 1, 2014.

---

[10] For plan years through 2018, if an individual could afford health insurance but choose not to buy it, payment of a fee called the individual Shared Responsibility Payment was required. (The fee is sometimes called the "penalty," "fine," or "individual mandate.") Starting with the 2019 plan year, the Shared Responsibility Payment no longer applies.

[11] Limit availability of premium credits and cost-sharing subsidies through the Exchanges to U.S. citizens and legal immigrants who meet income limits. Employees who are offered coverage by an employer are not eligible for premium credits unless the employer plan does not have an actuarial value of at least 60% or if the employee share of the premium exceeds 9.5% of income. Legal immigrants who are barred from enrolling in Medicaid during their first five years in the U.S. will be eligible for premium credits.

27.    Section 1313(a)(6)(A)[12] of the ACA specifies that payments made by,

through, or in connection with an Exchange, are subject to the False Claims Act (31

U.S.C. §3729, et seq.) if those payments include any Federal funds. It further states

that compliance with this requirement shall be a material condition of an issuer's

entitlement to receive payments, including payments of premium tax credits and

cost-sharing reductions, through the Exchange. Specifically, section 1313 of the

Affordable Care Act, entitled FINANCIAL INTEGRITY, provides in subsection

(a)(6), "Accounting for Expenditures," the following:

. . .

(6) APPLICATION OF THE FALSE CLAIMS ACT-

(A) IN GENERAL- Payments made by, through, or in connection with
an Exchange are subject to the False Claims Act (31 U.S.C. 3729 et
seq.) if those payments include any Federal funds. Compliance with
the requirements of this Act concerning eligibility for a health
insurance issuer to participate in the Exchange shall be a material
condition of an issuer's entitlement to receive payments, including
payments of premium tax credits and cost-sharing reductions, through
the Exchange.[emphasis added]

B.   The  ACA Minimum Cost Sharing Threshold

28.    The ACA establishes various "metal" tiers (i.e., bronze, silver, gold and

platinum) of health insurance coverage. These tiers are used for three primary

purposes as follows:

_____

[12] 42 U.S.C. 18033

- To set the minimum amount of coverage many people must have to satisfy the requirement that they be insured or pay a federal tax penalty beginning in 2014.

- To establish standardized levels of insurance individuals and small businesses can buy in health insurance purchasing Exchanges or in the outside market; and

- As benchmarks for premium and cost-sharing subsidies provided to lower and middle income people buying their own insurance in Exchanges.

29.     These requirements apply to all tiers of health insurance coverage, meaning that differences in the levels of coverage will reflect only variation in cost-sharing, not differences in the underlying benefits. However, the levels of coverage in the ACA are not defined using specific deductibles, copays, and coinsurance. Rather, they are specified using the concept of an "actuarial value" (AV). For example, a plan with an actuarial value of 70% (referred to as a "silver" plan in the ACA) means that for a standard population, the plan will pay 70% of their health care expenses, while the enrollees themselves will pay 30% through some combination of deductibles, copays, and coinsurance.

30.     The higher the actuarial value, the less patient cost-sharing the plan will have on average. The percentage a plan pays for any given enrollee will generally be different from the actuarial value, depending upon the health care services used and the total cost of those services. The details of the patient cost sharing vary from plan to plan. The ACA specifies that beginning in 2014 insurance

-13-

newly sold to individuals and small businesses in an Exchange or otherwise must be at one of four actuarial value levels: 60% (a bronze plan), 70% (a sliver plan), 80% (a gold plan), and 90% (a platinum plan).

C. The Insurance Exchanges

31.     Beginning in 2014, individuals and small businesses were able to purchase private health insurance through competitive marketplaces called Affordable Insurance Exchanges, "Exchanges," or "Marketplaces." Individuals, who qualify, and who enroll in a QHP through Exchanges receive financial assistance in the form of "premium tax credits" and "cost sharing reductions" that are intended to make health insurance more affordable and financial assistance to cover some or all cost sharing for essential health benefits.

32.     Coverage through the Exchange began in every State on January 1, 2014, with enrollment beginning October 1, 2013. Recognizing that not all States would elect to establish a State-based Exchange by this statutory deadline, the Affordable Care Act directed the Secretary of HHS to establish and operate a Federally Facilitated Exchange (FFE ) in any State that did not elect to do so, or will not have an operable Exchange for the 2014 coverage year, as determined by January 1, 2014. New Jersey falls into this category.

33.     States had the option under the ACA to (i) establish it's own Exchange, (ii) enter into a Partnership with an Federally-Facilitated Exchange (FFE) in any

-14-

State where a State-based Exchange is not operating or (iii) operate through a Federally Facilitated Exchange or marketplace.

34.    Under a State Partnership model, a State may administer plan management functions, in-person consumer assistance functions, or both. In non-Partnership FFE States, FFEs will perform these functions. 77 Fed. Reg. 18310 (March 27, 2012); 45 C.F.R. parts 155, 156 and 157.

35.    New Jersey has adopted to operate through a FFE or Federally Facilitated Marketplace.

36.    State Exchanges and Federal Exchanges are equivalent. The United States Supreme Court has found that there is no difference in a FFE and State created Exchange. They must meet the same requirements, perform the same functions, and serve the same purposes. Although State and Federal Exchanges are established by different sovereigns, Sections 18031 and 18041 of the ACA do not state that they differ in any meaningful way.   King v. Burwell, 135 S.Ct. 2480 (2015)

     D.   The Subsidy System

37.    Insurers who offer QHPs for individuals qualify for several government subsidies including the following:

     •     Advanced Premium Tax Credits (APTC) to reduce the enrollees' monthly premium payments for insurance plans purchased through the Exchange

-15-

or Marketplace based on the individual or families income in relation to the Federal Poverty Level (FPL).

- Cost Share Reduction subsidies to offer co-pays, deductible, and coinsurance at a reduction to low income members based on the individual or families income in relation to the FPL.

- Reinsurance to offset high cost members.

These subsidies, discussed and described herein form the basis for the false claims submitted and received by Defendants.

38.   The amount of two of these subsidies directly involve the income levels of individuals or families with low to moderate income. In order to ensure that health coverage is available for individuals/families with income between 133-400% of the Federal Poverty Level, coverage can be purchased through the Exchanges with "subsidies" to assist with paying health insurance premiums (through "Advance Premium Tax Credits") and assistance with payment of co-pays, deductibles, or co-insurance (through "Cost Sharing Reductions").

1. Advanced Premium Tax Credits (APTC)

39.   The advance premium tax credit (APTC) reduces the enrollees' monthly premium payments for insurance plans purchased through the Exchange or Marketplace. Health insurance plans offered through the Marketplace are standardized into four "metal" levels of coverage: bronze, silver, gold, and platinum.

-16-

40.     The ACA creates a subsidy system for low and some middle income families to help in the purchase of insurance on the insurance exchanges. The ACA sets a cap on the amount of insurance premium that individuals and families will have to pay, based on the second cheapest Silver plan and that person/family's income in relation to the Federal Poverty Level (FPL)

41.     Each "metal" plan will have subsets or "variants" to which enrollees will be assigned, which assignment is based on the level of income of the enrollee. The variant plans for each "metal" category are identical to the "master plan" in term of benefits. The only distinction being the level of assistance that the enrollee is receiving. As example, the benefits are the same in all Silver plans, master and variants, except for the amount of CSR (subsidy) that is being provided.

42.     Using information available at the time of enrollment, the Exchange determines whether the individual meets the income and other requirements for APTC payments and the amount of the payments that can be used to pay premiums. APTC, once determined, are essentially assigned to the Insurer selected on the Exchange and are made periodically to the issuer of the QHP in which the individual enrolls through a subsidy system. See sections 1401, 1411, and 1412 of the Affordable Care Act and 45 CFR part 155 subpart D.

2.   Cost Sharing Reductions (CSR)

43.     The ACA also requires issuers of QHPs to provide "reduced cost sharing" for essential health benefits (EHB) to eligible Marketplace enrollees. Cost

-17-

sharing is defined at 45 C.F.R. 155.20 as expenses on behalf of an enrollee for essential health benefits, including deductibles, co-pays, and coinsurance.

44.     Cost sharing does not include premiums, balance billing for out-of-network services, or out-of-pocket expenses for non-covered services. A cost-sharing reduction (CSR) plan is a variation of a standard plan that offers identical benefits and providers as the standard plan, except that the enrollee's out-of-pocket costs for essential health benefits are reduced depending on the consumer's eligibility. Reduced cost sharing must be available to eligible enrollees who are enrolled in a silver level plan through the Marketplace.

45.     As set forth at 45 CFR 156.410, the QHP issuer must ensure any individual enrolled through the Marketplace who is eligible for cost-sharing reductions (CSR) pays only the cost sharing required for the applicable covered service under the plan variation, and, in the case of improper assignment to a plan variation or improper cost sharing, the issuer must correct the plan variation assignment or refund the consumer.

3.     Subsidy Based on The Federal Poverty Level

46.     Each year the Federal Government benchmarks the Federal Poverty Level (FLP) at a certain income. Eligibility for some government services and benefits depends on how much income is above or below this number.

-18-

| Household Size[13] | Federal Poverty Level | | |
|---|---|---|---|
| | 2013 - 2014 | 2014 - 2015 | 2015-2016 |
| 1 | $11,490 | 11,670 | 11,770 |
| 2 | $15,510 | 15,730 | 15,930 |
| 3 | $19,530 | 19,790 | 20,090 |
| 4 | $23,550 | 23,850 | 24,250 |

47.    The FPL impacts insurance spending by capping the amount required to be spent. To illustrate, for a single individual with an income of $28,725, the applicable FPL would be $11,490 in 2014 and their income would be 250% of that amount. Under the law this would cap their yearly premium for the Silver Plan at 8.05% of their annual income, i.e., $2,313 annually or about $193 monthly. The remainder of the premium would be paid through the subsidies as described herein.

48.    For a family of 4 earning $47,100 they would have an income of 200% FPL ($23,550) and under the ACA would have premiums capped at 6.3% of their annual income: $2967.30 or $246.27 monthly.

| Income as % of FPL | Cap % (Lower End) | Cap % (Higher End) |
|---|---|---|
| Up to 133% | 2.0% | 2.0% |
| 133% - 150% | 3.0% | 4.0% |

---

[13] Additional family members past 4, increase the federal poverty level number by an additional 4,060

| | | |
|---|---|---|
| 150% - 200% | 4.0% | 6.3% |
| 200% - 250% | 6.3% | 8.05% |
| 250% - 300% | 8.05% | 9.5% |
| 300% - 400% | 9.5% | 9.5% |

4.   The "Silver Plan" and The Actual Subsidy

49.    The subsidy is based on the "Second Cheapest Silver Plan" authorized by each State. Under the ACA, insurers that sell plans on the exchanges must categorize each plan under one of 4 "metal tiers" based upon how much of the policyholders total health care costs the plan will cover.

50.    The preceding premium cap calculations are used to determine how much a family would have to pay themselves for the "second cheapest Silver plan" available to them.  Because insurance costs vary from State to State, the government then subsidizes any amount that the cost of that Silver Plan exceeds the premium cap. If the silver plan costs more than the premium cap would be, the "subsidy" makes up the difference. As an example, for the single person, if the benchmark silver plan cost $300 a month in premiums, the person would still only be responsible for $193 dollars a month and receive a subsidy for the difference of $107 dollars. The consumer could even opt to buy a cheaper Bronze plan or a more expensive option, and apply the same $107 dollar subsidy. (Note: If the cheaper plan actually costs less than $107 dollars a month, they would not receive the difference and lose the remainder of the subsidy received

-20-

     5.    Insurers Receive Advance Payments of Cost-Sharing
Reduction Subsidies

51.    QHP issuers are required to notify the Secretary of HHS of
cost-sharing reductions provided on behalf of eligible enrollees. In addition, periodic
and timely payments equal to the value of those reductions are required to be made
to the issuers. These payments are made in advance.

52.    Under the ACA and implementing regulations, CMS reconciles the
cost-sharing reduction portion of advance payment amounts by comparing what the
enrollee in a cost-sharing reduction plan variation paid in cost sharing to what the
enrollee would have paid if enrolled in a standard plan.

53.    In order to facilitate reconciliation of advance payments of cost-sharing
reductions to reflect the amount provided to enrollees in cost-sharing reduction
variation plans, issuers must report the amount they paid for each eligible medical
claim, the amount enrollees paid for the claims, and the amount of cost sharing that
would have been paid for the same services under the corresponding standard plan.
CMS uses this information to ensure payments reflect the cost-sharing amounts
provided for each policy in a plan variation. Defendants reported the same false
data to CMS during the reconciliation as they did during the initial qualification
and certification of their Plans.

54.    As set forth at 45 CFR 156.410(d)(3), issuers are not reimbursed for
any cost-sharing reductions provided to enrollees who were erroneously assigned to

-21-

a plan variation more generous than the one for which they are eligible. Any cost-sharing reductions, to the extent thereby or otherwise erroneously provided (such as cost-sharing reductions for non-EHB or non-covered services or cost-sharing reductions provided after a policy has been terminated), must be excluded from the reconciliation process. The only exception is provided under 45 CFR 156.430(f)(3), which permits issuers to seek reimbursement for cost-sharing reductions provided during a retroactive termination in which failure to terminate was not the fault of the QHP issuer, for example, when the QHP issuer receives a late termination notice from the Exchange.

55.    CMS requires issuers to adjudicate and re-adjudicate cost-sharing reductions separately from reconciliation of state advance payments for state subsidies that further reduce cost sharing for eligible enrollees in cost-sharing reduction plans, to ensure correct calculation of accumulators and re-adjudication of federal cost-sharing reductions provided.

56.    In the case of claims with coordinated benefits (COB), issuers must apply the COB amounts consistently to standard plans and plan variations when reporting total allowed costs. Issuers with little or no enrollment in a plan or enrollees with few claims for which cost-sharing reductions were provided may elect to reimburse CMS the full advance payment amount for those plans or policies rather than re-adjudicate such claims. Issuers that wish to return advance

-22-

payments for a policy that has been terminated must be excluded from the reconciliation process.

### 6.   ACA's Reinsurance Program For High Cost Enrollees

57.     The goal of the ACA's reinsurance program[14] was to stabilize individual market premiums due to the new reform of "guaranteed issue" for QHPs. The program was in place from 2014 through 2016. The program transfers funds to individual market insurance plans with higher-cost enrollees in order to reduce the incentive for insurers to charge higher premiums due to new market reforms that guarantee the availability of coverage regardless of health status. Reinsurance payments are based on actual costs.  Under reinsurance, some plans may receive payments for high-cost/high-risk enrollees, and still be eligible for payment for those enrollees under risk adjustment.

58.     The ACA set national levels for reinsurance funds at $10 billion in 2014, $6 billion in 2015, and $4 billion in 2016.  Based on estimates of the number of enrollees, HHS set a uniform reinsurance contribution rate of $63 per person in 2014, $44 per person in 2015, and $27 per person in 2016.

---

[14]Reinsurance differs from risk adjustment in that reinsurance is meant to stabilize premiums by reducing the incentive for insurers to charge higher premiums due to concerns about higher-risk people enrolling early in the program, whereas risk adjustment is meant to stabilize premiums by mitigating the effects of risk selection across plans. Reinsurance payments are only made to individual market plans that are subject to new market rules (e.g., guarantee risk adjustment payments are based on expected costs. ed issue), whereas risk adjustment payments are made to both individual and small group plans.

59.     Eligible QHPs received reinsurance payments when the plan's cost for
an enrollee crosses a certain threshold, called an "attachment point." HHS sets the
attachment point (a dollar amount of insurer costs, above which the insurer is
eligible for reinsurance payments) at $45,000 in 2014 and 2015. Because of the
smaller reinsurance payments pool for 2016, HHS raised the attachment point to
$90,000 for the 2016 benefit year. HHS also set a reinsurance cap (a dollar-amount
threshold, above which the insurer is no longer eligible for reinsurance) at $250,000
in 2014, 2015, and 2016

        E.   QHP Issuer Required Certifications

60.     In order to participate in an Exchange, Defendants must have in effect
a certification issued or recognized by the Exchange to demonstrate that each
health plan it offers in the Exchange is a QHP. 45 C.F.R. §156.200(a).

61.     Defendants, as the QHP issuer must be in compliance of all QHP Issuer
Minimum Certification Standards set forth in 45 C.F.R. 156.200(b) with respect to
each of its QHPs on an ongoing basis.  The Certification Standards, include, inter
alia,  adherence to the State requirements and any provisions imposed by a State's
QHPs. 45 C.F.R. 156.200(d) as follows:

> State requirements. A QHP issuer certified by an
> Exchange <u>must adhere to the requirements of this subpart
> and any provisions imposed by the Exchange, or a State in
> connection</u> with its Exchange, that are conditions of
> participation or certification with respect to each of its
> QHPs [emphasis added].

62.    Each request for payment of "advance tax credits" (or subsidy) for qualified enrollees in one of its QHPs, constitute a certification of compliance by Defendants.  This certification, by the express terms of the ACA is material to the payment of the subsidy [see ACA Section 1313(a)(6)(A)[15]]

## VI.   QHP CERTIFICATION  PROCESS

63.    Section 1311(d)(4)(A) of the Affordable Care Act directs that each Exchange must implement procedures for the certification, re-certification, and decertification of health plans as QHPs, consistent with guidelines developed by the Secretary.

65.    In accordance with 45 C.F.R. part 155 subpart K, CMS will review and approve or deny applications from issuers that are applying to offer QHPs in a FFE. Application for certification as a QHP in a FFE for the 2014 plan year where submitted electronically to CMS through it's Health Insurer Oversight System (HIOS). Upon acceptance, each plan is issued a HIOS identification number.

66.    Insurers seeking certification, such as defendants herein, were required to access the QHP Application in HIOS and submit all information necessary for certification of health plans as QHPs. The QHP Application includes both issuer-level and plan-level benefit and rate data and information, largely through standardized data templates.

---

[15] 42 U.S.C. 18033

-25-

67.   Insurers seeking certification, such as Defendants herein, also attest and certify as part of the Application, to their adherence to all of the regulations set forth in 45 C.F.R. parts 155 and 156, which specifically includes State insurance requirements[16] and other programmatic requirements necessary for the operational success of an Exchange, and are required to provide any requested supporting documentation.[17]   Defendants certification with respect to compliance with New Jersey State requirements was material and knowingly false.

68.   Defendants, as an issuer who offered QHPs through an FFE must meet both applicable State laws and requirements and QHP certification standards.   As set forth above, this includes, inter alia, adherence to the State requirements referenced in 45 C.F.R. 156.200(d)[18] and any provisions imposed by a State's QHPs, including N.J.A.C.  11:22–5.5 Network Co-Payment.   As a result, Defendants, at the time of their application for QHP status, falsely and expressly certified compliance with N.J.A.C.  11:22–5.5(a)(11).

69.   An FFE's role and authority are limited to the certification and management of participating QHPs, and do not extend beyond the Exchange or

---

[16] See .45 C.F.R. 156.200(d) states: . . . (d) State requirements. A QHP issuer certified by an Exchange must adhere to the requirements of this subpart and any provisions imposed by the Exchange, or a State in connection with its Exchange, that are conditions of participation or certification with respect to each of its QHPs

[17] See HHS Affordable Exchange Guidance dated April 5, 2013 from Center for Consumer Information and Insurance Oversight, Center for Medicare & Medical Services, Chapter 2, Section 1(i), page 20; at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2014_letter_to_issuers_04052013.pdf

[18] See n. 15 above regarding 45 C.F.R. 156.200(d).

affect otherwise applicable State law governing which health insurance products may be sold in the individual and small group markets. Several QHP certification standards rely on reviews that State departments of insurance (DOI) do not currently conduct. The New Jersey Department of Banking and Insurance (DOBI) is the relevant governing and enforcement agency for New Jersey for certification, compliance and enforcement of New Jersey State requirements as it relates to QHPs.

70.    CMS evaluates each potential QHP against all applicable certification standards, either by confirming the outcome of a State's review (as in the case of licensure) or by performing the review.  In the case of New Jersey, which has been approved by CMS as an "State Approved Effective Rate Review Program"[19] for QHP certification and rate review, CMS relies on New Jersey approval of the QHP application first, including performing QHP checks for Actuarial Values prior to CMS review and approval.  As such, a false or fraudulent misrepresentation to DOBI is also a false or fraudulent misrepresentation to CMS.

71.    Under the ACA, States will continue to perform their traditional regulatory role for issuers and health plans.

---

[19] 45 CFR 154.301

## VII.   THE NEW JERSEY MINIMUM COST SHARING THRESHOLD

72.   Defendants, as the QHP issuer must be in compliance[20] with all State requirements and any provisions imposed by a State <u>in addition to</u> the actuarial value (AV) of the particular plan, meaning that for a standard population, the plan will pay the AV% (70%, 80% or 90%) of their health care expenses, while the enrollees themselves will pay remaining balance (30%, 20%, 10%) through some combination of deductibles, copays, and coinsurance of their health expenses.

73.   The New Jersey State requirements regarding limits on co-payments that insurers such as AMNJ and AMHMO must also certify compliance with is N.J.A.C. 11:22–5.5 Network Co-payment, which states:

 (a) <u>Network copayments in health benefit plans and stand-alone prescription drug plans may not exceed </u>the following amounts:

   1. Preventive services, $30.00;

   2. Primary care provider office visit, $50.00;

   3. Specialist physician office visit, $75.00;

   4. Emergency room visit, $100.00;

   5. Outpatient surgery, $500.00;

   6. Inpatient admission, $500.00 per day up to a maximum of $2,500 per admission;

   7. Magnetic resonance imaging, computerized axial tomography and positron emission tomography, $100.00;

   8. Generic drug, $25.00 per 30-day supply;

---

[20] QHP Issuer Minimum Certification Standards set forth in 45 C.F.R. 156.200(b) state that with respect to each of its QHPs on an ongoing basis, the Certification Standards, include inter alia, adherence to the State requirements and any provisions imposed by a State its QHPs. 45 C.F.R. 156.200(d)

9. Preferred drug, $50.00 per 30-day supply;

10. Non-preferred drug, $75.00 per 30-day supply; and

11. For any other services and supplies, the copayment is to be determined so that the carrier insures 50 percent or more of the aggregate risk for the service or supply to which the copayment is applied. (This section would be the operative requirement involving the services at issue here, i.e., physical therapy, occupational therapy, speech therapy and chiropractic services.)

## VIII.  THE DEFENDANTS QUALIFIED HEALTH PLANS  IN NEW JERSEY

74.     Defendants had individual enrollees in a QHP in New Jersey for which it receives APTC, CSR subsidies and reinsurance as follows:

| INDIVIDUAL PLAN | 2014  ENROLLEES | 2015 ENROLLEES |
|-----------------|-----------------|----------------|
| AMNJ            | 25,373          | 13,003         |
| AMHMO           | 79,447          | 38,354         |
| TOTAL           | 104,820         | 51,357         |

These plans include:

1.  8  QHPs in violation for 2014

2.  6  QHPs in violation for 2015.

Each QHP can contain up to 7 variant plans. Variant plans are all identical as far as the benefit structure is concerned, but they differ in order to offer cheaper co-pays, coinsurance, and deductibles to low income members.

75.     The Plans[21] in violation are set forth below:

---

[21] The ID number for the Plans set forth below is assigned by CMS and is the identification number for the Plan in the CMS HIOS (Health Insurance Oversight System)

AmeriHealth NJ Plans in Violation of NJ Minimum Standards

2014                     Base Plans                Variant Plans

| Metal Level | Plan Name | On Exchange | Off Exchange | 73% AV | 87% AV | 94% AV |
|---|---|---|---|---|---|---|
| Bronze | NJ Tier 1 Advantage Bronze EPO | 91762NJ 0070004-01 | 91762NJ 0070077-00 | | | |
| Silver | NJ Premium Silver EPO | 91762NJ 0070005-01 | 91762NJ 0070063-00 | 91762NJ 0070005-04 | 91762NJ 0070005-05 | |
| Silver | NJ Standard Silver EPO | 91762NJ 0070006-01 | 91762NJ 0070064-00 | 91762NJ 0070006-04 | 91762NJ 0070006-05 | |
| Silver | NJ Tier 1 Advantage Silver EPO | 91762NJ 0070007-01 | 91762NJ 0070065-00 | 91762NJ 0070007-04 | 91762NJ 0070007-05 | |
| Silver | NJ Select Silver HMO | 77606NJ 0040001-01 | 77606NJ 0040051-00 | 77606NJ 0040001-04 | 77606NJ 0040001-05 | |
| Gold | NJ Standard Gold EPO | 91762NJ 0070010-01 | 91762NJ 0070067-00 | | | |

| Silver | NJ Cooper Advantage EPO | 91762NJ 0070008-01 | 91762NJ 0070008-00 | 91762NJ 0070008-04 | 91762NJ 0070008-05 | 91762NJ 0070008-06 |

-30-

| Silver | NJ Cooper Silver Premium POS Plus | 91762NJ 0070009-01 | 91762NJ 0070009-00 | 91762NJ 0070009-04 | 91762NJ 0070009-05 | 91762NJ 0070009-06 |
|---|---|---|---|---|---|---|

2015                              Base Plans                Variant Plans

| Metal Level | Plan Name | On Exchange | Off Exchange | 73% AV | 87% AV | 94% AV |
|---|---|---|---|---|---|---|
| Bronze | NJ Tier 1 Advantage Bronze EPO | 91762NJ 0070004-01 | 91762NJ 0070004-00 | | | |
| Bronze | NJ Community Advantage Bronze EPO | 91762NJ 0070081-01 | 91762NJ 0070081-00 | | | |
| Silver | NJ Standard Silver EPO | 91762NJ 0070006-01 | 91762NJ 0070064-00 | 91762NJ 0070006-04 | 91762NJ 0070006-05 | |
| Silver | NJ Tier 1 Advantage Silver EPO | 91762NJ 0070007-01 | 91762NJ 0070065-00 | 91762NJ 0070007-04 | | |
| Silver | NJ Premium Silver POS Plus | 91762NJ 0110002-01 | 91762NJ 0110002-00 | 91762NJ 0110002-04 | 91762NJ 0110002-05 | |
| Silver | NJ Select Silver HMO | 77606NJ 0040001-01 | 77606NJ 0040051-00 | 77606NJ 0040001-04 | 77606NJ 0040001-05 | |

-31-

| Silver | NJ Community Advantage EPO | 91762NJ 0070008-01 | 91762NJ 0070008-00 | 91762NJ 0070008-04 | 91762NJ 0070008-05 | 91762NJ 0070008-06 |
|---|---|---|---|---|---|---|

76.     In order to get certification, all plan variations must be approved before plan can be offered.  Including the base plan and each variation in the count, there are 20 plan variations in 2014 and 19 plan variations in 2015.

77.     According to CMS, total enrollment for all insurers in New Jersey under QHPs, and the percentage who received Cost Sharing Reduction through APTCs for 2014 and 2015 was as follows:

| Year | Total Enrollment | APTC Enrollment | % enrollment With APTC | CSR Enrollment | % CSR Enrollment |
|---|---|---|---|---|---|
| 2014[22] | 208,467 | 172,345 | 82.7% | 108,314 | 52.0% |
| 2015[23] | 249,395 | 205,242 | 82.3% | 129,277 | 51.8% |

---

[22]https://www.cms.gov/newsroom/mediareleasedatabase/fact-sheets/2015-fact-sheets-items/Table-1-widget.html

[23]https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-sheets-items/2016-06-30.html

## IX.  DEFENDANT'S  FRAUDULENT COST
## SHARING VIOLATES NEW JERSEY STANDARDS

A. Defendants Violation of N.J.A.C. 11:22–5.5(a)11 Relating to Physical
Therapy, Speech Therapy, Occupational Therapy and Chiropractic Services

78.   Relator alleges that Defendants knowingly committed fraud by charging

co-pay amounts in excess of the statutory maximum  ($50 and above)  to its members

for chiropractic, physical therapy, occupational therapy, and speech therapy services

for certain Qualified Health Plan in contract years 2014 and 2015 that exceeded 50%

of its average cost for these services.

79.   These copay amounts ($50, $60 and $75) are in violation of New Jersey

State regulation, entitled Network Copayment, N.J.A.C 11:22-5.5(a)11 for minimum

standards, which states that a network copayment shall be set so that the carrier

insures 50% or more of the aggregate risk for the service or supply to which the co-

payment is applied. Specifically, for 2014, the copay amounts of $50, $60 and $75

were in violation. For 2015, the copays of $60 and $75 were in violation.

80.   In 2014, Relator, as part of his assigned duties,  calculated the correct

average claim cost amount to be ninety three dollars and sixty nine cents ($93.69)

and reported these figures to his superior, Mark Robinson, the director of Actuarial

Services.  By maintaining co-pays of $50, $60 and $75 dollars in its QHPs,

Defendants exceeded the maximum allowable co-payment.

-33-

81.     By violating the New Jersey Network Copayment Minimum Standards
for QHPs plans offered under the Affordable Care Act, AMNJ and AMHMO also
violated the False Claims Act by procuring contracts to offer these QHPs under false
pretenses. Defendants received more than $133 million in subsidies related to these
QHPs that did not meet the minimum standards for state certification and
subsequent federal certifications.

82.     AMNJ and AMHMO knowingly submitted certain health insurance plans
(knowing that such plan designs did not meet the minimum requirement) to be
approved and accepted as QHPs in order to be eligible for placement on  a Federal
Facilitated Exchange and receive subsidies from the Federal Government, including
payments of premium tax credits, cost-sharing reductions, and reinsurance from
CMS. These violations would have prevented their State approvals, and subsequent
federal approvals from CMS  qualifying and certifying the plans as QHPs.

B.   Defendants  Were Aware of  The Violations Since 2011

83.     In 2011, Defendants received inquiries from New Jersey Department of
Banking and Insurance (DOBI) based on a rejection of the filing of certain plans,
which raised questions about the amount of the co-pays for rehabilitative and
habilitative type services.

84.     Actuaries at IBC were asked to verify that these therapy services were
in compliance with the co-pay limitations set forth in New Jersey's Network
Copayment requirements at N.J.A.C. 11:22-5.5(a)11.

85.    In reviewing the data, IBC actuarial analyst Rebecca Alvarado realized
that the Plans in question were not in compliance. Alvarado reported her findings to
Beth Forman, Director of Actuarial Services.

86.    In order to show compliance (or hide the lack of compliance), IBC used
averaged cost and claims data from not only physical therapy, speech therapy,
occupational therapy and chiro, (the services in question) but included such unrelated
services as chemotherapy codes, cardiac rehab codes, pulmonary codes, cognitive
therapy codes, respiratory therapy codes, and even procedures related to pulmonary,
cardiovascular, chemistry and toxicology.

87.    The inclusion of these unrelated services was designed to raise the
average costs to show compliance. Once they did so, Defendants represented to DOBI
that the Plans were in compliance and it was reported to the New Jersey Department
of Banking and Insurance (DOBI) that Ameriheatlh's plans were in compliance. [See
Exhibit C, email chain from July 2011 between Beth Forman, Director of Actuarial
Services and Becky Alvarado, discussing the inclusion of other services designed to
raise the average cost.]

88.    Although it was Defendant's responsibility to ensure compliance for each
health plan offered in the State of New Jersey, AMNJ and AMHMO continued to
charge $50, $60 and $75 copays despite their average claim costs being as low as $50
for certain services (e.g. Chiropratic Services).

-35-

89.   Given that their average claim costs were only $50, Defendants should have not have charged over $25 copays (50% of the $50 average claim cost).

C. Certifications in QHP Applications by Defendants to CMS Were False

90.   In 2013, AmeriHealth received both state and federal certifications to offer QHPs both on and off exchange in New Jersey for 2014, which were re-certified for 2015. The plan designs submitted for certification contained copays ($50, $60 and $75) that were in violation of N.J.A.C 11:22-5(a)11. AmeriHealth knew that it's plan designs were not in compliance with N.J.A.C 11:22-5(a)11.

91.   Notwithstanding that Defendants were aware of its noncompliance since 2011, at the time of application to CMS for QHP approval for the Exchanges and eligibility for APTC and CSR payments, Defendants took no action and falsely certified compliance which CMS relied on and which was intended to deceive CMS.

D. The 2014 Review

92.   In June 2014, as described herein, based on a complaint from a provider questioning the $50 co-pay, the New Jersey DOBI, Consumer Protection Department, requested that Defendants demonstrate that their $50 co-pays complied with N.J.A.C 11:22-5(a)11 for Chiropractic Services.  IBC, as they did in 2011, included inappropriate codes and services in the data to ensure that their "average cost" would be in compliance in relation to the co pay limits in N.J.A.C 11:22-5(a)11.

-36-

93.     On or about June 19, 2014 Gale Simon the Assistant Commissioner of

the Consumer Protection Services at the DOBI contacted Defendants to advise them

that they had received a complaint from a chiropractor regarding AmeriHealths

imposition of a $50.00 copay on network chiropractic services.  Simon expressed

concern that a $50.00 copay on a network chiropractor service may not be consistent

with N.J.A.C. 11:22-5(a)11 which states that a network co-payment shall be set so

that the carrier insures 50 percent more of the aggregate risk for the service or

supply to which the co-payment is applied. [See email chain attached hereto as

Exhibit B].

94.     On July 3, 2014 Mark Robinson, Director of Actuarial Services for IBC

responded to Gale Simon and Vance Neal at the DOBI that AmeriHealth has

interpreted the code to require that co-payments applicable to therapeutic

manipulations and therapy services average less than 50 percent of the aggregate

risk of these services.  Robinson indicated that they believed, based on AmeriHealth,

calculations that the average cost per visit was $154.45 thus in compliance with the

$50.00 copay. [See email chain attached hereto as Exhibit B].

95.     Upon receiving that information Gail Simon from DOBI asked for a list

of the CPT service codes that were included in the analysis and to identify the

provider types who submitted claims, for example, medical doctors, chiropractors,

physical therapists, etc.  Robinson responded by email July 16, 2014 advising that the

claims were made up of six different service codes being service codes 2034

-37-

occupational/speech therapy; 2035 physical therapy; 2037 chiropractic; 3034 occupational/speech therapy; 3035 physical therapy; and 3037 chiropractic. (Collectively the "Rehab Services Codes") This included both participating and nonparticipating providers. [See email chain attached hereto as Exhibit B].

96.     DOBI advised Robinson that it was inappropriate to include the amounts for out-of-network services as the test is for a "network co-pay" and therefore should only include the allowed amount for network services. Simon from DOBI also instructed Robinson to remove claims with deductibles and coinsurance. Upon receiving this information Robinson recounted the claims data, in this case reporting a claim average of $147.90 per visit thus being well within the 50 percent threshold with the $50.00 copay.

97.     DOBI continued to press Robinson with respect to the calculation and inquired why J codes (used for orally administered medications), S codes (private payer codes), and C codes (temporary 5-digit HCPCS codes assigned to certain new medical devices and supplies eligible for a passthrough payment) were included in the calculation, as well as services rendered by medical doctors and hospitals. See, Simon email of July 23, 2014, at Exhibit B. DOBI requested a conference call to discuss the issue.

After the conference call, Robinson, on behalf of Amerihealth, responded to Ms. Simon on July 25, 2014. [See, Exhibit B.] Ms. Simon had, during the conference call,

permitted Amerihealth to calculate its average costs by combining costs from chiropractic, physical therapy, occupational therapy, and speech therapy.

98.    Robinson recalculated Amerihealth's average costs, to include only network services of chiropractic care, physical therapy, occupational therapy and speech therapy.  For these services, Robinson reported to DOBI that AmeriHealth's fully insured claims averaged $100.70 per visit.  The conclusion of this average was that the $50.00 co-pay only represented 49.7 % of the aggregate risk of these services. [See Exhibit B].

99.    Upon learning about this shortly thereafter in August 2014 Relator advised Robinson that his calculations with respect to this claim and the information that he had represented to DOBI was inaccurate and misleading, stating "by excluding claims where both Deductible = 0 and Coinsurance = 0" was essentially counting plans where the members already reached the out of pocket maximum (no member liability claims), that was falsely raising the average AmeriHealth cost.

100.    Relator recalculated the claim and found that the average cost for 2014 for the Rehab Services Codes was $93.69 and reported this to Robinson, along with the calculations, a summary of which is set forth below:

| MONTH | Number of Claims for Service Codes | Plan Liability | Member Liability | Allowed Cost |
|-------|-----------------------------------|----------------|------------------|--------------|
| 2014-01 | 7,890 | 68.93 | 30.92 | 99.85 |
| 2014-02 | 7,791 | 63.54 | 30.53 | 94.08 |

| 2014-03 | 8,268 | 59.24 | 33.10 | 92.33 |
| 2014-04 | 8,346 | 57.77 | 32.94 | 90.71 |
| 2014-05 | 7,789 | 58.90 | 32.79 | 91.69 |
| 2014 to Date | 40,084 | 61.61 | 32.08 | 93.69 |

[See Relators NJ Therapeutic Service Code Analysis forwarded to Mark Robinson on August 5, 2014 along with summary analysis, attached hereto as Exhibit D].

101.   In order to appear that AmeriHealth was in compliance with N.J.A.C. 22:11-5.5(a)11, Robinson was using claims where member liability equal zero due to the members being in plans which were designed for 100 percent coinsurance or the member reached their out of pocket maximum (OOP max).  Robinson did so, knowingly by the clear and plain meaning of the regulation, along with DOBI expressed intentions, that the test only applied to claims where there was a "copayment" from a Plan that was "in network," especially since the title of  N.J.A.C. 22:11-5.5(a) is "Network Copayment."

102.   Relator argued to Robinson that these members have no network copay applied much like the deductible/coinsurance scenarios and should be excluded from the data, resulting in the $93.69 average cost.  In responding to Relator, Robinson acknowledged that it was "intentional" and refused to report the accurate average cost to DOBI. [See email dated August 8, 2014 from Robinson to Relator attached hereto as Exhibit E]

-40-

103.    Defendants also sold plans with $60 and $75 copays that were also in
violation for Chiropractic Services, Physical Therapy, Occupational Therapy, and
The average claim cost was calculated for the Rehab Service Codes all four services
combined.  While the regulation clearly states that each "service" should be within
the co-pay limitation, DOBI allowed Defendants to combine the Rehab Service Codes
because they are similar (rehabilitation related) and sometimes can be mis-coded by
providers (e.g., a Chiro visit may get coded and a PT visit). However, there was no
basis, or agreement to use such unrelated services as chemotherapy, cardiac rehab,
pulmonary, cognitive therapy, respiratory therapy, and even procedures related to
pulmonary, cardiovascular, chemistry and toxicology in the average cost calculation.

104.    Ultimately AmeriHealth reported a false average claim cost of $100.89
to justify the $50 copay and did not notify DOBI of the $60 and $75 copays that
clearly violated both the truthful $94 average claim cost and the false $100.89
average claim cost amount reported to DOBI.

E.  The 2015 Review

105.    In 2015, AmeriHealth was asked by another Department within DOBI
to justify their $75 copays, and again, AmeriHealth made specific representations
that their plans were in compliance and failed to disclose that their $75 copays (and
$60 copays ) did not comply with N.J.A.C 11:22-5(a)11.

106.    For contract years 2014 and 2015, AmeriHealth falsely obtained
certifications for its QHPs and received (based on both express and implied

-41-

certifications which were knowingly false) over $133 million in subsidies including

cost share reduction payments, premium subsidy payments (Advanced Premium tax

Credits), reinsurance payments, and risk corridor payments. In fact, as far back as

the 2011 Inquiry (see ¶ 83-89), and DOBI's rejection of Defendants filing and

methodology to show compliance, demonstrates that its false submissions and

certifications of its QHP for approval by DOBI in 2014 and 2015 were material and

done knowingly.

## X.  DEFENDANT'S VIOLATION OF THE FALSE CLAIMS ACT

A. The False Claims Act

### 1. The FCA And False Certification

107.     The FCA is "intended to reach all types of fraud, without qualification,

that might result in financial loss to the government." United States V. Neifert-

White, 390 U.S. 228, 232 (1968). Relators allege that Defendants violated the FCA by

causing the submission of false claims[24] all in violation of 31 U.S.C. § 3729(a)(1)(A).

This section imposes liability on any person who "Knowingly presents or causes to be

---

[24] The Federal FCA defines a "claim" to include any request or demand, whether under
contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient
if the United States Government provides any portion of the money or property which is requested or
demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any
portion of the money or property which is requested.

presented a false or fraudulent claim for payment or approval"; 31 U.S.C.
§ 3729(a)(1)(A), as amended May 20, 2009.[25]

108.    "Knowingly" means the defendant (1) had actual knowledge that the
claim is false; or (2) acted with deliberate ignorance of the truth or falsity of the
claims; or (3) acted with reckless disregard of the truth or false of the other claim.  31
U.S.C. § 3729(b)(1)(A)(1-3) and Section 2729(b)(1)(B).

109.    A false certification establishes the "falsity" of a claim under the FCA.
This was emphasized by Congress in the 1986 Amendments to the FCA stating "each
and every claim submitted under a contract, loan guarantee or other agreement
which was originally obtained by means of false statements or other corrupt and
fraudulent conduct, or in violation of any statute or appropriate regulation,
constitutes a false claim." S.Rep. No. 99-345 at 9 (1986), reprinted in 1986
U.S.C.C.A.M. 5266, 5274.

110.    The Third Circuit, in Wilkins and Willis ex rel USA v. United Health
Group,  (June 30, 2011)[26], adopted the implied certification theory under the False
Claims Act. In addition, the Third Circuit also indicated in Wilkins that no specific
claim need be identified at the pleading stage in an action under the FCA to state a
cause of action under the implied certification theory.  To establish a claim under §

---

[25] The Fraud Enforcement Recovery Act of 2009, Pub.L. No. 111-21, § 4, 123 Stat. 1616 (2009)
modified and renumbered the subsections of § 3729(a) ("FERA").

[26] See Third Circuit Docket, Case No 10-2747, Document 003110580261 filed 6/30/2011

3729(a)(1)(A) of the FCA, a relator "must prove that '(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.' " United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 304–05 (3d Cir.2011) (quoting United States ex rel. Schmidt v. Zimmer, Inc. ("Zimmer I "), 386 F.3d 235, 242 (3d Cir.2004)) (referring to previous codification of the statute as § 3729(a)(1)).

111.   Section 3729(a)(1)(A) requires only that a claimant present a 'false or fraudulent claim for payment or approval' without the additional element of a 'false record or statement.' Id.   Thus § 3729(a)(1)(A) allows a relator to bring a claim based on a defendant submitting a claim for government funds without explicitly making a false statement.

112.   A legally false FCA claim is based on a 'false certification' theory of liability." Id.   A claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation which is material to the government's decision whether to make payment for the goods or services.   Within the theory of false certification, there are two further categories: express and implied false certification.   A defendant violates the FCA under express false certification when, in conjunction with a request for Federal funds, it certifies that it is in compliance with regulations that are requirements for payment.

-44-

113.    An FCA violation occurs under implied false certification when a
Defendant submits a claim for payment that makes specific representations about
the goods or services provided, but knowingly fails to disclose the noncompliance
with a statutory, regulatory, or a contractual requirement. In these circumstances,
liability may attach if the omission renders those representations misleading.  This
is the substantially same scenario and facts presented in the TAC. United States
ex rel. Escobar  579 U.S._, 2016 WL 3317565, slip op., No. 15-7 (June 16, 2016),

114.    Liability under the FCA occurs under the implied certification for
those who submit claims that make fraudulent misrepresentations, which include
misleading omissions if they render the representations misleading  with respect to
the goods or services.  Specifically, representations, like the ones present here, that
fall within the rule that "half-truths" - representations that state the truth only so
far as it goes, while omitting critical qualifying information - can be actionable.

    2. AmeriHealth's Failure  to Comply With  N.J.A.C.11:22–5.5(a)(11)
       Was Material to the Government's Payment Decision

115.    Being a valid QHP was material to the Government payment decision.
Defendants fraudulently obtained Qualified Health Plan certification from New
Jersey DOBI. Had the Government payers, HHS and CMS, known this, it would not,
and as a matter of law, could not, pay Defendants subsidies or reimbursements for
claims submitted by them.

116.    The Supreme Court, in Escobar reaffirmed that the proper test for
determining materiality in FCA cases is whether the conduct at issue has "a natural

tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 136 S. Ct. at 2002 (citing 31 U.S.C. § 3729(b)(4);  Neder v. United States, 527 U.S. 1, 16 (1999); Kungys v. United States, 485 U.S. 759, 770 (1988)).

This approach is consistent with the statutory text of the FCA, which was amended in 2009 to expressly incorporate the "natural tendency" test, thereby rejecting a more onerous "outcome materiality" standard that some courts had adopted. See Pub. L. No. 111-21 at § 4 (2009) (The Fraud Enforcement and Recovery Act of 2009 ("FERA")).

### 3.  Factors to Consider In Natural Tendency Test

117.    The Supreme Court in Escobar identified a variety of factors bearing on this holistic assessment, including whether:

1.  whether the requirement violated is a condition of payment, Id. at 2003;

2.  whether the requirement violated is significant or "minor or insubstantial," Id.;

3.  whether the violation goes to the "'essence of the bargain,'" Id. at 2003 n.5 (quoting Junius Const. Co. v. Cohen, 257 N.Y. 393, 400 (1931)); and

4.  how the Government has treated similar violations when it had "actual knowledge" of them, Id. at 2003-04.

118.    Importantly, Escobar makes clear that no one factor is dispositive, and a court must evaluate these factors together to determine whether a particular violation is material. Id. at 2001 (citing Matrixx Initiatives, Inc. v. Siracusano, 563

-46-

U.S. 27, 39 (2011) (materiality cannot rest on a "single fact or occurrence as always determinative")); accord; United States ex rel. Escobar v. United Health Services, Inc., No. 14-1423, slip op. at 15 (1st Cir. Nov. 22, 2016) (employing Supreme Court's "holistic approach" to materiality analysis).

119.    With respect to the first factor, whether the requirement violated is a condition of payment, the underlying statute and regulations have deemed compliance with the provisions of the ACA a condition of payment. See Section 1313(a)(6) of the Affordable Care Act states provides that "payments made by, through, or in connection with an Exchange are subject to the False Claims Act (31 U.S.C. 3729 et seq.) if those payments include any Federal funds. Compliance with the requirements of the ACA concerning eligibility for a health insurance issuer to participate in the Exchange shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange."

120.    45 C.F.R. 156.2000(d) makes it clear that issuers must comply with state  exchange requirements for certification of QHPs. In addition, ACA section 1313(a)(b) makes it clear that violations with respect to eligibility to participate is material condition for government payments. This factor certainly points to "materiality."

121.    The second factor, whether the requirement violated is significant or "minor or insubstantial." also points to Defendants violation being material.   Being a qualified health plan by the State of New Jersey is not only clearly significant, it is

-47-

essential. Had the New Jersey Department of Banking and Insurance (DOBI) known that the Defendants submitted untested and false data in order to "show" compliance it would not have certified or approved Defendants health insurance plans.

First, these regulations, and it's underlying purpose is central to maintaining the integrity of the ACA, the primary purpose of which was to help individuals and small employers purchase affordable health insurance coverage and provide financial assistance to cover some or all cost sharing for essential health benefits. Violations of these cost sharing mandates only acts to unlawfully and unnecessarily increase the cost of these essential health benefits.

Second, these violations impact tens of thousands of individuals in New Jersey. Together, Defendants insured 104,820 individual in 2014 and 51,357 in 2015 in QHPs that allegedly were in compliance with FFE and New Jersey State insurance requirements that impacted hundreds of dollars of actual out of pockets costs for low income individuals and families.

Third, violation of the copayment standard for these Rehab Services can be particularly substantial, especially to low -to moderate income individuals and families because, by there very nature, these services, and the corresponding copays, are repetitive in nature. Typically, when someone needs any these services (Speech, PT, OT or chiro) it involves many visits. Each such visit has a copay. The excessive cost could likely involves hundreds of actual out of pocket costs for enrollees.

This factor demonstrates "materiality."

122.    The third factor, whether the violation goes to the "'essence of the bargain," also points to Defendants violation being material to the extent that the definition of "essence"[27] means "that which is indispensable." The essential "bargain" under the ACA is the Government's agreement to provide financial assistance (Cost Sharing Reductions, APTCs) for individuals to purchase health insurance and share costs. The other side of the "bargain" is that the ACA requires most individuals to have health insurance beginning in 2014.  Violations of mandates to limit the "cost sharing" frustrate this bargain.

123.    The indispensable or essence of the "bargain" requires that Insurers who seek to sell QHPs on the Exchanges to reduce cost-sharing  for low-and moderate-income people earning between 100 percent and 250 percent of the federal poverty level. The Defendants actions goes directly to raising the out of pocket expenses incurred for these very individuals and families. Essentially, even though they are receiving from CMS a CSR for these reduced out of pocket costs, Defendants nevertheless also receiving a "hidden" subsidy by overcharging copays to their members.

124.    These actions work to frustrate the very heart of what the ACA was intended to achieve. As of 2016, as many as 7 million Americans may have plans with these cost-sharing reductions. In the largest markets in the 38 states using the federal website for marketplace enrollment, the cost-sharing reductions substantially

---

[27] See Black's Law Dictionary, West, Revised 4ᵗʰ Edition, page 642

lower projected out-of-pocket costs for people who qualify for them[28]. According to the Centers for Medicare and Medicaid Services, growth in household out-of-pocket health care spending slowed from 2.1 percent in 2013 to 1.3 percent in 2014.[29]

125.    The Affordable Care Act's cost-sharing reductions are playing a critical role in limiting out-of-pocket cost exposure for low- and moderate-income people enrolled in marketplace plans. Defendants knowingly violation of State mandates, whose sole purpose is to control of limit the out of pocket cost goes to the essence of the bargain. This factor demonstrates "materiality."

126.    With respect to the fourth factor, i.e., how the Government has treated similar violations when it had "actual knowledge" of them, points to materiality. When DOBI became aware of the violations of the New Jersey network co-pay regulation N.J.A.C 11:22-5(a), it has instituted enforcement action. See Consent Order dated September 17, 2015 of the New Jersey DOBI Order E15-106[30], Fine Freelancers Consumers Operated and Oriented Program of New Jersey, Inc. Freelancers issued plans that had a $50 and $75 co-pays for certain services that did not satisfy the 50% test found in N.J.A.C 11:22-5(a) which is at issue here. Freelancers was forced to, and did agree to reprocess claims and pay a fine.  This action by DOBI was specifically directed to "the plans and benefits template used on

---

[28] S. R. Collins and D. Blumenthal, "New Federal Survey Shows Gains in Private Health Coverage and Fewer Cost-Related Problems Getting Care," The Commonwealth Fund Blog, Feb. 24, 2016.
[29] S. R. Collins and D. Blumenthal, "New U.S. Health Care Spending Estimates Reflect ACA Coverage Expansions and Higher Drug Costs," The Commonwealth Fund Blog, Dec. 4, 2015.

[30] See Order attached hereto as Exhibit G, page 4 of 7.

Federal Facilitated Marketplace to describe its change cost sharing." This action, post certification, once they became aware of the fraud, is consistent with the 2011 Inquiry[31] and DOBI's rejection of Defendants filing, demonstrates how they treated similar false submissions violations. These examples of prior conduct strongly points to materiality.

127.    Had the United States and the Department of Health and Human Services ("HHS"), and its Centers for Medicare & Medicaid Services ("CMS"), the administrators and the Government payers of the ACA known that the Defendants fraudulently obtained Qualified Health Plan certification from New Jersey Department of Banking and Insurance (DOBI) it would not, and as a matter of law, could not, pay Defendants subsidies or reimbursements for claims submitted by them.

128.    Even if the Government had actual knowledge (which it did not) and continued to pay claims, such action does not necessarily undermine a materiality finding because there are many good reasons, including important public policy and safety considerations, why the government might continue to pay claims in such circumstances. See U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 917 (4th Cir. 2003) (the government might have good reason to pay despite the violation because the contract is "advantageous to the government" or too far along to terminate without excessive costs).

---

[31] see ¶ 83-89 herein

-51-

129.    The more essential the continued execution of a contract is to an important government interest, the less the government's continued payment weighs in favor of the government knowledge defense. To find otherwise could lead to perverse outcomes; the more dependent the government became on a fraudulent contractor, the less likely it would be to terminate the contract (and the less likely the contractor would be held liable.") (internal quotations and citations omitted)).

130.    Indeed, on remand of Escobar from the Supreme Court, the First Circuit rejected the argument that materiality could not be established because Medicaid continued to pay claims after learning of alleged violations. It stated: "[M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance." United States ex rel. Escobar v. Universal Health Services, Inc., 842 F.3d 103, 112 (1st Cir. 2016). Escobar makes clear that the relevance of an agency's response depends on whether the agency had "actual knowledge" of fraud, see Escobar, 136 S. Ct. at 2003 (emphasis added); and "mere awareness of allegations . . . is different from knowledge of actual [misconduct]," Escobar, 842 F.3d at 112. Thus, where a defendant is subject to public accusations of fraud but disputes such accusations, it would be premature to impute "actual knowledge" to a contracting agency and to construe the agency's lack of response as definitive proof of the lack of materiality.

131.    Nothing in Escobar suggests that the government must always initiate proceedings to recoup payments previously made in order to establish that certain types of violations are material to payment. There is no administrative prerequisite

to the bringing of an FCA action. See, e.g., United States ex rel. Aranda v. Community Psychiatric Centers of Okla., Inc., 945 F.Supp.1485, 1489 (W.D. Okla. 1996). This factor demonstrates "materiality."

132.    This holistic approach to a materiality analysis reflects the Court's overarching framework for assessing materiality: that it "cannot rest on a single fact or occurrence as always determinative." Id. at 2001. Escobar did not sub silentio depart from the statutory and common law definitions of materiality (which support the natural tendency test) and endorse an outcome materiality standard. See also United States ex rel. Winkelman v. CVS Caremark, 2016 WL 3568145, at *8 (1st Cir. June 30, 2016) (noting that Escobar adopted common law understanding of materiality); see Harrison, 352 F.3d at 916-17 (the materiality inquiry focuses on the "potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered")[32].

133.    Indeed, if the Supreme Court had intended materiality to turn solely on whether the Government would actually have denied payment had it known of the fraud, it would not have been necessary to identify any other factors relevant to the

---

[32] In short, the Supreme Court did not purport to impose a heightened test for materiality beyond the "natural tendency" test codified in the False Claims Act and entrenched in the common law, and applied by this Court and others. See United States ex rel. Loughren v. Unum Group, 613 F.3d 300, 307 (1st Cir. 2010) (stating that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of decision making body to which it was addressed"); United States ex rel. Feldman v. Van Gorp., 697 F. 3d 78, 96 (2d Cir. 2012) (test for materiality "does not require evidence that a program officer relied upon the specific falsehoods proven"); United State ex rel. Matheny v. MedcoHealth Solutions, Inc., 671 F.3d 1217, 1228-29 (11th Cir. 2012) (same); United States ex rel. Longhi v. United States, 575 F.3d 458, 469-70 (5th Cir. 2009) (mere potential to influence is sufficient); United States v. Rogan, 517 F.3d 449, 452 (7th Cir. 2008) (rejecting argument that testimony of federal officials that they would not have paid claim was necessary); United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 916-17 (4th Cir. 2003).

multi-pronged materiality inquiry. See Escobar, 136 S. Ct. at 2003-04. Rather,
Escobar makes clear that the materiality inquiry requires a holistic assessment of the
tendency or capacity of the undisclosed violation to affect the Government
decision-maker.

### 4. Damages Under the False Claims Act

134.   The measure of damages the United States is entitled to recover under
the FCA is the amount of money the government paid out by reason of the false
claims over and above what it would have paid out if the claims had not been false or
fraudulent. Marcus, 317 U.S. at 543-545, 63 S.Ct. 379; United States v. Neifert-
White, 390 U.S. at 232, 88 S.Ct. 959.

135.   The government is allowed to recover three times the amount of its
damages. 31 U.S.C. § 3729(a). "FCA damages 'typically are liberally calculated to
ensure that they afford the government complete indemnity for the injuries done it.' "
United States ex rel. Roby v. Boeing Co., 302 F.3d 637, 646 (6th Cir.2002) (quoting
United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th
Cir.1998)).

136.   The projected damages for 2014 and 2015, based on the QHPs that were
in violation of N.J.A.C. 5.5(a)11 are set forth in detail in Exhibit F. This includes all
QHPs offered by Defendants during 2014 and 2015, segregated by the Cost Sharing
Reduction subsidy, Reinsurance subsidy and the APTC subsidy.

| YEAR | Cost Sharing Reduction (CSR) Subsidy | Reinsurance Subsidy | Premium Subsidy (APTC) | TOTAL |
|---|---|---|---|---|
| 2014 | 8,298,373 | 30,344,174 | 41,125,273 | 79,767,820 |
| 2015 | 13,048,371 | 16,289,123 | 24,504,167 | 53,841,661 |
| TOTAL | 21,346,744 | 46,633,297 | 65,692,440 | 133,609,481 |

**B. Defendant's Implied Certification**

137.    The Federal FCA, 31 U.S.C. § 3729(a)(1)(A) makes "knowingly[33]" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim[34].

138.    An issuer that wishes to offer QHPs through an FFE must meet both applicable State laws and requirements and QHP certification standards. Adherence to the State requirements referenced in 45 C.F.R. 156.200(d)[35] and any provisions

[33] "Knowingly" means the defendant (1) had actual knowledge that the claim is false; (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim.  31 U.S.C. § 3729(b)(1)(A)(1-3) and Section 2729(b)(1)(B).

[34] On November 2, 2015, President Obama signed into law the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (the 2015 Act), which further amended the Federal Civil Penalties Inflation Adjustment Act of 1990. The 2015 Act updates the process by which federal agencies adjust applicable civil monetary penalties for inflation to retain the deterrent effect of those penalties. The 2015 Act requires that not later than July 1, 2016, and not later than January 15 of every year thereafter, the head of each agency must, by regulation published in the Federal Register, adjust each CMP within its jurisdiction by the inflation adjustment described in the 2015 Act. For violations of the False Claims Act, the interim final rule minimum per-claim CMP's will increase to $10,781 from $5,500, and maximum per-claim CMPs will jump to $21,563 from $11,000. The increase takes effect August 1, 2015 and applies to violations after November 2, 2015.

[35] 45 C.F.R. 156.200(d) states: . . . (d) State requirements. A QHP issuer certified by an Exchange must adhere to the requirements of this subpart and any provisions imposed by the

imposed by a State's QHPs is impliedly and expressly certified to by the Defendants made implicit representations to CMS in its Applications to CMS for its plans that it sought QHP certification status that its QHP were in compliance with all State requirements. In addition, submitting enrollment numbers for qualified individuals in order to receive APTC and CSR subsidies requiring reaffirmation that its plans were in compliance as certified to in its application.

C. Defendant's Express Certification

139.   The Federal FCA, 31 U.S.C. § 3729(a)(1)(B) makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.

140.   Defendants herein made express false certification in it's QHP Applications to CMS for its plans that it sought QHP certification status. In addition, submitting enrollment numbers for qualified individuals in order to receive APTC and CSR subsidies requiring reaffirmation that its plans were in compliance as certified to in its application.

XI.   CAUSES OF ACTIONS

A.  COUNT ONE  - THE FCA: 31 U.S.C. § 3729(a)(1)(A)

---

Exchange, or a State in connection with its Exchange, that are conditions of participation or certification with respect to each of its QHPs

141.   All of the allegations set forth herein in paragraphs 1 - 139 are incorporated herein by reference as if fully set forth at length.

142.   The Federal FCA, 31 U.S.C. § 3729(a)(1)(A) makes "knowingly[36]" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.

B.   COUNT TWO - THE FCA: 31 U.S.C. § 3729(a)(1)(B)

143.   All of the allegations set forth herein in paragraphs 1 - 139 are incorporated herein by reference as if fully set forth at length.

144.   The Federal FCA, 31 U.S.C. § 3729(a)(1)(B) makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of $10,781.00 and $21,563.00.

C.   COUNT THREE - THE FCA: 31 U.S.C. § 3729(a)(1)( C )

145.   The Federal FCA, 31 U.S.C. sec. 3729(a)(1) ( c) makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed

---

[36] "Knowingly" means the defendant (1) had actual knowledge that the claim is false; (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim.  31 U.S.C. § 3729(b)(1)(A)(1-3) and Section 2729(b)(1)(B).

-57-

or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $10,781.00 and $21,563.00.

## XII. RELIEF REQUESTED

146.    Relator requests the following relief be imposed against Defendants:

(a) That the United States be awarded three times the amount of damages which it sustained because of the acts of Defendants pursuant to §3729(a)(1)(A) through ( C) of the FCA;

(b) That Defendants each be held liable for civil penalties of up to $21,563.00, but not less than $10,781.00 (as adjusted pursuant to §3729 of the FCA and the Civil Penalties Act), to the U.S. for each and every act in violation of the FCA.

( c) That this Court award such interest as is available pursuant to the FCA.

(d)    That in the event the United States intervenes in this action and takes over its prosecution, the Relator be awarded an amount for bringing this action on behalf of the United States of at least 15% but not more than 25% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(1) of the FCA;

(e) That in the event the United States and State Plaintiffs do not intervene in this action, the Relator be awarded an amount for bringing this action for the United States of at least 25% but not more than 30% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(2) of the FCA;

(f)   That this Court award reasonable attorneys' fees, costs and expenses to the Relator, which were necessarily incurred in bringing and prosecuting this case, pursuant to §3730(d)(1) or (2) of the FCA ; and

(g)   That this Court award such other relief as it deems just, necessary and fair.

Relators requests a trial by jury of all issues so triable.

DATED:   August 19, 2019

Respectfully submitted,

Counsel for Plaintiff/Relator

*Marc M. Orlow, Esquire*

BEGELMAN & ORLOW, P.C.
Marc M. Orlow, Esquire
Ross Begelman, Esquire
Regina D. Poserina, Esquire
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
Phone: (856) 428-6020
Fax: (856) 428-5485
marc.orlow@begelmanorlow.com
regina.poserina@begelmanorlow.com

# Exhibit A

# NEW JERSEY EHB BENCHMARK PLAN

## SUMMARY INFORMATION

| | |
|---|---|
| **Plan Type** | Plan from largest small group product, Health Maintenance Organization |
| **Issuer Name** | Horizon HMO |
| **Product Name** | HMO |
| **Plan Name** | Horizon HMO Access HSA Compatible |
| **Supplemented Categories** (Supplementary Plan Type) | • Pediatric Oral (State CHIP) <br> • Pediatric Vision (FEDVIP) |
| **Habilitative Services Included Benchmark** (Yes/No) | Yes |

# BENEFITS AND LIMITS

| Row Number | A<br>Benefit | B<br>Covered (Required): Is benefit Covered or Not Covered | C<br>Benefit Description (Required if benefit is Covered). Enter a Description, it may be the same as the Benefit name | D<br>Quantitative Limit on Service? (Required if benefit is Covered)- Select "Yes" if Quantitative Limit applies | E<br>Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F<br>Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G<br>Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit was selected in Limit Units, enter a description | H<br>Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I<br>Exclusions (Optional): Enter any Exclusions for this benefit | J<br>Explanation; (Optional): Enter an Explanation for anything not listed | K<br>Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Primary Care Visit to Treat an Injury or Illness | Covered | Primary care visit to treat an injury or illness | No | | | | | | | No |
| 2 | Specialist Visit | Covered | Specialist visit | No | | | | | | | No |
| 3 | Other Practitioner Office Visit (Nurse, Physician Assistant) | Covered | Other practitioner office visits (nurse, physician assistant) | No | | | | | Care and/or treatment by a Christian Science practitioner or care by a family member. | Practitioner must be licensed and acting within the scope of the license, but also cover services of BCBA and BCaBA practitioners. | No |
| 4 | Outpatient Facility Fee (e.g., Ambulatory Surgery Center) | Covered | Outpatient facility fee | No | | | | | | | No |
| 5 | Outpatient Surgery Physician/Surgical Services | Covered | Outpatient surgery; physician/surgical services | No | | | | | Local anesthesia billed separately when charges are included in surgery fee. | Pre-approval required. | No |
| 6 | Hospice Services | Covered | Hospice services | No | | | | | Private accommodations. | Inpatient hospice covered at the private room & board rate, Pre-approval required. | No |
| 7 | Non-Emergency Care When Traveling Outside the U.S. | Not Covered | Travel outside U.S. | | | | | | | | |
| 8 | Routine Dental Services (Adult) | Not Covered | Routine dental-adult (see explanation) | No | | | | | | See "Other" for covered dental-related services. | |
| 9 | Infertility Treatment | Covered | Limited infertility treatment | No | | | | | Services or supplies to enhance fertility that involve harvesting, storage and/or manipulation of eggs and sperm, including in vitro fertilization, embryo transfer, embryo freezing, gamete intra-fallopian transfer (GIFT), zygote intrafallopian transfer (ZIFT), donor sperm, surrogate motherhood, or sterilization reversal. | Pre-approval required. Except as specifically excluded, only artificial insemination and standard dosages, lengths of treatment and cycles of therapy of Prescription Drugs are covered. | No |
| 10 | Long-Term/Custodial Nursing Home Care | Not Covered | LTC/Custodial | | | | | | Custodial and domiciliary care | | |

New Jersey—2

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit: Select unit): If a Limit Unit was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation; (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | Private-Duty Nursing | Covered | Covered as part of home health benefits only | Yes | 60 | Visits per year | | | | Only covered under Home Health Care Services (see Home Health Care for other limits/conditions). | No |
| 12 | Routine Eye Exam (Adult) | Covered | Routine eye exam – adult (see exclusion/explanation) | No | | | | | Exams to determine the need for or changes of eyeglasses or lenses; eyeglasses or lenses of any type (other than initial replacements of the natural lens); eye surgery primarily intended to correct myopia, hyperopia or astigmatism. | Eye screenings provided as part of a routine physical exam are covered. | No |
| 13 | Urgent Care Centers or Facilities | Covered | Urgent care centers or facilities | No | | | | | | | No |
| 14 | Home Health Care Services | Covered | Home health care services | Yes | 60 | Visits per year | Visit limit is per calendar year | | Services furnished to family members, other than the patient. Services and supplies not included in the home health care plan. | Pre-approval required. Covers medically necessary and appropriate services in a written home health plan when certified as needed to avoid continuing hospitalization or confinement in a SNF. Services and supplies must be included in the written plan and furnished by a home health care professionals. The covered person's practitioner must establish the written plan within 14 days after the home health care starts and review it at least once every 60 days. | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in Insured as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: Enter an Explanation for anything not listed | K Does this benefit have limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | Emergency Room Services | Covered | Emergency room services | No | | | | | | No referral or notice required prior, but coverage is provided only if written proof of the occurrence, nature and extent of the emergency service is submitted within 30 days. Coverage for emergency services includes only treatment needed to treat the emergency; pre-approval is required for coverage of elective procedures performed after admission as a result of an emergency. Emergency services of non-network providers covered only if it is determined the covered person's symptoms were severe and delay of treatment would have been detrimental to health, the symptoms occurred suddenly and the covered person sought immediate attention, and the service or supply is not normally provided on a non-emergency basis. Includes emergency room treatment at Level 1 and Level 2 trauma centers (as required by NJAC 11:24A-2.6). | No |
| 16 | Emergency Transportation/ Ambulance | Covered | Emergency transportation/ambulance | No | | | | | Chartered flights. Travel or communication expenses of patients, health care providers or family members. Services for ambulance transport from a hospital to another facility except when a member is transferred to another inpatient health care facility. | Covers medically necessary and appropriate charges for transporting a member to a local hospital or to the nearest hospital where needed care can be given, if a local hospital cannot provide such care (but see exclusion). | No |

| Row Number | A Benefit | B Covered (Required!): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Units): If a Limit Unit was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | Inpatient Hospital Services (e.g., Hospital Stay) | Covered | Inpatient hospital services | No | | | | | Private accommodations | Pre-approval required. Covered at semi-private room and board rate. Includes nursing, intensive and special care facilities, imaging and laboratory services, drugs and biologicals, pre- and post-operative care, anesthesia, blood, surgical, medical and obstetrical services, etc. | No |
| 18 | Inpatient Physician and Surgical Services | Covered | Inpatient physician and surgical services | No | | | | | Local anesthesia charges if billed separately when charges are included in the fee for the surgery. | Pre-approval required for surgery. | No |
| 19 | Bariatric Surgery | Covered | Bariatric surgery | No | | | | | | | No |
| 20 | Cosmetic Surgery | Not Covered | See Exclusion and Explanation | No | | | | | Cosmetic surgery, treatment for complications of cosmetic surgery, related services or supplies and drugs provided for cosmetic purposes. | Defined as any surgery or procedure that involves physical appearance that does not correct or materially improve a physiological function and is not medically necessary. | No |
| 21 | Skilled Nursing Facility | Covered | Skilled nursing facility | No | | | | | Private accommodations. | Pre-approval required. Coverage of network SNF services and supplies only for those constituting skilled nursing care. | No |
| 22 | Prenatal and Postnatal Care | Covered | Prenatal and postnatal care | No | | | | | | See "Delivery and All Inpatient Services for Maternity Care." Mother may elect a home care program in lieu of the post-delivery hospital stay. | No |
| 23 | Delivery and All Inpatient Services for Maternity Care | Covered | Delivery and all inpatient services for maternity care | No | | | | 48 | Private accommodations. | Mother and newborn may be covered up to 48/96 hours inpatient in a network hospital after a vaginal/caesarian delivery if the attending physician determines it is medically necessary or the mother requests it. | No |
| 24 | Mental/Behavioral Health Outpatient Services | Covered | Mental/behavioral health outpatient services | No | | | | | Custodial care, education and training. | See also "Other" for Autism and Developmental Disabilities. | No |
| 25 | Mental/Behavioral Health Inpatient Services | Covered | Mental/behavioral health inpatient services | No | | | | | Private accommodations, custodial care, education and training. | Pre-approval required. | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | Substance Abuse Disorder Outpatient Services | Covered | Substance abuse disorder outpatient services | No | | | | | Custodial care, education and training. | | No |
| 27 | Substance Abuse Disorder Inpatient Services | Covered | Substance abuse disorder inpatient services | No | | | | | Private accommodations, custodial care, education and training. | Pre-approval required. | No |
| 28 | Generic Drugs | Covered | Generic drugs | No | | | | | Drugs prescribed for cosmetic purposes; nonprescription drugs. | Covered per prescription/refill for up to a 90-day supply or 100 unit doses, or the amount usually prescribed by the Network practitioner. Additional limits may apply based on FDA approved product labeling. See "Other" for additional Prescription Drug information. | No |
| 29 | Preferred Brand Drugs | Covered | Preferred brand drugs | No | | | | | Drugs prescribed for cosmetic purposes; nonprescription drugs. | Covered per prescription/refill for up to a 90-day supply or 100 unit doses, or the amount usually prescribed by the Network practitioner. Additional limits may apply based on FDA approved product labeling. Pre-approval required for certain prescription drugs. See "Other" for additional Prescription Drug information. | No |
| 30 | Non-Preferred Brand Drugs | Covered | Non-preferred brand drugs | No | | | | | Drugs prescribed for cosmetic purposes; nonprescription drugs. | Covered per prescription/refill for up to a 90-day supply or 100 unit doses, or the amount usually prescribed by the Network practitioner. Additional limits may apply based on FDA approved product labeling. Pre-approval required for certain prescription drugs. See "Other" for additional Prescription Drug information. | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefits is Covered): Select "Yes" If Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered); Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|
| 31 | Specialty Drugs | Covered | Specialty drugs | No | | | | | Drugs prescribed for cosmetic purposes; nonprescription drugs. | All specialty drugs require pre-approval. Defined as drugs that have unique production, administration or distribution requirements, and require specialized patient education prior to use and ongoing patient assistance while under treatment. Must be dispensed through specialty pharmaceutical providers. See "Other" for Hemophilia services as well as Anti-cancer Prescription Drugs. | No |
| 32 | Outpatient Rehabilitation Services | Covered | Outpatient rehabilitation services | Yes | 30 | Visits per year | | | | Pre-approval required. Separate from services provided through home health care benefits. | No |
| 33 | Habilitation Services | Covered | Habilitation services | Yes | 1 | Other | Habilitation services are subject to the limits applicable to rehabilitation services, other therapies, services and supplies. See Explanation. | | | Habilitations as provided through rehabilitation services are covered. See also: Hearing Aids; "Other" for Autism and Developmental Disabilities benefits; ST, PT/OT and ABA benefits; "Other" for Diabetes services. | No |
| 34 | Chiropractic Care | Covered | Therapeutic manipulation | Yes | 30 | Visits per year | | | | Covered when therapeutic manipulation is provided in a network practitioner's office, for no more than two modalities per visit. | No |
| 35 | Durable Medical Equipment | Covered | Durable medical equipment | No | | | | | | Pre-approval required, must be ordered by a network practitioner (and arranged through the carrier). | No |
| 36 | Hearing Aids | Covered | Hearing aids | Yes | 2 | Other | One/hearing-impaired ear every 24-months | | | Covered for members 15 years old and younger. The hearing aid must be recommended or prescribed by a licensed physician or audiologist. | No |
| 37 | Diagnostic Test (X-Ray and Lab Work) | Covered | Diagnostic test (X-ray and lab work) | No | | | | | | | No |

New Jersey—7

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered); Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered); Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"); Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"); Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit; If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: (Optional): Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered); Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | Imaging (CT/PET Scans, MRIs) | Covered | Imaging (CT/PET scans, MRIs) | No | | | | | | Pre-approval required, including for: CT, PET, MRI, Computed Tomography Angiography (CTA), Magnetic Resonance Angiogram (MRA), Nuclear Medicine (including Nuclear Cardiology). | No |
| 39 | Preventive Care/ Screening/Immunization | Covered | Preventive care/screening/immunization | No | | | | | Routine immunizations for the sole purpose of travel or as a requirement for a member's employment. | Includes USPSTF recommendations, but see "Other" for additional screening benefits. | No |
| 40 | Routine Foot Care | Not Covered | See Explanation | | | | | | | Routine foot care is excluded, except for the following: open cutting operations to treat weak, strained, flat, unstable or unbalanced feet, metatarsalgia or bunions; removal of nail roots; treatment of corns, calluses or toenails in conjunction with the treatment of metabolic or peripheral vascular disease. Also, see "Other" for Orthotics and Prosthetics benefits. | |
| 41 | Acupuncture | Not Covered | See Explanation | | | | | | | Covered when used as a substitute for other forms of anesthesia. | |
| 42 | Weight Loss Programs | Not Covered | | | | | | | | | |
| 43 | Routine Eye Exam for Children | Covered | Routine eye exam for children | Yes | 1 | Visits per year | | | | | No |
| 44 | Eye Glasses for Children | Covered | Eye glasses for children | Yes | 1 | Other | Allowance for eyeglasses (lenses and frames) or contact lenses annually. | | Does not provide allowance for both glasses and contacts in a single year. No vision therapy; no other corrective treatments or devices, except as described (see "Explanation"). | Includes coverage for exams by optometrist or ophthalmologist, including dilation, includes allowances for lenses, frames, contacts and discounts for laser surgery when using a contracted provider. | No |

New Jersey—8

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required If benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required If benefits is Covered): Select "Yes" If Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required If Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required If "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required If benefit is Covered): Select "Yes" If there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 45 | Dental Check-Ups for Children | Covered | Dental Services (per CHIP) | No. | | | | | Treatment for TMJ limited to members age 19 and younger. | Coverage includes screenings and other preventive services, diagnostic services, major and minor restorative services, endodontic, surgical and adjunctive services, periodontic and prosthodontic services, as medically necessary. Begins at age 1 year. Dental services also include orthodontia—see "Other." | No |

## OTHER BENEFITS

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Other | Covered | Speech and Cognitive therapy | Yes | 30 | Visits per year | Combined-30/calendar year | | | Limit only applies when provided in a network practitioner's office—services provided under Home Health Care or to treat Autism or Developmental Disabilities do not apply towards this limit. Also note: the benefit limit for the standard small group plans is combined for speech and cognitive therapy for a total of 30 visits, but for the standard Individual plan market, the limit is 30 visits each for speech and cognitive therapy. | Yes |
| 2 | Other | Covered | Physical and Occupational therapy | Yes | 30 | Visits per year | Combined-30/calendar year | | | Limit only applies when provided in a network practitioner's office—services provided under Home Health Care or to treat Autism or Developmental Disabilities do not apply towards this limit. Also note: the benefit limit for the standard small group plans is a combined 30 visit limit for PT and OT, but for the standard individual market, the benefit limit is 30 visits each for PT and OT. | No |
| 3 | Other | Covered | Autism/Developmental Disabilities - Speech therapy (Habilitative/rehabilitative) | Yes | 30 | Visits per year | visits per calendar year | | | Limit does not apply against other ST benefits under the policy. Only available for treatment of diagnosis of autism or developmental disability. Therapy need not be restorative. Therapy received through Early Intervention Services does not reduce these therapy benefits. | No |
| 4 | Other | Covered | Autism/Developmental Disabilities - Physical and Occupational therapy (Habilitative/rehabilitative) | Yes | 30 | Visits per year | Combined-30/calendar year | | | Limit does not apply against other PT/OT benefits under the policy. Only available for treatment of diagnosis of autism or developmental disability. Therapy need not be restorative. Therapy received through Early Intervention Services does not reduce these therapy benefits. | No |
| 5 | Other | Covered | Autism/Developmental Disabilities - Applied Behavior Analysis or Related Structured behavior Services (Habilitative/rehabilitative) | No | | | | | | For members <21 years old. Available to treat primary diagnosis of autism. Therapy need not be restorative. Therapy received through Early Intervention Services does not reduce any benefit. Treatment plan by physician required, reviewed semi-annually. | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered); Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" was selected in Limit Units; If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered); Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|
| 6 | Other | Covered | Food/Food Products for Inherited Metabolic Diseases | No | | | | | | Coverage for charges incurred for medical foods (enteral formulas) and low protein modified food products as determined medically necessary by the member's practitioner for the therapeutic treatment of inherited metabolic diseases. | No |
| 7 | Other | Covered | Specialized non-standard Infant formula | No | | | | | | For infants and toddlers. Covered as if a prescription drug for children diagnosed with multiple food protein intolerance for whom the formula is medically necessary and for whom trials of other non-cow milk-based formulas have not been successful. | No |
| 8 | Other | Covered | Blood, blood products and blood transfusions | No | | | | | Blood donated or replaced on behalf of a member. | Includes the cost of testing and processing of blood. See also "Hemophilia Services." | No |
| 9 | Other | Covered | Dental Care and Treatment—Illness and Injury | No | | | | | General dental services, both prophylactic and corrective. | Covered: diagnosis and treatment of oral tumors and cysts; surgical removal of bony impacted teeth; treatment of an injury to natural teeth or the jaw, including replacing natural teeth, if the injury was not caused (directly or indirectly) by biting or chewing, and all treatment is complete w/in 6 months from date of injury. Includes related dental x-rays. | No |
| 10 | Other | Covered | Dental Care and Treatment—Anesthesia | No | | | | | Anesthesia for dental services other than an described under "Explanation" | Covered when a member is severely disabled or a child under age six, general anesthesia and hospitalization for dental services, and dental services rendered by a dentist regardless of where provided when for a medical condition requiring hospitalization or general anesthesia. | No |
| 11 | Other | Covered | Temporomandibular Joint Disorder | No | | | | | Services or supplies for orthodontia, crowns or bridgework. | Surgical and nonsurgical treatment of TMJ is covered when medically necessary and appropriate. | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" was selected in Limit Units): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation (Optional): Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | Other | Covered | Cancer Clinical Trials | No | | | | | Costs of investigational drugs or devices, costs of non-health services, costs related to managing the research, any costs that would not be covered for treatments that are not Experimental or Investigational. | Fees and expenses are covered for treatment of a condition associated with a complication of the underlying disease (cancer) through an Approved Cancer Clinical Trial if such fees and expenses would be covered for care and treatment in a situation other than an Approved Cancer Clinical Trial. | No |
| 13 | Other | Covered | Pain Management Services | | | | | | | | |
| 14 | Other | Covered | Chelation therapy | No | | | | | | Pre-approval required. | No |
| 15 | Other | Covered | Chemotherapy | No | | | | | | Must be rendered by an appropriately licensed Network provider. | No |
| 16 | Other | Covered | Dialysis Treatment | No | | | | | | Must be rendered by an appropriately licensed Network provider. Includes both hemodialysis and peritoneal dialysis and treatment in a dialysis center by an appropriately licensed network provider. | No |
| 17 | Other | Covered | Radiation therapy | No | | | | | | Treatment of disease; diagnostic service requiring use of radioactive materials is not considered radiation therapy. Includes rental or cost of radioactive materials. | No |
| 18 | Other | Covered | Respiration therapy | No | | | | | | Treatment by a network provider that introduces dry or moist gases into the lungs. | No |
| 19 | Other | Covered | Infusion therapy | No | | | | | | Treatment involving the administration of antibiotics, nutrients, or other therapeutic agents by direct infusion. Pre-approval required. See also "Hemophilia" benefits; Infusion therapy is not linked to hemophilia treatment. | No |
| 20 | Other | Covered | Transplants: cornea, kidney, lung, liver, heart, pancreas, intestine, allogeneic bone marrow | No | | | | | | Costs associated with the transplant, including inpatient services, and practitioner services. | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (In hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | Other | Covered | Transplants: autologous bone marrow transplant | No | | | | | | Inpatient hospital services and practitioner services, including associated dose-intensive chemotherapy, but only if performed by institutions approved by the NCI, or pursuant to protocols consistent with the guidelines of the American Society of Clinical Oncologists. | No |
| 22 | Other | Covered | Transplants: peripheral blood stem cells | No | | | | | | Inpatient hospital and practitioner services, but only if performed by institutions approved by the NCI or pursuant to protocols consistent with the guidelines of the American Society of Clinical Oncologists. | No |
| 23 | Other | Covered | Transplants: donor costs. | No | | | | | Travel, accommodations, or comfort items. | Inpatient hospital costs of donors associated with transplants if the donor does not have health coverage that would cover the medical costs associated with his or her role as a donor. | No |
| 24 | Other | Covered | Hemophilia services | No | | | | | | Home treatment services for bleeding episodes are covered, including blood, blood products (factors), infusion equipment, and training. Clinical laboratory services at state-designated regional care centers are covered under certain circumstances whether or not the facility is in-network. | No |
| 25 | Other | Covered | Orthotics and prosthetics | No | | | | | | Covered if the member's practitioner determines it is medically necessary, and obtained from a licensed orthotist, prosthetist or certified pedorthist in-network. | No |
| 26 | Other | Covered | Newborn hearing screening | No | | | | | | Electrophysiologic screening covered during first 28 days after birth. Periodic monitoring for delayed onset hearing loss covered from age 29 days through 36 months after birth. | No |
| 27 | Other | Covered | mammograms | No | | | | | | Includes a base line mammogram from ages 35-39, covers annual mammograms from age 40 on, or at younger ages if a women is at risk. | No |
| 28 | Other | Covered | Lead screening, follow-up treatment of high levels of lead in blood | No | | | | | | Required during childhood. | No |
| 29 | Other | Covered | Mastectomy inpatient stay | No | | | | 48 | | | No |

| Row Number | A Benefit | B Covered (Required): Is benefit Covered or Not Covered | C Benefit Description (Required if benefit is Covered): Enter a Description, it may be the same as the Benefit name | D Quantitative Limit on Service? (Required if benefit is Covered): Select "Yes" if Quantitative Limit applies | E Limit Quantity (Required if Quantitative Limit is "Yes"): Enter Limit Quantity | F Limit Units (Required if Quantitative Limit is "Yes"): Select the correct limit units | G Other Limit Units Description (Required if "Other" Limit Unit): If a Limit Unit of "Other" was selected in Limit Units, enter a description | H Minimum Stay (Optional): Enter the Minimum Stay (in hours) as a whole number | I Exclusions (Optional): Enter any Exclusions for this benefit | J Explanation: (Optional) Enter an Explanation for anything not listed | K Does this benefit have additional limitations or restrictions? (Required if benefit is Covered): Select "Yes" if there are additional limitations or restrictions that need to be described |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | Other | Covered | Reconstructive breast surgery | No | | | | | | Pre-approval required. Surgery to restore and achieve symmetry, and/or cost of prostheses following a mastectomy on one or both breasts; treatment of physical complications, including lymphedemas. | No |
| 31 | Other | Covered | Diabetes Treatment—services and supplies | No | | | | | | Coverage for self-management education and nutrition counseling as medically necessary; coverage for insulin syringes and insulin needles; glucose test strips; lancets; pumps and infusers, drugs, etc. | No |
| 32 | Other | Covered | nutritional counseling | No | | | | | | For management of disease with specific criteria that can be verified (including diabetes); see also Diabetes services | No |
| 33 | Other | Covered | Prescription drugs – contraceptives | No | | | | | | Prescribed female contraceptives. Religious employers may request exclusion of the benefit. | No |
| 34 | Other | Covered | Prescription drugs – off label | No | | | | | | Coverage must be provided for off-label prescriptions when certain protocols are met. | No |
| 35 | Other | Covered | Prescription drugs – open formulary and mail order restrictions | No | | | | | | It is impermissible to require use of mail order only; it is impermissible to impose closed formularies. | No |
| 36 | Other | Covered | Anti-cancer Prescription Drugs | No | | | | | | Orally administered anti-cancer prescription drugs must be covered on a basis at least as favorable as intravenously administered or injected anti-cancer medications. | No |
| 37 | Other | Covered | Orthodontia (per CHIP) | No | | | | | Cosmetic orthodontia. | Coverage is limited to demonstration of at least one of the following: severe functional difficulties; developmental anomalies of facial bones and/or oral structure; facial trauma resulting in severe functional difficulties; or that psychological health requires orthodontic correction. Generally, coverage is limited to prevent or correct facial deformities, or functional difficulties in speech or mastication. | No |

# PRESCRIPTION DRUG EHB-BENCHMARK PLAN BENEFITS BY CATEGORY AND CLASS

| CATEGORY | CLASS | SUBMISSION COUNT |
|---|---|---|
| ANALGESICS | NONSTEROIDAL ANTI-INFLAMMATORY DRUGS | 20 |
| ANALGESICS | OPIOID ANALGESICS, LONG-ACTING | 10 |
| ANALGESICS | OPIOID ANALGESICS, SHORT-ACTING | 9 |
| ANESTHETICS | LOCAL ANESTHETICS | 3 |
| ANTI-ADDICTION/SUBSTANCE ABUSE TREATMENT AGENTS | ALCOHOL DETERRENTS/ANTI-CRAVING | 3 |
| ANTI-ADDICTION/SUBSTANCE ABUSE TREATMENT AGENTS | OPIOID ANTAGONISTS | 3 |
| ANTI-ADDICTION/SUBSTANCE ABUSE TREATMENT AGENTS | SMOKING CESSATION AGENTS | 3 |
| ANTI-INFLAMMATORY AGENTS | GLUCOCORTICOIDS | 1 |
| ANTI-INFLAMMATORY AGENTS | NONSTEROIDAL ANTI-INFLAMMATORY DRUGS | 20 |
| ANTIBACTERIALS | AMINOGLYCOSIDES | 6 |
| ANTIBACTERIALS | ANTIBACTERIALS, OTHER | 16 |
| ANTIBACTERIALS | BETA-LACTAM, CEPHALOSPORINS | 12 |
| ANTIBACTERIALS | BETA-LACTAM, OTHER | 1 |
| ANTIBACTERIALS | BETA-LACTAM, PENICILLINS | 6 |
| ANTIBACTERIALS | MACROLIDES | 4 |
| ANTIBACTERIALS | QUINOLONES | 8 |
| ANTIBACTERIALS | SULFONAMIDES | 4 |
| ANTIBACTERIALS | TETRACYCLINES | 4 |
| ANTICONVULSANTS | ANTICONVULSANTS, OTHER | 4 |
| ANTICONVULSANTS | CALCIUM CHANNEL MODIFYING AGENTS | 2 |
| ANTICONVULSANTS | GAMMA-AMINOBUTYRIC ACID (GABA) AUGMENTING AGENTS | 4 |
| ANTICONVULSANTS | GLUTAMATE REDUCING AGENTS | 5 |
| ANTICONVULSANTS | SODIUM CHANNEL AGENTS | 3 |
| ANTIDEMENTIA AGENTS | ANTIDEMENTIA AGENTS, OTHER | 6 |
| ANTIDEMENTIA AGENTS | CHOLINESTERASE INHIBITORS | 1 |
| ANTIDEMENTIA AGENTS | N-METHYL-D-ASPARTATE (NMDA) RECEPTOR ANTAGONIST | 3 |
| ANTIDEPRESSANTS | ANTIDEPRESSANTS, OTHER | 1 |
| ANTIDEPRESSANTS | MONOAMINE OXIDASE INHIBITORS | 7 |
| ANTIDEPRESSANTS | SEROTONIN/NOREPINEPHRINE REUPTAKE INHIBITORS | 4 |
| ANTIDEPRESSANTS | TRICYCLICS | 9 |
| ANTIEMETICS | ANTIEMETICS, OTHER | 9 |
| ANTIEMETICS | EMETOGENIC THERAPY ADJUNCTS | 9 |
| ANTIFUNGALS | NO USP CLASS | 6 |
| ANTIGOUT AGENTS | NO USP CLASS | 19 |
| ANTIMIGRAINE AGENTS | ERGOT ALKALOIDS | 5 |
| ANTIMIGRAINE AGENTS | PROPHYLACTIC | 2 |
| | | 3 |

| CATEGORY | CLASS | SUBMISSION COUNT |
|---|---|---|
| ANTIMIGRAINE AGENTS | SEROTONIN (5-HT) 1B/1D RECEPTOR AGONISTS | 7 |
| ANTIMYASTHENIC AGENTS | PARASYMPATHOMIMETICS | 3 |
| ANTIMYCOBACTERIALS | ANTIMYCOBACTERIALS, OTHER | 2 |
| ANTIMYCOBACTERIALS | ANTITUBERCULARS | 10 |
| ANTINEOPLASTICS | ALKYLATING AGENTS | 5 |
| ANTINEOPLASTICS | ANTIANGIOGENIC AGENTS | 2 |
| ANTINEOPLASTICS | ANTIESTROGENS/MODIFIERS | 3 |
| ANTINEOPLASTICS | ANTIMETABOLITES | 1 |
| ANTINEOPLASTICS | ANTINEOPLASTICS, OTHER | 2 |
| ANTINEOPLASTICS | AROMATASE INHIBITORS, 3RD GENERATION | 3 |
| ANTINEOPLASTICS | ENZYME INHIBITORS | 1 |
| ANTINEOPLASTICS | MOLECULAR TARGET INHIBITORS | 12 |
| ANTINEOPLASTICS | MONOCLONAL ANTIBODIES | 0 |
| ANTINEOPLASTICS | RETINOIDS | 3 |
| ANTIPARASITICS | ANTHELMINTICS | 3 |
| ANTIPARASITICS | ANTIPROTOZOALS | 11 |
| ANTIPARASITICS | PEDICULICIDES/SCABICIDES | 5 |
| ANTIPARKINSON AGENTS | ANTICHOLINERGICS | 2 |
| ANTIPARKINSON AGENTS | ANTIPARKINSON AGENTS, OTHER | 3 |
| ANTIPARKINSON AGENTS | DOPAMINE AGONISTS | 4 |
| ANTIPARKINSON AGENTS | DOPAMINE PRECURSORS/L-AMINO ACID DECARBOXYLASE INHIBITORS | 2 |
| ANTIPARKINSON AGENTS | MONOAMINE OXIDASE B (MAO-B) INHIBITORS | 2 |
| ANTIPSYCHOTICS | 1ST GENERATION/TYPICAL | 10 |
| ANTIPSYCHOTICS | 2ND GENERATION/ATYPICAL | 9 |
| ANTIPSYCHOTICS | TREATMENT-RESISTANT | 1 |
| ANTISPASTICITY AGENTS | NO USP CLASS | 3 |
| ANTIVIRALS | ANTI-CYTOMEGALOVIRUS (CMV) AGENTS | 2 |
| ANTIVIRALS | ANTI-HIV AGENTS, NON-NUCLEOSIDE REVERSE TRANSCRIPTASE INHIBITORS | 5 |
| ANTIVIRALS | ANTI-HIV AGENTS, NUCLEOSIDE AND NUCLEOTIDE REVERSE TRANSCRIPTASE INHIBITORS | 11 |
| ANTIVIRALS | ANTI-HIV AGENTS, OTHER | 3 |
| ANTIVIRALS | ANTI-HIV AGENTS, PROTEASE INHIBITORS | 9 |
| ANTIVIRALS | ANTI-INFLUENZA AGENTS | 4 |
| ANTIVIRALS | ANTIHEPATITIS AGENTS | 12 |
| ANTIVIRALS | ANTIHERPETIC AGENTS | 5 |
| ANXIOLYTICS | ANXIOLYTICS, OTHER | 4 |
| ANXIOLYTICS | SSRIS/SNRIS (SELECTIVE SEROTONIN REUPTAKE INHIBITORS/SEROTONIN AND NOREPINEPHRINE REUPTAKE INHIBITORS) | 5 |

| CATEGORY | CLASS | SUBMISSION COUNT |
|---|---|---|
| BIPOLAR AGENTS | BIPOLAR AGENTS, OTHER | 6 |
| BIPOLAR AGENTS | MOOD STABILIZERS | 5 |
| BLOOD GLUCOSE REGULATORS | ANTIDIABETIC AGENTS | 21 |
| BLOOD GLUCOSE REGULATORS | GLYCEMIC AGENTS | 2 |
| BLOOD GLUCOSE REGULATORS | INSULINS | 10 |
| BLOOD PRODUCTS/MODIFIERS/VOLUME EXPANDERS | ANTICOAGULANTS | 5 |
| BLOOD PRODUCTS/MODIFIERS/VOLUME EXPANDERS | BLOOD FORMATION MODIFIERS | 8 |
| BLOOD PRODUCTS/MODIFIERS/VOLUME EXPANDERS | COAGULANTS | 0 |
| BLOOD PRODUCTS/MODIFIERS/VOLUME EXPANDERS | PLATELET MODIFYING AGENTS | 7 |
| CARDIOVASCULAR AGENTS | ALPHA-ADRENERGIC AGONISTS | 4 |
| CARDIOVASCULAR AGENTS | ALPHA-ADRENERGIC BLOCKING AGENTS | 4 |
| CARDIOVASCULAR AGENTS | ANGIOTENSIN II RECEPTOR ANTAGONISTS | 7 |
| CARDIOVASCULAR AGENTS | ANGIOTENSIN-CONVERTING ENZYME (ACE) INHIBITORS | 10 |
| CARDIOVASCULAR AGENTS | ANTIARRHYTHMICS | 9 |
| CARDIOVASCULAR AGENTS | BETA-ADRENERGIC BLOCKING AGENTS | 13 |
| CARDIOVASCULAR AGENTS | CALCIUM CHANNEL BLOCKING AGENTS | 9 |
| CARDIOVASCULAR AGENTS | CARDIOVASCULAR AGENTS, OTHER | 4 |
| CARDIOVASCULAR AGENTS | DIURETICS, CARBONIC ANHYDRASE INHIBITORS | 2 |
| CARDIOVASCULAR AGENTS | DIURETICS, LOOP | 4 |
| CARDIOVASCULAR AGENTS | DIURETICS, POTASSIUM-SPARING | 4 |
| CARDIOVASCULAR AGENTS | DIURETICS, THIAZIDE | 6 |
| CARDIOVASCULAR AGENTS | DYSLIPIDEMICS, FIBRIC ACID DERIVATIVES | 2 |
| CARDIOVASCULAR AGENTS | DYSLIPIDEMICS, HMG COA REDUCTASE INHIBITORS | 7 |
| CARDIOVASCULAR AGENTS | DYSLIPIDEMICS, OTHER | 6 |
| CARDIOVASCULAR AGENTS | VASODILATORS, DIRECT-ACTING ARTERIAL | 3 |
| CARDIOVASCULAR AGENTS | VASODILATORS, DIRECT-ACTING ARTERIAL/VENOUS | 3 |
| CENTRAL NERVOUS SYSTEM AGENTS | ATTENTION DEFICIT HYPERACTIVITY DISORDER AGENTS, AMPHETAMINES | 4 |
| CENTRAL NERVOUS SYSTEM AGENTS | ATTENTION DEFICIT HYPERACTIVITY DISORDER AGENTS, NON-AMPHETAMINES | 4 |
| CENTRAL NERVOUS SYSTEM AGENTS | CENTRAL NERVOUS SYSTEM AGENTS, OTHER | 4 |
| CENTRAL NERVOUS SYSTEM AGENTS | FIBROMYALGIA AGENTS | 3 |
| CENTRAL NERVOUS SYSTEM AGENTS | MULTIPLE SCLEROSIS AGENTS | 5 |
| DENTAL AND ORAL AGENTS | NO USP CLASS | 6 |
| DERMATOLOGICAL AGENTS | NO USP CLASS | 31 |
| ENZYME REPLACEMENT/MODIFIERS | NO USP CLASS | 8 |
| GASTROINTESTINAL AGENTS | ANTISPASMODICS, GASTROINTESTINAL | 5 |
| GASTROINTESTINAL AGENTS | GASTROINTESTINAL AGENTS, OTHER | 6 |
| GASTROINTESTINAL AGENTS | HISTAMINE2 (H2) RECEPTOR ANTAGONISTS | 4 |

| CATEGORY | CLASS | SUBMISSION COUNT |
|---|---|---|
| GASTROINTESTINAL AGENTS | IRRITABLE BOWEL SYNDROME AGENTS | 2 |
| GASTROINTESTINAL AGENTS | LAXATIVES | 3 |
| GASTROINTESTINAL AGENTS | PROTECTANTS | 2 |
| GASTROINTESTINAL AGENTS | PROTON PUMP INHIBITORS | 6 |
| GENITOURINARY AGENTS | ANTISPASMODICS, URINARY | 7 |
| GENITOURINARY AGENTS | BENIGN PROSTATIC HYPERTROPHY AGENTS | 9 |
| GENITOURINARY AGENTS | GENITOURINARY AGENTS, OTHER | 3 |
| GENITOURINARY AGENTS | PHOSPHATE BINDERS | 3 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (ADRENAL) | GLUCOCORTICOIDS/MINERALOCORTICOIDS | 23 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (PITUITARY) | NO USP CLASS | 4 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (PROSTAGLANDINS) | NO USP CLASS | 1 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (SEX HORMONES/MODIFIERS) | ANABOLIC STEROIDS | 2 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (SEX HORMONES/MODIFIERS) | ANDROGENS | 4 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (SEX HORMONES/MODIFIERS) | ESTROGENS | 6 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (SEX HORMONES/MODIFIERS) | PROGESTINS | 5 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (SEX HORMONES/MODIFIERS) | SELECTIVE ESTROGEN RECEPTOR MODIFYING AGENTS | 1 |
| HORMONAL AGENTS, STIMULANT/REPLACEMENT/MODIFYING (THYROID) | NO USP CLASS | 3 |
| HORMONAL AGENTS, SUPPRESSANT (ADRENAL) | NO USP CLASS | 1 |
| HORMONAL AGENTS, SUPPRESSANT (PARATHYROID) | NO USP CLASS | 1 |
| HORMONAL AGENTS, SUPPRESSANT (PITUITARY) | NO USP CLASS | 8 |
| HORMONAL AGENTS, SUPPRESSANT (SEX HORMONES/MODIFIERS) | ANTIANDROGENS | 5 |
| HORMONAL AGENTS, SUPPRESSANT (THYROID) | ANTITHYROID AGENTS | 2 |
| IMMUNOLOGICAL AGENTS | IMMUNE SUPPRESSANTS | 16 |
| IMMUNOLOGICAL AGENTS | IMMUNIZING AGENTS, PASSIVE | 0 |
| IMMUNOLOGICAL AGENTS | IMMUNOMODULATORS | 8 |
| INFLAMMATORY BOWEL DISEASE AGENTS | AMINOSALICYLATES | 3 |
| INFLAMMATORY BOWEL DISEASE AGENTS | GLUCOCORTICOIDS | 5 |
| INFLAMMATORY BOWEL DISEASE AGENTS | SULFONAMIDES | 1 |
| METABOLIC BONE DISEASE AGENTS | NO USP CLASS | 11 |
| OPHTHALMIC AGENTS | OPHTHALMIC PROSTAGLANDIN AND PROSTAMIDE ANALOGS | 3 |
| OPHTHALMIC AGENTS | OPHTHALMIC AGENTS, OTHER | 4 |

| CATEGORY | CLASS | SUBMISSION COUNT |
|---|---|---|
| OPHTHALMIC AGENTS | OPHTHALMIC ANTI-ALLERGY AGENTS | 9 |
| OPHTHALMIC AGENTS | OPHTHALMIC ANTI-INFLAMMATORIES | 11 |
| OPHTHALMIC AGENTS | OPHTHALMIC ANTIGLAUCOMA AGENTS | 14 |
| OTIC AGENTS | NO USP CLASS | 6 |
| RESPIRATORY TRACT AGENTS | ANTI-INFLAMMATORIES, INHALED CORTICOSTEROIDS | 6 |
| RESPIRATORY TRACT AGENTS | ANTIHISTAMINES | 9 |
| RESPIRATORY TRACT AGENTS | ANTILEUKOTRIENES | 3 |
| RESPIRATORY TRACT AGENTS | BRONCHODILATORS, ANTICHOLINERGIC | 2 |
| RESPIRATORY TRACT AGENTS | BRONCHODILATORS, PHOSPHODIESTERASE INHIBITORS (XANTHINES) | 2 |
| RESPIRATORY TRACT AGENTS | BRONCHODILATORS, SYMPATHOMIMETIC | 10 |
| RESPIRATORY TRACT AGENTS | MAST CELL STABILIZERS | 1 |
| RESPIRATORY TRACT AGENTS | PULMONARY ANTIHYPERTENSIVES | 4 |
| RESPIRATORY TRACT AGENTS | RESPIRATORY TRACT AGENTS, OTHER | 4 |
| SKELETAL MUSCLE RELAXANTS | NO USP CLASS | 6 |
| SLEEP DISORDER AGENTS | GABA RECEPTOR MODULATORS | 3 |
| SLEEP DISORDER AGENTS | SLEEP DISORDERS, OTHER | 5 |
| THERAPEUTIC NUTRIENTS/MINERALS/ELECTROLYTES | ELECTROLYTE/MINERAL MODIFIERS | 6 |
| THERAPEUTIC NUTRIENTS/MINERALS/ELECTROLYTES | ELECTROLYTE/MINERAL REPLACEMENT | 5 |

# Exhibit B

## Johnson, Eric D.

| | |
|---|---|
| From: | Johnson, Eric D. |
| Sent: | Wednesday, August 06, 2014 9:28 AM |
| To: | Robinson, Mark E. |
| Subject: | RE: $50 Copay for Chiropractic Services - DOBI File 200477 - Matlock Family Chiropractic |
| Attachments: | NJ Ther Analysis (6 Svc Codes) (PP MBR LIA = 0).xlsx |

See the attached...

From: Robinson, Mark E.
Sent: Tuesday, August 05, 2014 2:49 PM
To: Johnson, Eric D.
Subject: RE: $50 Copay for Chiropractic Services - DOBI File 200477 - Matlock Family Chiropractic

Eric:

Thank you for both of the new calculations. While I'm confident that the latest calculation producing $93.69 is likely correct, I'm interested in more insight about the claims for which Deductible, Coinsurance and Copay are all = 0. The claims like this must have a greater average allowed amount per visit. Can you produce distributions of the allowed costs for these claims 1) by service type code and 2) by servicing provider specialty code/description. Mostly, I'm curious why no cost sharing appears to have applied. We could also look at it by procedure code, but I don't want to start with that detail.

On a separate thought, do the new calculations include the month of July 2014 posted claims? If so, we could consider including dates of service through 6/30/2014. While we may prefer to be consistent with the original basis, I am open to including a later month (particularly if we ever get back over $100). Thanks,

Mark

From: Johnson, Eric D.
Sent: Tuesday, August 05, 2014 11:27 AM
To: Robinson, Mark E.
Subject: FW: $50 Copay for Chiropractic Services - DOBI File 200477 - Matlock Family Chiropractic

Hi Mark,

Bad news...

By excluding claims where both Deductible = 0 and Coinsurance = 0, I was still capturing claims where there was no member liability (claims where Deductible, Coinsurance, and Copay all = 0). I confirmed that I was pulling claims with no member liability.

After revising the query to only look at claims where COPAY > 0 (only claims subject to a copay), the analysis now has 81,883 service counts and a $90.68 allowed cost per visit for 2013; and 40,084 service counts and a $93.69 allowed average cost per visit for 2014.

I renamed the revised files to reflect the filter used.
* NJ Ther Analysis (6 Svc Codes) (PP No DED or COI).xlsx

1

• **NJ Ther Analysis (6 Svc Codes) (PP Copay Only). xlsx**

**From:** Johnson, Eric D.
**Sent:** Tuesday, August 05, 2014 10:49 AM
**To:** Robinson, Mark E.
**Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic

HI Mark,

You door has been closed all morning, however, I believe I understood the request and revised the query accordingly.

The original analysis had 111,407 service counts and a $94.43 allowed cost per visit for 2013; and **54,404** service counts and a **$100.70** allowed average cost per visit for 2014.

The **revised (copay only)** analysis has 106,519 service counts and a $94.69 allowed cost per visit for 2013; and 51,218 service counts and a $100.89 allowed average cost per visit for 2014.

The revised file is named "NJ Ther Analysis (6 Svc Codes) (PP Copay Only)."

**From:** Robinson, Mark E.
**Sent:** Tuesday, August 05, 2014 9:02 AM
**To:** Johnson, Eric D.
**Subject:** FW: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic
**Importance:** High

Eric:

Please see Gale Simon's latest request, below, and evaluate. Let's briefly discuss this (maybe 10:00 AM?), before you go far with an analysis. Thanks,

Mark

**From:** Simon, Gale [mailto:Gale.Simon@dobi.state.nj.us]
**Sent:** Monday, July 28, 2014 1:15 PM
**To:** Robinson, Mark E.; Vance, Neil; DeRosa, Ellen
**Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
**Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic

Mark, I hate to be a pest but the demonstration should only include network chiropractic, OT, PT and ST services to which a network copay was applied. If there are any such claims that were subject to a network deductible and/or a network coinsurance, those claims should not be included.

Can you have the demonstration revised accordingly?

Thanks.

**From:** Robinson, Mark E. [mailto:Mark.E.Robinson@ibx.com]
**Sent:** Friday, July 25, 2014 5:17 PM
**To:** Simon, Gale; Vance, Neil; DeRosa, Ellen

2

**Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
**Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic

As a follow-up to the phone meeting on Wednesday, we revised the demonstration again to only include network services of chiropractic care, physical therapy, occupational therapy and speech therapy (no longer including cardiac rehabilitation, pulmonary rehabilitation and infusion therapy). For these services, AmeriHealth's fully-insured claims paid year-to-date with 1/1/2014 through 5/31/2014 dates of service included 54,404 provider visits at an aggregate provider allowance of $5,478,326. These claims averaged a $100.70 allowed cost per visit. Thus, the referenced copay of $50 represents 49.7% of the aggregate risk of these services. Sincerely,

Mark E. Robinson, ASA, MAAA
Independence Blue Cross Family of Companies
(215) 241-2215
Mark.E.Robinson@ibx.com

> **From:** Simon, Gale [mailto:Gale.Simon@dobi.state.nj.us]
> **Sent:** Wednesday, July 23, 2014 10:26 AM
> **To:** Robinson, Mark E.; Vance, Neil; DeRosa, Ellen
> **Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
> **Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic
>
> Mark, Ellen and I have questions about the demonstration, specifically about why J, S and C codes are included as well as services rendered by medical doctors and hospitals. Do you have any time for a call today or should we raise our questions in the Thursday call?
>
> Thanks.

> **From:** Robinson, Mark E. [mailto:Mark.E.Robinson@ibx.com]
> **Sent:** Tuesday, July 22, 2014 7:33 PM
> **To:** Simon, Gale; Vance, Neil
> **Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
> **Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic
>
> We revised the original reporting methodology to exclude the amounts for out-of-network services. Limited to network services, AmeriHealth's fully-insured therapeutic manipulations and therapy services claims paid year-to-date with 1/1/2014 through 5/31/2014 dates of service included 67,042 provider visits at an aggregate provider allowance of $9,915,429. These claims averaged a $147.90 allowed cost per visit. Thus, the referenced copay of $50 represents 33.8% of the aggregate risk of these services. Sincerely,
>
> Mark E. Robinson, ASA, MAAA
> Independence Blue Cross Family of Companies
> (215) 241-2215
> Mark.E.Robinson@ibx.com

> > **From:** Simon, Gale [mailto:Gale.Simon@dobi.state.nj.us]
> > **Sent:** Thursday, July 17, 2014 8:22 AM
> > **To:** Robinson, Mark E.; Vance, Neil
> > **Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
> > **Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic

I omitted a word – you can't <u>include</u> the amounts for out of network services...

**From:** Simon, Gale
**Sent:** Wednesday, July 16, 2014 7:35 PM
**To:** 'Mark.E.Robinson@ibx.com'; Vance, Neil
**Cc:** Martino, Peg; 'Yvonne.Pilgrim@ibx.com'; 'lilton.taliaferro@ibx.com'
**Subject:** Re: $50 Copay for Chiropractic Services - DOBI File 200477 - Matlock Family
Chiropractic

Mark, you can't <u>include</u> the amounts for out of network services as the test is for a network
copay so should include only the allowed amount for network services. Please omit the out of
network services and tell me what those numbers are.

**From:** Robinson, Mark E. [mailto:Mark.E.Robinson@ibx.com]
**Sent:** Wednesday, July 16, 2014 06:58 PM
**To:** Simon, Gale; Vance, Neil
**Cc:** Martino, Peg; Pilgrim, Yvonne <Yvonne.Pilgrim@ibx.com>; Taliaferro Jr., Lilton R.
<Lilton.Taliaferro@ibx.com>
**Subject:** RE: $50 Copay for Chiropractic Services - DOBI File 200477 - Matlock Family
Chiropractic

Attached is a list of the procedure codes (CPT or HCPCS) included in the analysis, shown in
decreasing order of the proportion of overall allowed costs included in the analysis. Please note
that inclusion of claims in the analysis was not determined solely based on procedure
codes. Instead, a combination of service type codes (derived within AmeriHealth's data
warehouse) and procedure codes was used to identify the included claims.

The provider types who submitted the claims were physical therapy (44.6% of allowed costs),
occupational or speech therapy (2.6%), chiropractic (12.0%), hospital (mostly infusion therapy;
13.8%), other therapy (15.3%), medical doctor (5.7%), home health (3.6%), cardiac rehabilitation
(1.5%) and others (0.9%).

Claims included in the analysis were those for both participating and non-participating
providers. Sincerely,

Mark E. Robinson, ASA, MAAA
Independence Blue Cross Family of Companies
(215) 241-2215
Mark.E.Robinson@ibx.com

**From:** Simon, Gale [mailto:Gale.Simon@dobi.state.nj.us]
**Sent:** Monday, July 07, 2014 10:08 AM
**To:** Robinson, Mark E.; Vance, Neil
**Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
**Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family
Chiropractic

Please provide a list of the CPT codes included in your analysis and identify the provider
types who submitted the claims, e.g. medical doctors, chiropractors, physical therapists,
etc. Also please confirm that these are network providers only.

Thank you.

4

**From:** Robinson, Mark E. [mailto:Mark.E.Robinson@ibx.com]
**Sent:** Thursday, July 03, 2014 4:02 PM
**To:** Simon, Gale; Vance, Neil
**Cc:** Martino, Peg; Pilgrim, Yvonne; Taliaferro Jr., Lilton R.
**Subject:** RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic

AmeriHealth has interpreted N.J.A.C. 11:22-5.5(a)11 to require that the copayment applicable to therapeutic manipulations and therapy services is on average less than 50% of the aggregate risk of these services. For demonstration of compliance, AmeriHealth's fully-insured therapeutic manipulations and therapy services claims paid year-to-date with 1/1/2014 through 5/31/2014 dates of service have included 77,331 provider visits at an aggregate provider allowance of $11,943,735. These claims averaged a $154.45 allowed cost per visit. Thus, the referenced copay of $50 represents 32.4% of the aggregate risk of these services. Sincerely,

Mark E. Robinson, ASA, MAAA
Independence Blue Cross Family of Companies
(215) 241-2215
Mark.E.Robinson@ibx.com

# Exhibit C

## Johnson, Eric D.

| | |
|---|---|
| From: | Robinson, Mark E. |
| Sent: | Friday, June 27, 2014 1:35 PM |
| To: | Johnson, Eric D. |
| Subject: | FW: Therapy Services |

3 of 3

From: Forman, Beth
Sent: Friday, June 20, 2014 9:06 AM
To: Robinson, Mark E.
Subject: FW: Therapy Services

2 of 2

From: Alvarado, Rebecca
Sent: Monday, July 11, 2011 11:38 AM
To: Forman, Beth
Subject: RE: Therapy Services

Beth,

I updated the file so that it now includes all the categories based on your suggestion below. We meet the 50% requirement in aggregate, but some of the individual service type do not meet the requirement independently. Here is a link to the file:

\\g3\actuary\AMERIHLT\NJ\RATE_FIL\Minimum Standard Benefits\data.xlsx
<file:///\\g3\actuary\AMERIHLT\NJ\RATE_FIL\Minimum%20Standard%20Benefits\data.xlsx>

Becky Alvarado

Small Group Pricing

Independence Blue Cross

(215) 241-9141

1

INTERNAL IBC DOCUMENT!
THIS DOCUMENT MAY NOT BE FORWARDED TO ANYONE THAT IS NOT AN ASSOCIATE OF THE
INDEPENDENCE BLUE CROSS FAMILY OF COMPANIES.

From: Forman, Beth
Sent: Friday, July 08, 2011 11:21 AM
To: Alvarado, Rebecca
Subject: RE: Therapy Services

Hi Becky –

Great – thanks. On the summary tab, can you also show cost/claim (in addition to cost/unit?). I think
this will be more meaningful. If you have a chance, can you also spend a few minutes flipping through the
CPT manual (outside of Carolyn's office) & see if you can add in a few of the others? I did a quick search
on-line & came up with the following:

1)   Chemotherapy codes

http://www.bcbsks.com/customerservice/providers/Publications/institutional/manuals/workshop/AllPayers
07/BlueCross_HCPCS_update.pdf

2)   Cardiac Rehab:

93797; 93798

http://medpolicy.ibx.com/policies/MPI.nsf/6eeddf656d983ec98525695e0068df68/85256aa800623d7a852
57677004b2339!OpenDocument&Highlight=0,cardiac,rehab

3)   Pulmonary Rehab (maybe we can try the codes listed under the HCPCS2 section?)

http://medpolicy.ibx.com/policies/MPI.nsf/6eeddf656d983ec98525695e0068df68/85256aa800623d7a852
576dd005e62b3!OpenDocument&Highlight=0,pulmonary

4)   Cognitive therapy (from Medicare website)

Question 7: Is there a specific HCPCS code or range of HCPCS codes to report for cognitive speech
therapy training?

Answer: For cognitive speech therapy, a speech-language pathologist could use either code [CPT] 92507

2

# Exhibit D

## New Jersey Fully-Insured Commercial Therapeutic Svcs
### 6 Svc Codes*

| Month | SVCs | Average | | |
|---|---|---|---|---|
| | | Plan Liability | MBR Liability | Allowed Cost |
| 201301 | 6,995 | 61.61 | 30.54 | 92.15 |
| 201302 | 6,416 | 56.63 | 30.85 | 87.48 |
| 201303 | 6,874 | 56.68 | 31.29 | 87.97 |
| 201304 | 7,312 | 59.12 | 31.06 | 90.18 |
| 201305 | 7,458 | 55.35 | 31.06 | 86.41 |
| 201306 | 6,289 | 54.32 | 30.81 | 85.13 |
| 201307 | 7,371 | 60.58 | 29.65 | 90.23 |
| 201308 | 6,885 | 64.76 | 29.37 | 94.13 |
| 201309 | 6,153 | 64.98 | 30.55 | 95.54 |
| 201310 | 7,200 | 63.07 | 30.64 | 93.71 |
| 201311 | 6,574 | 60.23 | 30.32 | 90.55 |
| 201312 | 6,356 | 65.23 | 29.93 | 95.16 |
| CY 2013 | 81,883 | 60.18 | 30.51 | 90.68 |
| 201401 | 7,890 | 68.93 | 30.92 | 99.85 |
| 201402 | 7,791 | 63.54 | 30.53 | 94.08 |
| 201403 | 8,268 | 59.24 | 33.10 | 92.33 |
| 201404 | 8,346 | 57.77 | 32.94 | 90.71 |
| 201405 | 7,789 | 58.90 | 32.79 | 91.69 |
| 2014 to Date | 40,084 | 61.61 | 32.08 | 93.69 |

*Includes all line items of claims containing at least one line item among
the following service types:

| Svcs Code | Description |
|---|---|
| 2034 | OCCUPATIONAL/SPEECH THERAPY |
| 2035 | PHYSICAL THERAPY |
| 2037 | CHIROPRACTIC |
| 3034 | OCCUPATIONAL/SPEECH THERAPY |
| 3035 | PHYSICAL THERAPY |
| 3037 | CHIROPRACTIC |

Exhibit E

# Exhibit E

**Johnson, Eric D.**

| | |
|---|---|
| **From:** | Robinson, Mark E. |
| **Sent:** | Friday, August 08, 2014 9:32 AM |
| **To:** | Johnson, Eric D. |
| **Subject:** | RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic |

Eric:


I figured you would be surprised by this.  It was intentional and not the result of any confusion about the different calculation scenarios.  Let's fully discuss during our 10:00 AM meeting,


Mark


From: Johnson, Eric D.
Sent: Friday, August 08, 2014 9:28 AM
To: Robinson, Mark E.
Subject: RE: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic


Hi Mark,


I am confused as to why we responded with the $100.89 amount as opposed to the $94 amount (when also excluding claims where member liability = 0 from the data).


I thought that Cindy's analysis of claims where member liability = 0 revealed scenarios where the plan design was a 100% plan coinsurance or the member reached their OOP Max (plan design switched to a 100% plan coinsurance).

My thinking is that given the above, these scenarios (member liability = 0) also have no network copay applied (much like deductible / coinsurance scenarios) and should be excluded from the data resulting in the $94 average cost per visit.


From: Robinson, Mark E.
Sent: Thursday, August 07, 2014 7:46 PM
To: Janney, John R.; Johnson, Eric D.; Lakshman, Hugh; Munoz, Michael A.; Petrizzi, Ryan J.; Rachfalski, Daniel
Cc: Taliaferro Jr., Lilton R.
Subject: FW: $50 Copay for Chirporactic Services - DOBI File 200477 - Matlock Family Chiropractic

1

# Exhibit F

# 2014 NJ Copay Fraud Damages

| Metal Level | HIOS ID | Chiro/PT/ST/OT Copay | Cost Share Reduction | Reinsurance | Premium Subsidy | |
|---|---|---|---|---|---|---|
| Bronze ON-X | 91762NJ0070004-01 | 75 | | 3,012,268 | TBD | |
| Bronze OFF-X | 91762NJ0070007-00 | 75 | | 818,948 | | |
| | | | | | | |
| Silver ON-X | 91762NJ0070005-01 | 75 | | 159,946 | TBD | |
| Silver OFF-X | 91762NJ0070063-00 | 75 | | 119,521 | | |
| Silver 73 CSR | 91762NJ0070005-04 | 75 | 138 | 204,310 | 157,442 | |
| Silver 87 CSR | 91762NJ0070005-05 | 60 | 161,018 | 643,924 | 377,746 | |
| Silver 94 CSR | 91762NJ0070005-06 | 30 | 159,662 | 488,832 | 201,973 | |
| | | | | | | |
| Silver ON-X | 91762NJ0070006-01 | 75 | | 129,346 | | |
| Silver OFF-X | 91762NJ0070064-00 | 75 | | 0 | | |
| Silver 73 CSR | 91762NJ0070006-04 | 75 | 0 | 0 | 300,135 | |
| Silver 87 CSR | 91762NJ0070006-05 | 60 | 173,494 | 461,832 | 752,933 | |
| Silver 94 CSR | 91762NJ0070006-06 | 30 | 243,174 | 488,833 | 525,129 | |
| | | | | | | |
| Silver ON-X | 91762NJ0070007-01 | 75 | | 1,967,359 | TBD | |
| Silver OFF-X | 91762NJ0070065-00 | 75 | | 429,500 | | |
| Silver 73 CSR | 91762NJ0070007-04 | 60 | 0 | 2,273,195 | 5,061,887 | |
| Silver 87 CSR | 91762NJ0070007-05 | 40 | 1,817,202 | 5,811,940 | 13,747,887 | |
| Silver 94 CSR | 91762NJ0070007-06 | 30 | 2,926,776 | 4,153,568 | 9,631,655 | |
| | | | | | | |
| Silver ON-X | 77606NJ0040001-01 | 75 | | 1,097,423 | TBD | |
| Silver OFF-X | 77606NJ0040051-00 | 75 | | 110,981 | | |
| Silver 73 CSR | 77606NJ0040001-04 | 75 | 122,899 | 943,766 | 2,124,632 | |
| Silver 87 CSR | 77606NJ0040001-05 | 60 | 1,490,903 | 2,494,807 | 5,521,492 | |
| Silver 94 CSR | 77606NJ0040001-06 | 30 | 1,203,107 | 1,042,726 | 2,722,365 | |
| | | | | | | |
| Gold ON-X | 91762NJ0070010-01 | 50 | | 1,896,373 | TBD | |
| Gold OFF-X | 91762NJ0070067-00 | 50 | | 1,594,776 | | |
| | | | | | | |
| | | Total Option 1 | 8,298,373 | 30,344,174 | 41,125,273 | 79,767,820 |

# 2015 NJ Copay Fraud Damages

| Metal Level | HIOS ID | Chiro/PT/ST/OT Copay | Cost Share Reduction | Reinsurance | Premium Subsidy |
|---|---|---|---|---|---|
| Bronze ON-X | 91762NJ0070004-01 | 75 | | 1,045,211 | TBD |
| Bronze OFF-X | 91762NJ0070004-00 | 75 | | 179,283 | |
| | | | | | |
| Bronze ON-X | 91762NJ0070081-01 | 75 | | 272,907 | |
| Bronze OFF-X | 91762NJ0070081-00 | 75 | | | |
| | | | | | |
| Silver ON-X | 91762NJ0070008-01 | 75 | | 1,759,818 | TBD |
| Silver OFF-X | 91762NJ0070008-00 | 75 | | 0 | |
| Silver 73 CSR | 91762NJ0070008-04 | 75 | 126,094 | 403,284 | 1,040,903 |
| Silver 87 CSR | 91762NJ0070008-05 | 60 | 869,468 | 2,052,984 | 2,195,422 |
| Silver 94 CSR | 91762NJ0070008-06 | 30 | 962,196 | 1,319,658 | 1,016,692 |
| | | | | | |
| Silver ON-X | 91762NJ0070006-01 | 75 | | 159,886 | |
| Silver OFF-X | 91762NJ0070006-00 | 75 | | 7,943 | |
| Silver 73 CSR | 91762NJ0070006-04 | 75 | 15,927 | 200,529 | 166,219 |
| Silver 87 CSR | 91762NJ0070006-05 | 60 | 248,675 | 399,011 | 433,991 |
| Silver 94 CSR | 91762NJ0070006-06 | 30 | 222,903 | 151,089 | 258,879 |
| | | | | | |
| Silver ON-X | 91762NJ0070007-01 | 75 | | 1,369,281 | TBD |
| Silver OFF-X | 91762NJ0070007-00 | 75 | | 476,504 | |
| Silver 73 CSR | 91762NJ0070007-04 | 60 | 317,410 | 867,432 | 2,521,332 |
| Silver 87 CSR | 91762NJ0070007-05 | 40 | 4,408,681 | 2,224,611 | 6,626,488 |
| Silver 94 CSR | 91762NJ0070007-06 | 30 | 3,984,762 | 1,432,371 | 4,317,336 |
| | | | | | |
| Silver ON-X | 77606NJ0040001-01 | 75 | | 338,022 | TBD |
| Silver OFF-X | 77606NJ0040001-00 | 75 | | 256,038 | |
| Silver 73 CSR | 77606NJ0040001-04 | 75 | 90,008 | 207,699 | 1,334,763 |
| Silver 87 CSR | 77606NJ0040001-05 | 60 | 955,444 | 643,729 | 3,056,118 |
| Silver 94 CSR | 77606NJ0040001-06 | 30 | 846,803 | 521,833 | 1,536,027 |
| | | | | | |
| | Total Option 1 | | 13,048,371 | 16,289,123 | 24,504,167 | 53,841,661 |

| | | Cost Share Reduction | Reinsurance | Premium Subsidy | |
|---|---|---|---|---|---|
| | **2014 HIOS ID** | | | | |
| 1 | **91762NJ0070004** | 0 | 3,831,216 | 0 | |
| 2 | **91762NJ0070005** | 320,818 | 1,616,533 | 737,160 | |
| 3 | **91762NJ0070006** | 416,668 | 1,080,011 | 1,578,196 | |
| 4 | **91762NJ0070007** | 4,743,978 | 14,635,562 | 28,441,428 | |
| 5 | **77606NJ0040001** | 2,816,909 | 5,689,703 | 10,368,489 | |
| 6 | **91762NJ0070010** | 0 | 3,491,149 | 0 | |
| | **2014Total** | **8,298,373** | **30,344,174** | **41,125,273** | **79,767,820** |
| | | | | | |
| | **2015 HIOS ID** | | | | |
| 1 | **91762NJ0070004** | 0 | 1,224,494 | 0 | |
| 2 | **91762NJ0070081** | 0 | 272,907 | 0 | |
| 3 | **91762NJ0070008** | 1,957,758 | 5,535,744 | 4,253,017 | |
| 4 | **91762NJ0070006** | 487,505 | 918,458 | 859,088 | |
| 5 | **91762NJ0070007** | 8,710,853 | 6,370,199 | 13,465,156 | |
| 6 | **77606NJ0040001** | 1,892,255 | 1,967,321 | 5,926,908 | |
| | **2015 Total** | **13,048,371** | **16,289,123** | **24,504,167** | **53,841,661** |

# Exhibit G

Order No. E15- 106

## STATE OF NEW JERSEY
### DEPARTMENT OF BANKING AND INSURANCE

IN THE MATTER OF:

Proceedings by the Commissioner of Banking            )
and Insurance to Fine Freelancers Consumer            )        CONSENT ORDER
Operated and Oriented Program of New Jersey, Inc. )

TO:    Freelancers Consumer Operated and Oriented Program of New Jersey, Inc.
       570 Broadway, Suite 1100
       Newark, NJ 07102

This matter having been opened by the Commissioner of the Department of Banking and Insurance ("Commissioner"), State of New Jersey, upon information that Freelancers Consumer Operated and Oriented Program of New Jersey, Inc. ("Freelancers"), doing business as Health Republic Insurance of New Jersey, has violated provisions of the laws of the State of New Jersey; and

WHEREAS, Freelancers is a domestic insurance company authorized to transact business in New Jersey pursuant to N.J.S.A. 17B:18-42 since May 1, 2013; and

WHEREAS, N.J.A.C. 11:22-5.9(b)3 requires that the most preferred tier of a drug formulary, i.e. the tier with the lowest cost sharing, include more than one drug to treat each covered disease state where more than one drug is available; and

WHEREAS, N.J.A.C. 11:22-5.5(a) caps copayments for specified network services such as primary care and specialist physician visits and provides that for services not specified, the network copayment must be determined so that the carrier insures 50% or more of the aggregate risk for the service or supply to which the copayment is applied; and

WHEREAS, N.J.S.A. 26:2S-4 provides that a carrier shall disclose in writing to a subscriber, at the time of enrollment, among other things, a description of the covered services and benefits to which the subscriber or other covered person is entitled, the restrictions or limitations on covered services and benefits, the financial responsibility of the covered person, including copayment and deductibles, prior authorization and any other review requirements with respect to accessing covered services, where and in what manner covered services may be obtained, the covered person's right to appeal and the procedure for initiating an appeal of a utilization management decision made by or on behalf of the carrier with respect to the denial, reduction or termination of a health care benefit or the denial of payment for a health care service, and the procedure to initiate an appeal through the Independent Health Care Appeals Program; and

WHEREAS, N.J.A.C. 11:24A-2.3 provides that carriers shall provide to each subscriber within no more than 30 days following the effective date of coverage, through a handbook, certificate or other evidence of coverage, information describing, among other things, the covered services under the policy or contract including all exclusions, limitations, restrictions on accessing covered services such as prior authorization, preadmission certification and periodic review of ongoing treatment, a full and clear description of the carrier's policies and procedures for the provision of emergency and urgent care services, all dollar, day, visit or procedure limits and the method of exchanging inpatient for outpatient services, the responsibility of the covered person to pay deductibles, coinsurance or copayment as appropriate, and where and in what manner covered services can be obtained; and

WHEREAS, N.J.A.C. 11:4-37.3(b)3 provides that a carrier shall provide each covered person with a current evidence of coverage within 30 days of enrollment and no later than 30 days after any policy or contract changes; and

WHEREAS, N.J.A.C. 11:22-3.3(c) specifies that the paper standard format for the standard health care enrollment form for health insurance coverage can be accessed at http://www.state.nj.us/dobi/formlist.htm#insuranceformsandapps; and

WHEREAS, the standard health care enrollment form includes item C. Plan Option and instructs carriers to include information regarding pediatric dental coverage in this section; and

IT APPEARING, that specialty drugs include high cost drugs that require unique handling and/or patient education and which may be the only drugs to treat particular diseases, such as hemophilia and growth hormone deficiency; and

IT FURTHER APPEARING, that Freelancers placed all specialty drugs in its least preferred drug tier from January 1, 2014 to April 1, 2015; and

IT FURTHER APPEARING, that the placement of all specialty drugs in the least preferred drug tier means that no drugs were available for certain diseases in the most preferred tier contrary to N.J.A.C. 11:22-5.9(b)3; and

IT FURTHER APPEARING, that to correct this violation, Freelancers has voluntarily and temporarily moved all specialty drugs to Tier 1, eliminated Tier 4, revised the summary of benefits and coverage and policy form documents to eliminate Tier 4 cost sharing and reprocessed 145 specialty drug claims to pay at Tier 1 cost sharing, resulting in additional payments totaling $136,367; and

IT FURTHER APPEARING, that Freelancers did not adjust the plan and benefits template used on federally facilitated marketplace to describe its change in cost sharing for

specialty drugs and incorrectly specified unapproved cost sharing for certain behavioral health and substance abuse services; and

IT FURTHER APPEARING, that Freelancers issued plans with $75 copayments for outpatient mental health/substance abuse treatment and $50 and $75 copayments for therapeutic manipulation, which copayments did not satisfy the 50% test at N.J.A.C. 11:22-5.5(a); and

IT FURTHER APPEARING, that Freelancers has reduced the therapeutic manipulation copayment to $35 and the outpatient mental health/substance abuse copayment to $50 and has reprocessed 368 claims for outpatient mental health/substance abuse treatment and therapeutic manipulation, resulting in additional payments totaling $6,990; and

IT FURTHER APPEARING, that Freelancers is revising the Summary of Benefits and Coverage, other marketing materials and the policy forms to specify the corrected copayment amounts; and

IT FURTHER APPEARING, that, from January to August 2015, Freelancers failed to issue individual health benefit plans contracts, small employer health benefit plan contracts and small employer health benefit plan certificates to individual and groups covered under such plans that are compliant with the terms of the standard plans of the Individual Health Coverage ("IHC") and Small Employer Health ("SEH") programs and that accurately reflect the terms of the health benefit plans, contrary to N.J.S.A. 26:2S-4, N.J.A.C. 11:24A-2.3 and N.J.A.C. 11:4-37.3(b)3; and

IT FURTHER APPEARING, that Freelancers has not provided the 96-hour supply of prescription drugs that require prior approval but for which prior approval had not been secured, as required by the IHC and SEH standard forms; and

IT FURTHER APPEARING, that Freelancers advises that the 96-hour supply of prescription drugs that require prior approval but for which prior approval has not been secured is being provided as of June 5, 2015; and

IT FURTHER APPEARING, that Freelancers has identified the members who may have been harmed by the failure to dispense a 96-hour supply and the scope of appropriate remediation, and has been working with the Department to effect that remediation; and

IT FURTHER APPEARING, that the nongroup enrollment form used by Freelancers does not include information regarding pediatric dental coverage in item C, or elsewhere on the form, that Freelancers advised the Department by letter dated July 31, 2015, that it would revise the nongroup enrollment form to capture information regarding pediatric dental coverage and submit the revised form to the Department prior to implementation, and that Freelancers submitted the revised form to the Department on August 28, 2015; and

IT FURTHER APPEARING, that Freelancers asserts that the violations set forth above were not intentional or intended to mislead the Department or the public; and

IF FURTHER APPEARING, that Freelancers has cooperated in the Department's investigation of these violations; and

IT FURTHER APPEARING, that this matter should be resolved upon the consent of the parties to these proceedings without resort to a formal hearing, and further good cause appearing;

NOW, THEREFORE, IT IS on the 17th day of September, 2015:

ORDERED AND AGREED, that Freelancers will pay a fine in the amount of four hundred fifty thousand dollars ($450,000) in four installments, with an initial payment of one hundred fifty thousand dollars ($150,000) due on execution of this consent order by the company and with three subsequent payments of one hundred thousand dollars ($100,000) each due on

October 15, November 15 and December 15, 2015. The payments shall be made through certified check, attorney trust account check, money order or electronic funds transfer made payment of "State of New Jersey – General Treasury"; and

IT IS FURTHER ORDERED AND AGREED, that the signed Consent Order together with the initial payment of $150,000 shall be sent to Gale Simon, Assistant Commissioner, Department of Banking and Insurance, 20 West State Street, P. O. Box 329, Trenton, NJ 08625-0329; and

IT IS FURTHER ORDERED AND AGREED, that Freelancers will continue to institute measures and monitor operations in order to obtain and/or maintain compliance with all Department statutes and regulations; and

IT IS FURTHER ORDERED AND AGREED, that in the event full payment of the fine is not made in accordance with this Order, the Commissioner may exercise any and all remedies available by law, including but not limited to recovery of any unpaid penalties in summary proceedings, in accordance with the penalty enforcement law, N.J.S.A. 2A:58-10 et seq.; and

IT IS FURTHER ORDERED AND AGREED, that the provisions of this Consent Order represent a final agency decision and constitute a full and final resolution of the matters addressed herein.

Peter L. Hartt
Director of Insurance

Page 6 of 7.

**Consented as to Form, Content and Entry:**

_____

Freelancers Consumer Operated and
Oriented Program of New Jersey, Inc.
Name: Rebecca Kampick
Title: Board Chair

9-17-15
Date