BEGELMAN & ORLOW, P.C.
BY:   Marc M. Orlow
        Ross Begelman
        Regina D. Poserina
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
(856) 428-6020
Fax: (856) 428-5485

*Attorneys for Plaintiff*
*Eric Johnson*

---

### IN THE UNITED STATES  DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| United States of America, ex rel. Eric Johnson, | : : : | |
| *Plaintiff,* | : : : | Civil Action No.: 1:17-cv-11646-RBK-JS |
| v. | : : | |
| AmeriHealth Insurance Company of New Jersey; AmeriHealth HMO, Inc. Independence Holdings, Inc., | : : : : | |
| *Defendants.* | : : | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO THE MOTION TO DISMISS THE FIRST AMENDED *QUI TAM* COMPLAINT

Table of Contents

I. Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Rule 12(b)(6) Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. Rule 9(b) Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. The False Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B. The Patient Protection and Affordable Care Act . . . . . . . . . . . . . . . . . . . 5

IV. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. The FAC plausibly pleads Defendant's express and implied legal
       falsity under the FCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1. The FAC pleads an express certification of compliance with
          New Jersey regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2. The FAC plausibly alleges that Defendants violated N.J.A.C.
          1:22-5.5(a)(11) by charging co-pay amounts in excess of the
          statutory maximum to its members . . . . . . . . . . . . . . . . . . . . . . . . 8

        3. The FAC plausibly alleges that Defendants violated 45 C.F.R.
          156.200(d) which requires compliance with State insurance
          requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B. The FAC plausibly pleads Defendant's knowingly violated the FCA . . . 17

    C. The FAC plausibly pleads materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1. Whether the requirement violated is a condition of payment . . . . 22

        2. Whether the requirement violated is significant or "minor or
          insubstantial" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3. Whether the violation goes to the "essence of the bargain" . . . . . . 24

i

    4. How the Government has treated similar violations when it had
       "*actual knowledge*" of them ............................... 24

  D. The FAC plausibly pleads causation ........................... 27

  E. The FAC pleads a conspiracy ................................. 29

  F. The FAC meets Rule 9(b) ..................................... 29

V. Conclusions ................................................... 30

## TABLE OF AUTHORITIES

<u>Caselaw</u>

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 573 (2007) . . . . . . . . . . . . . . . . . . . . 3

*Connolly v. Lee Construction Corp.,* 809 F.3d 780, 786 (3rd Cir. 2016) . . . . . . . . . 4

*Foglia v. Renal Ventures Management, LLC,* 754 F.3d
153,156-57 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Garcia v. United States,* 469 U.S. 70, 75, 105 S. Ct. 479,
83 L. Ed. 2d 472 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Halo Electronics Inc. v. Pulse Electronics Inc.,* 136 S. Ct. 1926 (2016) . . . . . . . . . 21

*Harrison v. Westinghouse Savannah River Co.,*
176 F.3d 776 (Fourth Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d
197, 202 (3rd Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*King v. Burwell,* 135 S.Ct. 2480 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Matrixx Initiatives, Inc. v. Siracusano,*
563 U.S. 27, 39 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*McDermott v. Clondalkin Group, Inc.,* 649 F. App.'s 263, 269 n.3
(3rd Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Phillips v. City of Allegheny,* 515 F3d 224, 233 (3rd Cir. 2008) . . . . . . . . . . . . . . 4, 20

*Safeco Insurance Co. Of America v. Burr,* 551 U.S. 47(2007) . . . . . . . . . . . . . . 20, 21

*Smith v. Carolina Med Center,* 274 F. Supp. 3d 300, 321 (E.D. Pa. 217) . . . . . . 4, 19

*United States ex rel. Bahnsen v. Boston Scientific New Row Modulation*
*Corp.,* No. 11-1210, 2017 W.L. 6403864, *9 (D.N.J. December 15, 2017) . . . . 19, 20

*United States ex rel. Cantekin v. Univ of Pittsburgh,* 192 F.3d
402, 411 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States ex rel. Escobar v. United Health Services, Inc.,*
No. 14-1423, slip op. at 15 (1ˢᵗ Cir. Nov. 22, 2016) . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States ex rel. Escobar v. Universal Health Servs., Inc.,*
136 S. Ct. 1989, 1996 195 L. Ed.2d 348 (2016) . . . . . . . . . . . . . . . . . . . . 4, passim

*United States ex rel. Greenfield v. Medco health Solutions, et al,*
880 F3d 89 (3ʳᵈ Cir. 2018) WL 473158 . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, passim

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,*
352 F.3d 908, 917 (4ᵗʰ Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States ex rel. Hendow v. Univ. of Phoenix,*
461 F.3d 1166, 1174 (9ᵗʰ Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States ex rel. Petratos v. Genentech, Inc.,*
855 F.3d 481 (Third Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, passim

*United States ex rel. Spay v. CVS Caremark Corp.,* 913 F.
Supp. 2ⁿᵈ 125, 156 (E.D.Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States ex rel. Streck v. Allergan, Inc.,* 746 F.
App'x. 101, 108-09 (3ʳᵈ Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States ex rel. Streck v. Bristol Meyers Squibb Company,*
No. 13-7547, 2018 W.L. 6300578, *12 (E.D.Pa. November 29, 2018),
Motion for reconsideration denied at 370 F.Supp. 3ʳᵈ 491,496
(E.D.Pa. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States ex rel. Wilkins v. United Health Group, Inc.,*
659 F.3d 295, at 304-05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Statutes</u>

31 U.S.C.§3729 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, passim

31 U.S.C §3729(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

31 U.S.C.§3729(b)(1)(A)(1-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

31 U.S.C.§3729(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 U.S.C. 18033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

45 C.F.R. 154.301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

45 C.F.R. §156.200(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

45 C.F.R. §156.200(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

45 C.F.R. §156.200(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, passim

45 C.F.R/ parts 155 and 156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ACA Section 1313(a)(6)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, passim

N.J.A.C. 11:22-5.5(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, passim

The Health Care and Education Reconciliation Act of 2010
(Pub. L. 111-152) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Patient Protection and Affordable Care Act (Pub. L. 111-148) . . . . . . . . . . . . . 1

Rules

Fed.R.Civ.P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, passim

Fed.R.Civ.P.12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed.R.Civ.P.77 18310, 18415 (Mar.27,2012) . . . . . . . . . . . . . . . . . . . . . . . 7, 15

Other Authorities

Black's Law Dictionary, Revised Fourth Edition pages 642, 967 . . . . . . . . . . . 16, 24

https://www.merriam-webster.com/dictionary/its . . . . . . . . . . . . . . . . . . . . . . . . 16

HHS Affordable Exchange Guidance, April 3, 2015 from
Center for Consumer Information and Insurance Oversight,
CMS, Chapter 2 Section 1(i), p 20, at https://www.cms.gov/
CCIIO/Resources/Regulations-and-Guidance/Downloads/2014_
letter_to_issuers_04052013.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

https://www.reginfo.gov/public/do/DownloadDocument?objectID=55583701 . . . . . 8

## I. PRELIMINARY STATEMENT

Relator, Eric Johnson ("Relator"), respectfully submits this memorandum of points and authorities in opposition to the Motion to Dismiss (the "Motion") the First Amended Complaint ("FAC") filed by defendants Independence Holdings, Inc., trading as Independence Blue Cross (IBC"), AmeriHealth Insurance Company of New Jersey, Inc. ("Amerihealth") and AmeriHealth HMO, Inc. ("Amerihealth HMO"), collectively the "Defendants". The Defendants have employed the "kitchen sink" model for its Motion. Defendants contend that (1) the complaint does not plead *"falsity"*, (2) the complaint fails to state a plausible scheme by which Defendants *"knowingly"*, i.e. had *scienter*, in violating the False Claims Act, 31 U.S.C. §3729, et seq. ("FCA"); (3) any violations of the Affordable Care Act[1] (ACA) Act or New Jersey Administrative Code (N.J.A.C.) regarding minimum standards for qualified health insurance plans regarding limits on co-payments that insurers can charge are not *"material"*; (4) there is no plausible facts alleged which demonstrate the required *causation* between the alleged violations of the Defendants and a violation of the FCA; (5) the facts pled by Plaintiff lack the requisite specificity required by Rule 9(b) and finally, (6) no conspiracy has been plausibly pled among the corporate defendants. As discussed in detail below, Defendants' arguments ignore the detailed and specific factual allegations in the

---

[1] The Patient Protection and Affordable Care Act (Pub. L. 111-148) was enacted on March 23, 2010 and amended by The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152) shortly thereafter are collectively referred to as the "Affordable Care Act" or "ACA.

FAC, the *plain meaning* of the ACA and its regulations, attempts to *conflate* the separate elements of "materiality" and "falsity" of the FCA, and *mischaracterizes* the facts, applicability and contents of the materials attached to the FAC. The Motion should be denied.

Relator plausibly pleads in the FAC a plethora of specific facts alleging that Defendants engaged in a scheme to violate the ACA in order to obtain status as an eligible "qualified health plan" (QHP) by making false certifications which scheme violated the FCA. The FAC describes and explains that Defendants knew that their proposed insurance plans[2] (the "Plans") would not qualify because of its failure to comply with New Jersey State insurance laws[3] regarding network co-pay amounts in excess of the statutory maximum. Defendants, knowing that Center for Medicare and Medicaid Services (CMS) expected the States to review potential QHPs for compliance and would utilize and rely on the States review[4], knowingly submitted false data to the New Jersey Department of Insurance and Banking (DOBI) in order to have its insurance Plans eligible to be qualified health plans under the ACA. DOBI is the relevant governing and enforcement agency for New Jersey for

---

[2] See FAC ¶ 74 to 76 describing eight QHPs in violation for 2014 and six QHPs in violation for 2015. Each QHP can contain up to 7 variant plans. Including the base plan and each variation in the count, there are 20 plan variations in 2014 and 19 plan variations in 2015

[3] N.J.A.C. 11:22–5.5(a)(11)

[4] See FAC ¶ 67, and n.17;  See HHS Affordable Exchange Guidance dated April 5, 2013 from Center for Consumer Information and Insurance Oversight, Center for Medicare & Medical Services, Chapter 2, Section 1(ii), page 20; at https://www.cms.gov/CCIIO/ Resources/Regulations-and -Guidance/Downloads/ 2014_letter_to_issuers_04052013.pdf

certification, compliance and enforcement of New Jersey State requirements as it

relates to health plan benefits and QHPs [FAC ¶ 69].   Specifically, Defendants

falsely certified (both expressly and by impliedly) directly to CMS that it was in

compliance with all State laws regarding *State mandated benefits such as network*

*co-pay requirements designed to protect consumers.*  As such Defendants QHPs are

"*tainted.*" These facts lead to only one conclusion: The FAC adequately alleges

plausible and particularized violations of the ACA and FCA sufficient to defeat the

Motion and allow Relator to prosecute his claim.

## II. APPLICABLE LEGAL STANDARDS

**A. Rule 12(b)(6) Standard.**  Under Federal Rule of Civil Procedure 8(a)(2), "A

pleading that states a claim for relief must contain … a short and plain statement

of the claim showing that the pleader is entitled to relief." *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 573 (2007).  Therefore, "to survive a Motion to Dismiss a

complaint must contain a sufficient factual matter, accepted as true, to state a

claim to relieve that is plausible on its fact." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  "A claim has facial plausibility when the plaintiff pleads factual content and

allows the court to draw a reasonable inference that the Defendant is liable for the

misconduct". *Id.* (citation omitted).  In evaluating motions to dismiss under Rule

12(b)(6), courts "accept all factual allegations as true, construe the complaint in the

light most favorable to plaintiff, and determine whether, under any reasonable reading ... the plaintiff may be entitled to relief."[5]

B. **Rule 9(b) Standard**. Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity of the circumstances constituting fraud or mistake," which is met in the FCA context by "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Management, LLC*, 754 F.3d 153, 156-57 (3rd Cir. 2014), "malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. Rule of Civil Procedure 9(b); see *Smith v. Carolina Med Center*, 274 F. Supp. 3d 300, 321 (E.D. Pa. 217) (FCA knowledge "may be alleged generally under Rule 9(b).")

## III. GOVERNING LAW

A. **The False Claims**.    A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality. *United States ex rel. Escobar* v, *Universal Health Servs., Inc.* 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348 (2016) (materiality); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, at 304-05 (falsity, causation, knowledge).

---

[5] *Phillips v. City of Allegheny*, 515 F.3d 224, 233 (3rd Cir. 2008) "quotation omitted"; see *Connolly v. Lee Construction Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016) (rejecting that the "plausibility standard" is akin to a "probability requirement"); *McDermott v. Clondalkin Group, Inc.*, 649 F. App.'s 263, 269 n.3 (3rd Cir. 2016), (rejecting Defendants' factual contentions and reversing dismissal)

B.  **The Patient Protection and Affordable Care Act.** As stated in the FAC, the ACA gives each State the opportunity to establish or participate in an Affordable Insurance Exchange through a State run Exchange or a Federally Facilitated Exchange (FFE) (the "Exchange(s)). These Exchanges were established to allow individuals and eligible employers to compare and select from qualified health plans (QHPs). These Plans must meet all Federal requirements of the ACA as well as all related minium insurance requirements of the respective States in which the QHP is offered. [FAC ¶ 23]. The FAC describes in detail the operational requirements and parameters of the ACA (FAC ¶¶ 24-26, 28-30), the insurance Exchanges (FAC ¶¶ 31, 36) as well as the subsidies (FAC ¶¶ 37, 59 ) available from the Federal Government for low and some middle income families to help in the purchase of insurance on the insurance exchanges.

The ACA expressly requires Insurers who want to include their insurance plans on the Exchange to demonstrate that each health plan it offers in the Exchange is a qualified health plan (QHP). 45 C.F.R. §156.200(a).  This specifically and expressly requires any QHP issuer to be in compliance of all QHP Issuer Minimum Certification Standards set forth in 45 C.F.R. 156.200(d), including adherence to the State requirements and any provisions imposed by a State's QHPs. [FAC ¶¶ 60-61]. Central to the case before the Court is this mandate set forth at 45 C.F.R. 156.200(d) as follows:

> ***State requirements.*** *A QHP issuer certified by an Exchange <u>must adhere to the requirements of this subpart and any provisions imposed by the Exchange, or a State in connection</u> with <u>its Exchange</u>, that are*

*conditions of participation or certification with respect to each of its QHPs* [emphasis added].

Congress's intent regarding the materiality of the ACA to the FCA is clear. As alleged clearly in the FAC, Congress specifically intended a violation of the ACA to be a violation of the FCA[6].

## IV. ARGUMENT

### A.   The FAC plausibly pleads Defendants' express and implied legal falsity under the FCA

A legally false FCA claim is based on a 'false certification' theory of liability. Within the theory of false certification, there are two further categories: express and implied false certification. [FAC ¶¶ 107 - 114].

Defendants' Motion claims that the FAC does not plausibly plead the requisite "falsity" under either an implied certification or express certification theory. The premise for such claim is based on three separate arguments. First, the FAC never alleges an express certification of compliance with any New Jersey regulation [Motion at page 9]. Second, the ACA, and its regulations (45 C.F.R. § 156.200(d)) does not require compliance with State insurance regulations [Motion at page 10]. Third, the FAC does not plausibly allege Defendants' non-compliance with New Jersey's Network Co-Pay regulation [Motion at pages 15-16]. These arguments are supported only by twisting the *plain meaning* of the ACA regulation 45 C.F.R.

---

[6] Section 1313(a)(6)(A) of the ACA specifies that payments made by, through, or in connection with an Exchange, are subject to the False Claims Act (31 U.S.C. §3729, et seq.) if those payments include any Federal funds.  It further states that compliance with this requirement shall be a *material condition of an issuer's entitlement to receive payments*, including payments of premium tax credits and cost-sharing reductions, through the Exchange. [emphasis added]

156.200(d), *misstating* a small passage in the Federal Register[7], *conflating* the

separate elements of materiality and falsity and *asserting facts inappropriate* at the

Motion to Dismiss stage.

    Contrary to these assertions, the FAC plausibly alleges that (i) compliance

with New Jersey's network co-pay mandate set forth in  N.J.A.C. 11:22–5.5(a)(11)[8]

is required to become an eligible "QHP", permitting participation in

the ACA Exchanges and (ii) Defendants violated N.J.A.C. 11:22–5.5(a)(11) by

charging co-pay amounts in excess of the statutory maximum to its members for

chiropractic, physical therapy, occupational therapy, and speech therapy services

for certain specific Plans[9] in contract years 2014 and 2015.

### 1. The FAC pleads an express certification of compliance with  New Jersey regulations

    In 2013, Defendants received both state and federal certifications to offer

QHPs both on and off exchange in New Jersey for 2014, which were re-certified for

2015. The Plans designed and submitted for certification contained co-pays ($50,

$60 and $75) that were in violation of N.J.A.C 11:22-5.5(a)11. Defendants knew that

its Plan designs were not in compliance with N.J.A.C 11:22-5.5(a)11. [FAC ¶ 90].

As stated in the FAC, in order to get certification, all of the Defendants' proposed

---

[7]  77 Fed. Reg. 18310, 18415 (Mar. 27, 2012). See Motion at page 12

[8]  *N.J.A.C. 11:22–5.5 Network Co-payment states: (a) Network copayments in health benefit plans and stand-alone prescription drug plans may not exceed the following . . . (11). For any other services and supplies, the copayment is to be determined so that the carrier insures 50 percent or more of the aggregate risk for the service or supply to which the copayment is applied.*

[9] See FAC ¶¶ 74-75

insurance plans and variations had to be approved before the plans could be offered. These Plans included the base plan and each variation. Defendant had 20 plan variations in 2014 and 19 plan variations in 2015. [FAC ¶ 76, ¶ 67, n. 17 recited herein[10]].

As discussed in the FAC (See letter of April 5, 2013, FAC ¶ 67 n. 17), in a guidance letter from CMS dated April 5, 2013 for Issuers on FFEs (such as the case here) from CMS to Insurers seeking QHP certification, CMS informed the Insurers like Defendants that they will also be required to *attest* to their adherence to the regulations set forth in 45 C.F.R. parts 155 and 156. [ See CMS letter of April 5, 2013 at pages 5, 20]. These mandatory requirements include a specific attestation[11] regarding Benefit Design which requires Insurers to certify that *"it will comply with all benefit design standards, federal  regulations and laws, and state laws regarding state mandated benefits . . ."* [emphasis added]

Contrary to Defendants' claim, the FAC clearly alleges that Defendant applied for certification from New Jersey DOBI for its plans to be considered as QHPs, expressly certified to both DOBI and CMS that they were in compliance and did so identifying the specific Plans.

### 2. The FAC plausibly alleges that Defendants violated N.J.A.C. 11:22–5.5(a)(11) by charging co-pay amounts in excess of the statutory maximum to its members

---

[10] See HHS Affordable Exchange Guidance, April 5, 2013 from Center for Consumer Information and Insurance Oversight, CMS, Chapter 2, Section 1(i), p 20, at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/ 2014_letter_to_issuers_04052013.pdf

[11] See  http://www.reginfo.gov/public/do/DownloadDocument?objectID=55583701(page 2 of 9,Benefit Design Attestations, #2.)

The FAC alleges facts that plausibly demonstrate that Defendants have been in violation of N.J.A.C. 11:22–5.5(a)(11) since at least 2011 by charging co-pay amounts in excess of the statutory maximum to its members. The FAC also spells out how Defendants calculated its "average costs" of the various CPT[12] service codes and the steps taken by Defendants to deceive DOBI. [See generally FAC ¶¶ 83 -106, Exh. B, C, D and E].

In 2011, Defendants received inquiries from DOBI based on a rejection of the filing of certain plans, which raised questions about the amount of the co-pays for rehabilitative and habilitative type services. [FAC ¶¶ 83-87, Exh. C]. Actuaries at Defendant IBC were then asked to verify that these therapy services were in compliance with the co-pay limitations set forth in New Jersey's Network Copayment requirements at N.J.A.C. 11:22-5.5(a)11. During this review that DOBI requested, Defendant IBC's actuarial analyst Rebecca Alvarado realized that the Plans in question were not in compliance with th co-pay limitation. Alvarado reported her findings to Beth Forman, Director of Actuarial Services. [ FAC ¶ 84-85].

Being "in compliance" meant that the co-pays charged by Defendants in their various plans could not be more than 50% of Defendants' "average costs" for these services. Knowing that they were not in compliance meant that Defendants' needed to increase its reported "average cost" to show DOBI that they were in compliance,

---

[12] Current Procedural Terminology (CPT) codes are developed by the American Medical Association (AMA) to describe a wide range of healthcare services. These codes are utilized to communicate with other physicians, hospitals, and insurers for claims processing.

which Defendants did by including  in the calculation expensive costs that are wholly unrelated to costs of the services in question.

Specifically, as alleged in the FAC,  IBC used average costs and claims data from not only physical therapy, speech therapy, occupational therapy and chiro, (the services in question) but included unrelated and costly services as chemotherapy codes, cardiac rehab codes, pulmonary codes, cognitive therapy codes, respiratory therapy codes, and even procedure codes related to pulmonary, cardiovascular, chemistry and toxicology services. [FAC ¶ 86]. Using these inflated and unrelated costs, it was falsely reported to DOBI that Defendants' AmeriHealth's plans were in compliance with N.J.A.C. 11:22-5.5(a)(11). [FAC ¶ 87].

In 2013, Defendants applied to CMS for QHP certification to have its Plans eligible to be placed on the ACA Exchanges. Notwithstanding that they knew at the time of its noncompliance since 2011 with N.J.A.C. 11:22-5.5(a)(11), they took no action to correct its calculations and required certifications at the time of application to CMS for QHP approval for the Exchanges and eligibility for subsidy payments. Defendants took no action and falsely certified compliance which CMS relied on and which was intended to deceive CMS. [FAC ¶91].   Defendants did so knowing that CMS evaluates each potential QHP against all applicable certification standards, including the outcome of a State's review.  In the case of New Jersey, which has been approved by CMS as an "State Approved  Effective Rate Review Program"[13]  for QHP  certification and rate review, Defendants knew that CMS

---

[13] 45 CFR 154.301

would rely on New Jersey approval of the QHP application. [FAC ¶ 70].

As such, a false or fraudulent misrepresentation to DOBI is also a false or fraudulent misrepresentation to CMS. Defendants fraudulent conduct continued through application and certifications of its Plans until June 2014 when DOBI became aware of the issue based on a complaint from a provider questioning the $50 co-pay. As a result, once again, the Consumer Protection department of DOBI, requested that Defendants demonstrate that their $50 co-pay complied with N.J.A.C 11:22-5.5(a)11 for Chiropractic Services. Defendant IBC, as they did in 2011, included inappropriate CPT codes and services in the data to ensure that their "average cost" would be in compliance in relation to the copay limits in N.J.A.C 11:22-5.5(a)11. [FAC¶ 92]. This time, however, DOBI officials were much more dilligent, specifically asking what CPT service codes Defendants were using in its calculation. From July 3, 2014 through August 8, 2014, Gale Simon, the Asst. Commissioner of the Consumer Protection Services at DOBI and Mark Robinson, Director of Actuarial Services for Defendant IBC corresponded by email over a dozen times in which Simon from DOBI advised Robinson from IBC that its interpretation of N.J.A.C 11:22-5.5(a)11 was unacceptable. Specifically, Simon stated *"the test is for a network copay"* advising that only network service for chiropractic care, physical therapy, occupational therapy and speech should be included. [See FAC ¶¶ 93 -99 Exh. B, page 3, email of July 23, 2014]. After another demonstration calculation, Simon, still not satisfied that the calculation was being done consistent with DOBI's interpretation, advised Mark Robinson by email on

July 28, 2014 that they *"should only include network chiropractic, OT, PT, and ST services to which a network copay was applied."* [emphasis added]. [Exh. B, page 2, Simon email of July 28, 2014].

At this Point, IBC's Robinson asked Relator Johnson to *"evaluate"* the calculations in accordance with the instructions and interpretation of Simon from DOBI and *"discuss"* with him. [Exh. B, page 2, Robinson email of Aug. 5, 2014]. Relator revised the calculations accordingly and advised Robinson using CPT services count where there was a copay (as instructed by Simon) which revealed an average cost of $94.93 which would exceed the statutory maximum of 50%. [Exh. B, page 2, Johnson email of Aug. 5, 2014; Exh. D]. Robinson, in an email back to Johnson on the same day, acknowledges that he is *"confident that the latest calculation (Johnson's) producing a $93.69 is likely correct. . . "* Despite the foregoing, and explicitly disregarding of DOBI's interpretation and instructions to use services item when only where a <u>*network copay was applied*</u>, Robinson submitted to Simon (explicitly disregarding DOBI's interpretation) a calculation of $100.89, using service items when there was <u>no copay</u>. [Exh. B, page 2, Robinson email of Aug. 5, 2014]. [See also Exh. E, page 1, emails of Aug. 7th and 8th, 2014 between Robinson and Johnson]. While these numbers bounced the Plans with a $50 copay between compliance and non-compliance, <u>the Plans which contained a $60 and $75 dollar copay were substantially out of compliance even using IBC's rejected calculations.</u> [FAC ¶ 103 - 104].

Defendants dismiss this evidence and well pleaded facts, characterizing this

clear interpretation (by DOBI) as only Relator's "*opinion*." Defendants presumably contend in its Motion that DOBI has no "*authority*" or cannot provide "*regulatory guidance*" to exclude cost of services when a member has a $0 copay. [Defendants' Motion at page 15-16]. Defendants take this position while admitting in its Motion that they have no guidance or law to the contrary to support its position. In fact, the calculation or interpretation had nothing to do with Relator's *opinion*. As evidenced by the email correspondence set forth in the FAC and herein, Relator was only carrying out the instructions by DOBI as relayed to him by his superior, Mark Robinson. In point of fact, Defendants position contradicts DOBI's interpretation which was given directly to Defendants.

There was no ambiguity in DOBI's interpretation. They make this assertion because they do not have any such evidence to support its tortured interpretations. They did not have any contrary authority in 2011, 2014 or 2015 and they have none even now. If they did, they would have raised it directly with DOBI at the time and attempted to persuade DOBI. Instead, they were simply "guided" by any interpretation that would keep their non-compliance hidden from CMS and DOBI, who are the appropriate regulatory authorities.

Defendants fraudulent scheme to hide their noncompliance continued into 2015. AmeriHealth was asked by DOBI to justify their $75 copays, and again, AmeriHealth, together with the support from IBC, made specific representations that their plans were in compliance and failed to disclose that their $75 copays (and $60 copays ) did not comply with N.J.A.C 11:22-5.5(a)11. [FAC ¶ 105]. Collectively,

while Defendants were perpetrating this fraud for contract years 2014 and 2015,
Defendants falsely received over $133 million in subsidy payments (Advanced
Premium tax Credits), reinsurance payments, and risk corridor payments. [FAC ¶
106].

### 3. The FAC plausibly alleges that Defendants violated 45 C.F.R. 156.200(d) which requires compliance with State insurance requirements

The well pleaded factual allegations of the FAC, when applied to the "plain
meaning" of the regulation plausibly shows that 45 C.F.R. 156.200(d) requires
compliance with the New Jersey Network Copay mandate in N.J.A.C 11:22-
5.5(a)11. This regulation is codified in the New Jersey Administrative Code, under
SubChapter 5, is entitled " **SUBCHAPTER 5. <u>MINIMUM STANDARDS</u> FOR
HEALTH BENEFITS PLANS, PRESCRIPTION DRUG PLANS, AND DENTAL
PLANS" [emphasis added].** *See New Jersey Administrative Code N.J.A.C. 11:22-5
Table of Contents.* Clearly, New Jersey views and considers this regulation as a
<u>minimum</u> *"condition of participation or certification"* with respect to each of its
health benefit plans that it would consider certifying as a QHP.

Defendants, as the QHP issuer must be in compliance of all QHP Issuer
Minimum Certification Standards set forth in 45 C.F.R. 156.200(b) with respect to
each of its QHPs on an ongoing basis. The Certification Standards also include,
inter alia, adherence to the State requirements and any provisions imposed by a
State's QHPs. 45 C.F.R. 156.200(d) as follows:

> ***State requirements.*** *A QHP issuer certified by an Exchange must
> <u>adhere to the requirements of</u> this subpart and any provisions*

> *imposed by the Exchange, or <u>a</u> State in connection with <u>its Exchange</u>,*
> *that are <u>conditions of participation or certification</u> with respect to*
> *each of its QHPs* [emphasis added]. [FAC ¶ 61].

Defendants argument that the FAC has not plead "falsity" under the FCA is

based on New Jersey's election to operate under a FFE [See FAC ¶ 35] as opposed

to a State run Exchange [ See Motion page 12-14]. Essentially, Defendants claim

that *"in connection with its exchange"* is *solely limited* to a State run exchange.

Ergo, since New Jersey has a FFE, compliance with minimum State insurance

standards are not required. This is utter nonsense. Their sole support for this

argument is a passage in the Federal Register discussing 45 C.F.R. 156.200(d),

which Defendants present in the Motion [at page 12] as follows:

> "The regulation is unambiguous, and its history confirms this plain
> reading. This history underscores that the only state provisions
> being referenced are *"additional conditions for participation"* in
> exchanges, which a state *"may choose to establish"* in connection
> with <u>its</u> exchange and which are distinct from *"generally
> applicable State laws or regulations"* governing health insurance
> issuers in the state."

The actual full and accurate passage from the portion of the Federal Register

includes the following:

> . . .We noted that States may choose to establish  additional conditions
> for participation beyond the  minimum standards  established by the
> Secretary. 77 FR 18310, 18415 (March 27,2012)

As important, there is no reference in the Register's specific language of State

laws being *"distinct"* from those that are required for participation in exchanges.

Also, there is no reference in the actual language to *"generally applicable."* As seen

above, N.J.A.C. 11:22-5.5(11) is, at a minimum, an "additional condition for

participation" because it is, by its express terms, considered a minimum standard by New Jersey a "condition of participation or certification" of its health plans. When the full un-editorialized version is reviewed, Defendants theory falls apart.

Defendants claim or attempt to make a legal distinction between a State run Exchange and FFE is also contrary to the intent of the ACA as found by the United States Supreme Court. As noted in the FAC, State Exchanges and Federal Exchanges are equivalent. The United States Supreme Court has found that there is no difference in a FFE and a State created Exchange. They must meet the same requirements, perform the same functions, and serve the same purposes. Although State and Federal Exchanges are established by different sovereigns, Sections 18031 and 18041 of the ACA do not state that they differ in any meaningful way. *King v. Burwell*, 135 S.Ct. 2480 (2015) [FAC ¶ 36].

The plain meaning of the regulation also supports the finding that *"in connection with its exchange"* can only mean, using the plain meaning of the word "its"[14] to be New Jersey's Exchange, (their choice of a FFE), which the Supreme Court has interpreted to be equivalent to a State Run Exchange. It is the Exchange that New Jersey chose to operate, and whether a State run Exchange or FFE "must meet the same requirements, perform the same functions, and serve the same purposes." *Id. King v Burwell.* In construing the meaning of these regulatory mandates, the Courts in this Circuit, have consistently held that "Courts must

---

[14] Definition of *"Its"*: relating to it or itself especially as possessor, https://www.merriam-webster.com/dictionary/its; may import ownership, possession or us, Black's Law Dictionary, Revised Fourth Edition page 967

begin the task of statutory construction with the presumption that Congress

expresses its intent through the ordinary meaning of its language," requiring courts

to defer to the plain language of the statute whenever possible." *Idahoan Fresh v.*

*Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998). (quoting *Garcia v.*

*United States*, 469 U.S. 70, 75, 105 S. Ct. 479, 83 L. Ed. 2d 472 (1984)).

See also, the ACA definition of Exchange, which makes no distinction.

Under 45 C.F.R. 155.20, "Exchange" is defined as "a governmental agency or non-

profit entity that meets the applicable standards of this part and makes QHPs

available to qualified individuals and/or qualified employers. Unless otherwise

identified, this term includes an Exchange serving the individual market for

qualified individuals . . . *regardless of whether the Exchange is established and*

*operated by a State (including a regional Exchange or subsidiary Exchange) or by*

*HHS.*" [emphasis added]

Once the plaining meaning of the word *"its"* is applied to "*Exchange*" (whether

FFE or State), the requirement that Issuers, such as Defendants, must be in

compliance with State minimum standards for participation or certification of its

health insurance plans becomes evident from the plain meaning of the regulation.

For all of the foregoing reasons, it is clear that the FAC plausibly pleads "falsity."

B.     **The FAC plausibly pleads Defendants' knowingly violated the FCA**

"Knowingly" means the defendant (1) had actual knowledge that the claim is

false; or (2) acted with deliberate ignorance of the truth or falsity of the claims; or

(3) acted with reckless disregard of the truth or false of the other claim.  31 U.S.C.

§ 3729(b)(1)(A)(1-3) and Section 2729(b)(1)(B).[FAC ¶ 108].

Defendants, notwithstanding clear evidence to contrary, claim that Relator has not pointed to any warning from DOBI that costs where a member had a -$0- copay should be excluded from the calculation [Motion at 19]. This is simply false. As set forth in great detail, the FAC and the email attachments to the FAC show actual knowledge as far back as 2011 through 2015. As set forth earlier, from July 3, 2014 through August 8, 2014, Simon from DOBI advised Robinson from IBC that its interpretation of N.J.A.C 11:22-5.5(a)11 was unacceptable. Specifically, Simon stated *"the test is for a network copay"* advising that only network service for chiropractic care, physical therapy, occupational therapy and speech should be included. [Exh. B, page 3, email of July 23, 2014]. After another demonstration calculation, Simon, still not satisfied that the calculation was being done consistent with DOBI's interpretation, advised Mark Robinson by email on July 28, 2014 that they *"should only include network chiropractic, OT, PT, and ST services to **which a network copay was applied."*** [emphasis added]. [Exh. B, page 2, Simon email of July 28, 2014].

These warnings also came from within their own house. As plead in the FAC, IBC actuarial analyst Rebecca Alvarado realized in 2011 that the Plans in question were not in compliance. Alvarado reported her findings to Beth Forman, Director of Actuarial Services [FAC 85]. Relator himself warned Mark Robinson, the head actuary in August 2014. [Exh. B, page 2, Johnson email of August 5, 2014; Exh. D]. Robinson, in an email back to Johnson on the same day, acknowledges that he is

*"confident that the latest calculation (Johnson's) producing a $93.69 is likely correct. . . "*Despite the foregoing, and in direct contradiction of DOBI's interpretation and instructions to use services item when there was a *network copay was applied*, Robinson submitted to Simon (explicitly disregarding DOBI's interpretation) a calculation of $100.89, using service items when there was no-copay. [Exh. B, page 2, Robinson email of August 5, 2014]. [See Exh. E, page 1 - emails of August 7th and 8th, 2014 between Robinson and Johnson]. This was not a "reasonable interpretation" in the face of direct guidance from DOBI. Rather, it was intentional, deceitful and fraudulent.

The FAC also alleges that Defendants knew of their non compliance and QHP certifications were false and thus acted knowingly for purposes of the FCA. These general allegations alone are sufficient.[ *Id.* ¶¶ 5, 7 to 10, 78, 81, 82, 85, 87, 91, 92, 97-99, 101 to 104 and 106; ("malice, intent, knowledge and other conditions of a person's mind may be alleged generally.  Federal Rule 9(b); *Smith*, 274 F. Supp. 3d at 321. But as discussed above, the FAC alleges numerous details corroborating this general allegations. [See generally FAC ¶¶ 83 -106, Exhibits B, C, D and E].

Defendants also claim a lack of the requisite scienter under the FCA, adopting a post-hoc rationale that Defendants' actions were "objectively reasonable," regardless of Defendants' intent *at the time*. [Defendants' Motion pages 17-19]  The Courts have rejected this framework, holding that defendants' contemporaneous intent is what matters, even in the face of statutory ambiguity, which is absent here. *United States ex rel. Bahnsen v. Boston Scientific New Row Modulation Corp.*,

No. 11-1210, 2017 W.L. 6403864, *9  (D.N.J. December 15, 2017) ("[T]he timing of a defendant's reasonable interpretation is critical . . . a claimant cannot avoid liability by manufacturing an after the fact reasonable interpretation of an ambiguous provision."); *United States ex rel. Streck v. Bristol Meyers Squibb Company*, No. 13-7547, 2018 W.L. 6300578, *12 (E.D.Pa. November 29, 2018) ("A Court should not resolve an FCA claim at the motion to dismiss stage where the plaintiff plausibly alleges that the defendant proceeded with its interpretation in the face of contrary guidance.")  Motion for reconsideration denied at 370 F.Supp. 3rd 491, 496 (E.D.Pa. 2019) (whether guidance warned defendant away, "presents a question of fact").

The complaint alleges Defendants' contemporaneous, knowing and willful scienter. The Defendants cannot now ask the Court to disregard that allegation and dismiss this case at the pleading stage. *Phillips*, 515 F.3rd App. 233.  In addition, Defendants request this Court to adopt facts contrary to the complaint is improper. See *United States ex rel Spay v. CVS Caremark Corp.*, 913 F. Supp. 2nd 125, 156 (E.D. Pa. 2012).  Indeed, such factual disputes are often insufficient to support post discovery summary judgment, let alone a motion to dismiss, as determinations of intent under the FCA which are traditionally within the purview of the fact finder.[15] Nevertheless, Defendants cite *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), to argue that the complaint should be dismissed on the pleadings regardless of defendants' intent at the time.  Although not cited by Defendants, the Supreme

---

[15] See, e.g. *United States ex rel. Cantekin v. Univ of Pittsburgh*, 192 F.3d 402, 411 (3rd Cir. 1999) ("in applying [the FCA knowledge] standards to the record before us, we must heed the basic rule that a Defendants' state of mind typically should not be decided on summary judgment").

Court's recent decision in *Halo Electronics Inc. v. Pulse Electronics Inc.*, 136 S. Ct. 1926 (2016), made it clear that *Safeco* does not support this argument. *Id.* at 1933 ("Nothing in *Safeco* suggests that we should look to facts that defendant neither knew or had reason to know at the time he acted"). Instead the Court reaffirmed that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct" rather than "the stretch of his attorney's ingenuity" in justifying conduct after the fact. *Id.*

Defendants also misread *United States ex rel Streck v. Allergan, Inc.*, 746 F. App'x. 101 (3rd Cir. 2018) as adopting its rejected reading of *Safeco*. In *Streck*, the Third Circuit concluded that the defendants did not knowingly violate the FCA by excluding the price appreciation credits in calculating a drug's average manufacturing price because that pricing statute was ambiguous and there was no evidence that the defendants were aware at the time that their reading of the statute was erroneous. (*Streck*, 746 F. App'x at 108-09). Thus, *Streck* does not support Defendants' argument that a defendant can avoid scienter as a matter of law merely by claiming that his conduct conformed to an objectively reasonable interpretation of the law, regardless any contemporaneous intent.

Indeed the FAC alleges the opposite. See FAC, Exh. E, email from Mark Robinson dated August 8, 2014 to Relator, responding after he was surprised that Robinson, contrary to DOBI's direction, included claims in its average cost where there was no copay. Robinson responded stating: *"I figured you would be surprised by this. It was <u>intentional</u> and <u>not the result of any confusion</u> about the different*

*calculation scenarios. Let's discuss during our 10:00 AM meeting."* [emphasis added]. The FAC plausibly pleads "scienter."

### C.  The FAC plausibly pleads materiality

The question as to whether the "falsity" of Defendants certification was "material" was extensively addressed in the FAC with an application of the well pleaded facts to the factors set out by the Supreme Court in *Escobar*. [see generally, FAC ¶¶ 115 - 133]. We will further address it here along with Defendants mischaracterization of the *Escobar* and *Petrotas* holdings. The "falsity" in this case is defendants certifications and representations to DOBI and CMS that they were in compliance with New Jersey's minimum standards for qualified health plans. The proper question surrounding the "materiality" test is whether being a valid QHP would have a natural tendency to influence, or [is] capable of influencing the Government's payment decision. [FAC ¶ 115]. The answer is certainly yes, both from a "plausibility" perspective as well as legal one.

The Supreme Court in *Escobar*, in assessing "materiality," identified a variety of factors bearing on a holistic assessment, specifically including the following:

### 1.  Whether the requirement violated is a condition of payment, *Id. at 2003*;

Congress's intent regarding the materiality of the ACA to the FCA is clear. As alleged clearly in the FAC, Congress specifically intended a violation of the ACA to be a violation of the FCA.. Section 1313(a)(6)(A) [42 U.S.C. 18033] of the ACA specifies that payments made by, through, or in connection with an Exchange, are subject to the False Claims Act (31 U.S.C. §3729, et seq.) if those payments include

any Federal funds. *It further states that compliance with this requirement shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange.* Specifically, section 1313 of the Affordable Care Act, entitled FINANCIAL INTEGRITY, provides in subsection (a)(6), "Accounting for Expenditures," the following:

**(6) APPLICATION OF THE FALSE CLAIMS ACT·**

**(A) IN GENERAL·** <u>Payments made by, through, or in connection with an Exchange</u> are subject to the False Claims Act (31 U.S.C. 3729 et seq.) if those payments include any Federal funds. Compliance with the requirements of this Act concerning eligibility for a health insurance issuer to participate in the Exchange **<u>shall be a material condition of an issuer's entitlement to receive payments</u>**, including payments of premium tax credits and cost-sharing reductions, through the Exchange.[emphasis added] FAC ¶ 27.

The ACA, in 45 C.F.R. 156.2000(d) makes it clear that issuers must comply with State exchange requirements for certification of QHPs. In addition, ACA section 1313(a)(b) makes it clear that violations with respect to eligibility to participate is a material condition for government payments. [FAC ¶ 120].  This factor certainly points to "materiality."

> 2. **Whether the requirement violated is significant or "minor or insubstantial,"** *Id. at 2003*

Becoming a qualified health plan by the State of New Jersey is not only clearly significant, it is essential.  These violations impact tens of thousands of individuals in New Jersey. Together, Defendants insured 104,820 individuals in 2014 and

51,357 in 2015 in QHPs that allegedly were in compliance with FFE and New

Jersey State insurance requirements.  [FAC ¶ 74].

    3.   Whether the violation goes to the "'essence of the bargain, *Id. at 2003*

    As plead in the FAC, the third factor, *whether the violation goes to the*

*"'essence of the bargain,"* also points to Defendants violation being material to the

extent that the definition of "essence"[16] means *"that which is indispensable."*  The

Defendants actions goes directly to raising the out of pocket expenses incurred for

these very individuals and families it was designed to help. Essentially, even

though they are receiving from CMS a CSR subsidy for these reduced out of pocket

costs, Defendants nevertheless were also receiving a "hidden" subsidy by

overcharging copays to their members. [FAC ¶ 123].

    4.   How the Government has treated similar violations when it had
        *"actual knowledge"* of them  *Id. at  2003*

    Specifically, the *Escobar* Court described this factor as follows:

> proof of materiality can include, but is not necessarily  limited to,
> *evidence that the defendant knows that the  government consistently
> refuses to pay claims in the  mine run of cases based on noncompliance
> with the  particular statutory, regulatory, or contractual  requirement*.
> Conversely, if the *government pays a **particular claim in full despite its**
> **actual knowledge*** that certain requirements were violated, that is very
> strong evidence that those requirements are not material. Or, if  the
> *government regularly pays a particular type of claim in full despite*
> ***actual knowledge** that certain  requirements were violated*, and has
> signaled no change  in position, that is strong evidence that the
> requirements are not material [emphasis added]

    Conveniently, despite *Escobar* specifically conditioning this factor on the

---

[16]See Black's Law Dictionary, Revised Fourth Edition, page 642

Government's *actual knowledge*, Defendant in their Motion, attempts to set the bar

as *"evidence that . . . the Government consistently refuses to pay claims . . . based

on noncompliance with the  particular" regulatory requirement."* [Motion at page

20].  Missing from Defendants' reference to this important factor is the prerequisite

that the Government had "*actual knowledge*." It is undisputed that neither CMS or

DOBI was aware of Defendants' intentional misrepresentation. It is telling, but

nevertheless inexcusable, that Defendants felt compelled to mischaracterize this

factor leaving out this key fact. This is especially true given the lengths that IBC

went to hide the true calculations of its "average cost" of services despite DOBI's

clear guidance. The Third Circuit*, in United States ex rel. Petratos v. Genentech

Inc.*, 855 F.3d 481 (Third Cir. 2017), followed this same requirement regarding

"actual knowledge" of the Government as a prerequisite to this condition.

However, as set forth in the FAC, even if the Government had actual knowledge

(which it did not) and continued to pay claims, such action does not necessarily

undermine a "materiality" finding because there are many good reasons, including

important public policy and safety considerations, why the government might

continue to pay claims in such circumstances. *See U.S. ex rel. Harrison v.

Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003)

(the government might have good reason to pay despite the violation because the

contract is "advantageous to the government" or too far along to terminate without

excessive costs). [FAC ¶ 128].  This is particularly applicable to this case. As

described in the FAC Defendants had insured 104,820 individuals in 2014 and

51,357 in 2015 in QHPs as enrolled subscribers in health plans. Does Defendant

suggest that the Government had to revoke Defendants' Plans and throw

subscribers out on the street? The *Escobar* Court recognized this conundrum. The

more essential the continued execution of a contract is to an important government

interest, the less the government's continued payment weighs in favor of the

government knowledge defense.  This is particularly true in this case for an

additional reason. The ACA, and its subsidies, where just starting[17].  Applications

were filed in 2013 and the first contract year or subsidies for QHPs on the

Exchanges was 2014. There literally was no history to determine if *the  government*

*consistently refused to pay claims in the  mine run of cases based on noncompliance*

*with the particular statutory, regulatory, or contractual_requirement.*  This factor is

either neutral or inapplicable. It certainly does not weigh against demonstrating

"materiality." [FAC ¶ 131]

Importantly, *Escobar* makes clear that no one factor is dispositive, and a court

must evaluate these factors together to determine whether a particular violation is

material. *Id. at 2001* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39

(2011) (materiality cannot rest on a "single fact or occurrence as always

determinative")); accord; *United States ex rel. Escobar v. United Health Services,*

*Inc.*, No. 14-1423, slip op. at 15 (1st Cir. Nov. 22, 2016) (employing Supreme Court's

---

[17]  In fact, Defendants' claim and argument regarding the Consent Order dated September 17, 2015 of the New Jersey DOBI Order E15-106, *Fine Freelancers Consumers Operated and Oriented Program of New Jersey, Inc.* that was attached to the FAC is exactly the type of argument flatly rejected *by Escobar. Escobar* set out a holistic assessment of materiality. Moreover, in the *Fine Freelancers,* it was already an operating entity. In the case of Defendants, they were only applying for QHP status.

"holistic approach" to materiality analysis).  For all of the foregoing reasons, it is clear that the FAC plausibly pleads "materiality."

### D.  The FAC plausibly pleads causation

Defendants assert in the Motion that the FAC does not plausibly plead "causation," because there is no *direct* connection between the alleged falsity and financial loss to the Government [Motion at pages 26-27]. Defendants go even further, asserting that Relator failed to show that *"AmeriHealth absence from the FFE would have resulted in the Government no longer paying subsidies for these patients and services."* [Motion at page 27].

The Third Circuit, *in both Petratos[18] and Medco[19]* demonstrate that Relator has plausibly plead causation.  In *Petratos*, the relator alleged that Genentech suppressed data that caused doctors to certify incorrectly that Avastin was "reasonable and necessary" for certain at-risk Medicare patients. The District Court focused on the *falsity* element, concluding that the disputed claims were not false because they were "reasonable and necessary" as a matter of law. The Third Circuit disagreed with the District Court's reasoning, but affirmed on other grounds, concluding that *Petratos* could not establish "materiality."

In addressing the causation element, the Third Circuit in *Petratos*, citing to *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) found that the causation element cannot be met *merely* by showing "but for"

---

[18]  *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (2017)

[19] *United States ex rel Greenfield v Medco Health Solutions*, et al, 880 F.3d 89 (3rd Cir. 2018) WL 473158

causation.  The Ninth Circuit, consistent with similar findings by the Fourth Circuit[20], rightly noted that false claims liability attaches *"because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder."* *Harrison*, 176 F.3d at 788 (emphasis added). Using this reasoning, the *Hendow* Court  found that the  "[m]ere regulatory violations do not give rise to a viable FCA action," but rather, "[i]t is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.[emphasis added]. Following this reasoning in *Harrison,* the *Hendow Court* stated causation as *"all that matters is whether the false statement or course of conduct causes the government to "pay out money or to forfeit moneys due."* [emphasis added.] This the reasoning that *Petratos* has adopted as it relates to causation, i.e., the false certification and efforts surrounding it is the causation. That is the case here. In *Hendow*, which was at the Motion to Dismiss stage, similar to *Petratos*, the Court found that because relators plausibly alleged (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due, their cause of action under the False Claims Act survives a motion to dismiss and the reversed the decision of the district court. The Third Circuit in *Medco*, a false certification case involving the Anti Kickback Statute, has also rejected the "direct causal direct" argued by Defendant.  *United States ex rel Greenfield v Medco Health Solutions*, et al, 880 F.3d 89 (3rd Cir. 2018) WL 473158.

_____

[20] Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (Fourth Cir. 1999)

Similarly, at the motion to dismiss stage, Relator has plausibly plead sufficient facts detailing a course of conduct that resulted in false certifications that caused the Government to pay out money.

### E.  The FAC pleads a conspiracy

To prove a FCA conspiracy claim under 3729(a)(3) , a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement."

The FAC pleads both of these elements. Mark Robinson is the director of Actuarial Services for Defendant Independence Holdings. IBC provides shared services and support to AMNJ and AMHMO in connection with management [FAC ¶ 18]. This agreement is perfectly lawful. What is unlawful is the agreement reached in August 2014, and again in 2015 between Robinson, and behalf of IBC and Amerihealth and Amerihealth HMO to intentionally deceive Gail Simon at DOBI with average cost numbers for specific network co-pay service codes so that Amerihealth and Amerihealth HMO could obtain QHP certification for its Plans. The remaining element, (least one act performed in furtherance of that agreement) was actually certifying these false numbers to DOBI. [FAC ¶ 104].

### F.  The FAC meets Rule 9(b)

In the instant case, the FAC pleads with particularity all of the essential facts of Defendants scheme. The specific particulars, supported by emails of the individuals involved consist of the following:

- the specific individuals *who* were involved from Defendants and DOBI. See, e.g., ¶¶ 11-18, 80, 83-85, 87, 94 - 104 and Exh. B, C, and E.

- *what* happened, (i.e, the fraudulent scheme. See, e.g., all of the above, and ¶¶ 81, 82, 86 - 91.

- *when* and *where* the scheme occurred. See, e.g., all of the above, plus ¶¶ 83, -89, 92 - 106.

- *how* the scheme developed and was implemented. *See* 80-85, 87, 94 - 104 and Exhibits B, C, and E.

The FAC pleads with particularity the specific health plans involved [FAC ¶ 75]; the type and amount of each subsidy received for 2014 and 2015 (FAC ¶¶ 37-45, Exhibit F); the certifications made by Defendants [FAC ¶¶ 4, 5, 7 -9, 60 - 64, 66 - 68, 70, 73, 76, 81, 82, 90, 91, 98, 103, 104, 106, 137 - 140] as well as the connection between the New Jersey State insurance requirements, becoming a qualified health plan eligible for the ACA Exchanges, and the violation of the FCA.

## V. CONCLUSIONS

For the foregoing reasons set forth herein, Relator respectfully requests that Defendants Motions be denied.

BEGELMAN & ORLOW, P.C.

By: _____
Marc M. Orlow, Esquire
Ross Begelman, Esquire
Regina Poserina, Esquire