IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX</u>. <u>REL.</u> ERIC JOHNSON, <br><br> *Relator,* <br><br> v. <br><br> AMERIHEALTH INSURANCE COMPANY OF NEW JERSEY; AMERIHEALTH HMO, INC.; INDEPENDENCE HOLDINGS, INC., <br><br> *Defendants.* | CIVIL ACTION <br><br> No. 17-11646 |

**Goldberg, J**                                                                                                             **March 2, 2022**

**MEMORANDUM OPINION**

This is a qui tam action brought on behalf of the United States of America under the False Claims Act ("FCA") by Plaintiff-Relator Eric Johnson ("Relator").[1] It is alleged that Defendants AmeriHealth Insurance Company of New Jersey ("AmeriHealth"), AmeriHealth HMO, Inc. ("AmeriHealth HMO"), and Independence Holdings, Inc. ("IBC") (collectively, "Defendants") engaged in a scheme to violate the Patient Protection and Affordable Care Act in having their insurance plans certified as Qualified Health Plans despite Defendants' knowing failure to comply with New Jersey's insurance laws limiting the amounts charged for network co-pays.

---

[1] On May 18, 2020, Chief Judge D. Brooks Smith of the United States Court of Appeals for the Third Circuit designated and assigned me to this matter. (<u>See</u> ECF No. 30).

1

Defendants have moved to dismiss all claims of the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), contending that the Amended Complaint fails to meet threshold pleading requirements. For the reasons stated below, I will the grant the motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

At this stage of the litigation, I am required to analyze Defendants' motion based upon the facts as pled in the Amended Complaint. When deciding a motion to dismiss for failure to state a claim, I must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

### A.     The Affordable Care Act

To understand Relator's allegations, it is first necessary to briefly explain the regulatory structure of the Patient Protection and Affordable Care Act ("ACA").

Enacted in March 2010, the ACA has two core features that are relevant to this case: Affordable Insurance Exchanges ("Exchanges") and Qualified Health Plans ("QHP" or "QHPs"). In relevant part, the ACA defines an "Exchange" as "a governmental agency or non-profit entity that meets the applicable standards . . . and makes QHPs available to qualified individuals and/or qualified employers." 45 C.F.R. § 155.20. QHPs are insurance plans that are certified to provide essential health benefits, including coverage of ten essential benefit categories.[2] Insurance companies that offer plans that qualify as QHPs are eligible for subsidies and reimbursements pursuant to the ACA. (FAC ¶¶ 4, 22–24, 31, ECF No. 8.); see also 42 C.F.R. § 155.20.

---

[2] The ten "essential health benefits" that must be provided by QHPs include: (1) Ambulatory patient services, (2) Emergency services, (3) Hospitalization, (4) Maternity and newborn care, (5) Mental health and substance use disorder services, including behavioral health treatment, (6) Prescription drugs, (7) Rehabilitative and habilitative services and devices, (8) Laboratory services, (9) Preventive and wellness services and chronic disease management, and (10) Pediatric services, including oral and vision care. See 42 C.F.R. § 156.110(a).

2

Exchanges are designed to help individuals and small business employers compare and purchase affordable health insurance coverage through the use of premium tax credits and cost sharing reductions. The ACA expressly requires that, in order for insurance companies to list their health insurance plans on an Exchange, the insurance company must certify that each health plan that it intends to offer in the Exchange is a QHP. All QHP issuers[3] must comply with the ACA's various insurance coverage requirements and Exchange processes, procedures, and requirements on an ongoing basis. (FAC ¶¶ 22–23, 60); see also 42 C.F.R. §§ 156.200(a) and (b).

Insurance coverage through Exchanges began in every state on January 1, 2014. Individual states may, but are not required to, establish their own state Exchange. For states that do not elect to create their own Exchange, the ACA directs the Secretary of Health and Human Services to establish a Federally Facilitated Exchange, which is operated by the Centers for Medicare and Medicaid Services. Insurance companies submit applications to the Centers in seeking QHP approval for Federal Exchange eligibility. The Department of Insurance and Banking is also involved in the process of certifying insurance health plans as QHPs. (FAC ¶¶ 4, 9, 32–34, 36, 67, 69, 91); see also 42 U.S.C. §§ 18031, 18041.

Central to the present lawsuit is the following provision within the ACA:

> **(d) State requirements. A QHP issuer certified by an Exchange must adhere to the requirements of this subpart and any provisions imposed by the Exchange, or a State in connection with its Exchange, that are conditions of participation or certification with respect to each of its QHPs.**

45 C.F.R. § 156.200(d). (FAC ¶ 61.)

---

[3] A "QHP issuer" is defined as "a health insurance issuer that offers a QHP in accordance with a certification from an Exchange." 45 C.F.R. §§ 155.20, 156.20. In relevant part, a "health insurance issuer" or "issuer" means an insurance company, insurance service, or insurance organization (including an HMO) that is required to be licensed to engage in the business of insurance in a State and that is subject to State law that regulates insurance." 45 C.F.R. §§ 144.103, 156.20.

Relator reads this provision as requiring all QHPs that operate through the Federally Facilitated Exchange in New Jersey to comply with both federal regulations governing QHP's insurance coverage *as well as* New Jersey's state-specific requirements for insurance plans offered within the state.  Thus, Relator posits that this ACA statutory language requires compliance with New Jersey regulations limiting co-payment amounts charged to policyholders.  This statutory interpretation forms the basis of Relator's claims in that Relator alleges Defendants exceeded allowable copayment amounts.  Defendants disagree with Relator's reading of § 156.200(d) and assert that because New Jersey has not established its own exchange, this section does not impose the New Jersey state-specific copayment regulations.

### B.  Relevant Background on New Jersey Insurance Laws

New Jersey has codified requirements on the amounts of copays that insurance companies operating within the state may charge for certain medical services.  Relevant to this case are copays charged to policyholders for physical therapy, occupational therapy, speech therapy, and chiropractic services.  For these services, New Jersey requires insurance companies to certify that their benefit plans' "copayment is to be determined so that the carrier insures 50 percent or more of the aggregate risk for the service or supply to which the copayment is applied."  (FAC ¶¶ 35, 73); N.J.A.C. § 11:22–5.5(a)(11) ("the New Jersey regulation").

### C.  The Alleged Scheme

Relator alleges that Defendants knowingly committed fraud by charging its QHP policyholders copay amounts in excess of New Jersey statutory maximums for the therapy services.  Relator claims that for these services in the 2014 and 2015 contract years, Defendants charged its QHP policyholders $50 or more in copays.  Relator contends that these charges

exceeded 50% of the average cost per service, in violation of N.J.A.C. § 11:22–5.5(a)(11).  (FAC ¶ 78.)

At the time the Complaint was filed, Relator was employed by Defendant IBC as an Actuarial Analyst.  His duties included performing monthly cost share reduction estimates for the ACA and assisting in creating annual filings to the Centers for Medicare and Medicaid Services.  Relator alleges that Defendants AmeriHealth and AmeriHealth HMO received more than $133 million in federal subsidies for selling their health plans as QHPs on the Federally Facilitated Exchange in the 2014 and 2015 contract years.  Relator claims that despite knowing some of those health plans exceeded the maximum allowable copayments charged to policyholders under New Jersey regulations, AmeriHealth and AmeriHealth HMO still submitted these health plans as QHPs and received the corresponding federal tax credits, cost sharing reductions, and reinsurance from the Centers for Medicare and Medicaid Services.  (Id. at ¶¶ 81, 82.)

Relator alleges that Defendants were aware of their copay violations as early as 2011, before they submitted their plans for QHP certification.  In 2011, Defendants received inquiries from the Department of Banking and Insurance based on a rejection of filing of certain of AmeriHealth's and AmeriHealth HMO's insurance plans, specifically the copay amounts charged for in-network rehabilitative and habilitative services.  As a result, actuaries at IBC were asked to verify that the charges for these therapy services were in compliance with the copay limitations set forth in N.J.A.C. § 11:22–5.5(a)(11).  IBC actuarial analyst Rebecca Alvarado realized that the insurance plans in question were not in compliance and reported her findings to the Director of Actuarial Services, Beth Forman.  (Id. at ¶¶ 83–85.)

In order to achieve the appearance of compliance, it is alleged that IBC inflated the averaged costs and claims data by including in its calculations not only total costs for the therapy

services, but also unrelated services such as chemotherapy, cardiac rehabilitation, pulmonary, cognitive therapy, respiratory therapy, and others. By improperly including the unrelated services in their calculations, Defendants were able to report to the Department of Banking and Insurance that the relevant insurance plans' copays were in compliance because the average costs for the therapy services now appeared higher, making it acceptable to charge a higher copay. AmeriHealth and AmeriHealth HMO continued to charge in-network copays in excess of those permitted by N.J.A.C. § 11:22–5.5(a)(11). (Id. at ¶¶ 86–88.)

Relator alleges that in 2013, AmeriHealth and AmeriHealth HMO submitted their insurance plans to the Centers for Medicare and Medicaid Services for QHP certification in order to sell those plans on the Federally Facilitated Exchange. Relator asserts that even though Defendants knew that copays charged to policyholders for the therapy services exceeded those permitted by N.J.A.C. § 11:22–5.5(a)(11), Defendants falsely certified on their applications that they were in compliance with the New Jersey regulation. Following health provider complaints about excessive copays being charged by Defendants' plans for chiropractic services, IBC conducted two additional reviews of Defendants' copays, one in 2014 and another in 2015. (Id. at ¶¶ 90–92, 105.) Defendants allegedly continued to falsely report to the Department of Banking

and Insurance that its plans were in compliance with N.J.A.C. § 11:22–5.5(a)(11), despite the fact that the figures they reported were deliberately overinflated.

### D. Procedural Background

Based on these alleged facts, Relator filed the original Complaint, asserting violations of the False Claims Act, and did so *ex parte* and under seal, allowing the United States Government the opportunity to investigate.

On September 10, 2019, the Government filed a notice declining to intervene but permitting Relator to maintain the action in the name of the United States. Thereafter, the Honorable Robert B. Kugler, who was previously assigned, unsealed the case and ordered the Complaint served on Defendants.

Relator filed an Amended Complaint on September 11, 2019, bringing claims for violation of the following False Claims Act provisions: 31 U.S.C. § 3729(a)(1)(A) (Count I) and 31 U.S.C. § 3729(a)(1)(B) (Count II).[4] Defendants have moved to dismiss the remaining Counts One and Two of the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. To determine the sufficiency of a complaint under Twombly and Iqbal, a court must (1) "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) identify the allegations that, "because they are no more than conclusions, are

---

[4] The Amended Complaint also contained a third count for a violation of 31 U.S.C. § 3729(a)(1)(C). However, Relator voluntarily dismissed this count on August 12, 2020. (ECF Nos. 39, 40.)

not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, . . . assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (internal quotation marks omitted).

It is well-established, however, that *qui tam* actions brought under the False Claims Act must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b). U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 n.9 (3d Cir. 2004) (citing U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998)); U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 143 (E.D. Pa. 2012). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

This heightened pleading standard requires plaintiffs to "plead with particularity precise misconduct with which they are charged [in order] to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). "Thus, Rule 9(b) requires, at a minimum, that plaintiffs support their allegations . . . with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks omitted). However, courts will accept allegations on information and belief when

"the facts at issue are peculiarly within the defendant's possession." See Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 107 n.31 (3d Cir. 2015); Rockefeller, 311 F.3d at 216.

## III.  DISCUSSION

Relator's claims hinge on whether the ACA required Defendants to comply with New Jersey insurance regulations while selling their QHPs on New Jersey's Federal Exchange. As noted above, the particular New Jersey insurance regulation at issue, N.J.A.C. § 11:22–5.5(a)(11), limits the amounts of copays charged for in-network physical therapy, occupational therapy, speech therapy, and chiropractic services.

### A.  Falsity

Defendants first argue that the Amended Complaint fails to state a claim for relief under Fed. R. Civ. P. 12(b)(6) because Relator has failed to allege falsity. Defendants contend that: (1) the ACA, specifically § 156.200(d), did not require them to comply with N.J.A.C. § 11:22–5.5(a)(11) because they operated through a Federal Exchange rather than a State created Exchange; and (2) Relator's claim for express false certification via an attestation fail because the attestation did not require compliance with N.J.A.C. § 11:22–5.5(a)(11).

Under the False Claims Act, it is illegal to present a "false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). A fraudulent claim may be either factually or legally false. United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 94 (3d Cir. 2018). Factual falsity is not at issue here. Legal falsity occurs when a defendant lies about its compliance with a statutory, regulatory, or contractual requirement. Id. A defendant's false certification of compliance can be either express or implied. Id. Implied false certification occurs when a defendant submits a request for payment and (1) "makes specific representations about the goods or services provided; and [(2)] the defendant's failure to disclose noncompliance with [the]

9

material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." See Universal Health Servs., Inc. v. United States, 579 U.S. 176, 190 (2016).

### 1. Interpretation of 45 C.F.R. § 156.200(d)

Defendants' primary point is that they could not have submitted a false claim to the government because § 156.200(d) did not require QHPs operating through a Federal Exchange to comply with state insurance regulations. Rather, Defendants contend that § 156.200(d) only requires issuers operating through State Created exchanges to comply with state regulations. Thus, Defendants maintain that because their health insurance plans at issue were all operated through New Jersey's Federal Exchange which was established by the federal government, § 156.200(d) only required them to meet minimum federal requirements.

It is worth repeating that 45 C.F.R. § 156.200(d) states:

> (d) State requirements. A QHP issuer certified by an Exchange must adhere to the requirements of this subpart and any provisions imposed by the Exchange, or a State in connection with its Exchange, that are conditions of participation or certification with respect to each of its QHPs.

45 C.F.R. § 156.200(d). Defendants point out that grammatically, the word "its" in the phrase "or a State in connection with its Exchange," refers to "State's." In other words, the provision should be interpreted to read "or a State in connection with *that State's* Exchange." Accordingly, Defendants press that § 156.200(d) does not incorporate by reference any New Jersey insurance regulations because New Jersey did not establish its own Exchange. Instead, New Jersey chose to operate through a Federal Exchange established and operated by the federal government. Defendants argue, therefore, that this Exchange was not "New Jersey's Exchange" within the meaning of § 156.200(d).

To support their argument that § 156.200(d) does not impose state insurance requirements on insurers operating through Federal Exchanges, Defendants urge that the "or a State in

10

connection with its Exchange" phrase acts as a qualifier. Defendants posit that the fact that the federal government establishes and operates Federal Exchanges when states opt not to create their own Exchange is why the qualifier is necessary. Defendants explain that the qualifier allows a state greater latitude to impose additional requirements and conditions for participation on an Exchange it chooses to operate. On the other hand, the qualifier prevents a state that chooses not to establish its own Exchange from imposing additional conditions of participation on the Centers for Medicare and Medicaid's operation of Federal Exchanges. Defendants point to a passage in the Federal Register discussing § 156.200(d) to bolster this assertion. This passage states: "In § 156.200, we outline the proposed standards on QHP issuers as a condition of participation in the Exchange. . . *We noted that States may choose to establish additional conditions for participation beyond the minimum standards established by the Secretary.*" 77 FR 18310, 18415 (March 27, 2012) (emphasis added).

Relator responds that a proper reading of § 156.200(d) required Defendants to comply with state regulations imposed by New Jersey in connection with "its" exchange (or, its choice of a Federal Exchange). Relator notes that the United States Supreme Court has found that State created Exchanges and Federally Facilitated Exchanges are "by statutory definition, equivalent," and must meet the same requirements, perform the same functions, and serve the same purposes. (FAC ¶ 23, n. 8). Relator cites <u>King v. Burwell</u>, 576 U.S. 473 (2015) to support this argument, and asserts that, because State and Federal Exchanges are equivalent, it follows that the "its Exchange" phrase in § 156.200(d) must mean New Jersey's Exchange (or their choice of a Federal Exchange). Relator concludes that this reading of § 156.200(d) required Defendants to comply with N.J.A.C. § 11:22–5.5(a)(11) as a provision imposed by New Jersey in connection with its Exchange.

After careful examination of § 156.200(d), and the parties' differing interpretations of this regulation, I conclude that § 156.200(d) did not require Defendants to comply with New Jersey's copay requirements. I reach this conclusion for the following reasons.

I first note that neither party identified any decisional authority interpreting whether the violation of a state regulation could also be a violation of the ACA in a state that operates through a Federal Exchange. For that reason, I have analyzed § 156.200(d) to determine whether it requires compliance with state regulations in this particular set of circumstances. To answer this question, I am guided by the familiar rules of statutory construction which begin with "an examination of the plain language of the statute." Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir. 2001). If the language is plain and unambiguous, the inquiry ends. Id. In determining whether the language is ambiguous, I must consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. (quoting Marshak v. Treadwell, 240 F.3d 184, 192–93 (3d Cir. 2001)). The United States Court of Appeals for the Third Circuit has instructed courts to give meaning to every word Congress used in order to avoid any interpretation "which renders an element of the language superfluous." Id.

Section 156.200 is entitled "QHP issuer participation standards," and section (d) is entitled "state requirements." The section begins by stating that: "[a] QHP issuer certified by an Exchange must adhere to the requirements of this subpart and any provisions imposed by the Exchange[.]" 45 C.F.R. § 156.200. I construe this language to unambiguously require all QHP issuers to meet the minimum federal requirements under the ACA, regardless of whether they operate through a Federal Exchange or a State created Exchange.

After stating that QHP issuers must meet minimum federal requirements, the section includes a phrase, separated by commas, which reads **". . ,or [provisions imposed by] a State in**

**connection with its Exchange, that are conditions of participation or certification with respect to each of its QHPs."** This language requires QHP issuers to comply with applicable state regulations, but only if the state in which they operate has established its own Exchange.

Here, Relator has conceded that New Jersey did not establish its own Exchange. (FAC ¶ 35). Accordingly, there are no provisions imposed by the state of New Jersey "in connection with its Exchange" under § 156.200(d) that Defendants were required to comply with. It follows that any alleged violation of N.J.A.C. § 11:22–5.5(a)(11) could not be the basis for a False Claims Act action because Defendants were not required to certify compliance with that regulation. For these reasons, Relator cannot establish falsity under the False Claims Act, and his claims must fail.

Relator's reliance on King v. Burwell, 576 U.S. 473 (2015) has not convinced me that this reading of § 156.200(d) is in error. In King, the United States Supreme Court interpreted an IRS final rule that construed a specific provision of the ACA. By way of background, one of the ways the ACA expanded access to healthcare coverage was its general requirement that individuals maintain health insurance coverage or make a payment to the IRS. Id. at 481. One exception to this rule excused individuals from purchasing healthcare if doing so would exceed eight percent of their total income. Id. at 482. However, the ACA also provided refundable tax credits to individuals with household incomes between 100 and 400 percent of the federal poverty line. Id. Upon receipt of these tax credits, certain individuals who would have been exempt from purchasing coverage because it exceeded eight percent of their income were no longer exempt because the tax credits offset the difference. Id. The Court explained the specific provision of the ACA regarding tax credits, as well as the IRS Rule interpreting this provision:

> The Act initially provides that tax credits "shall be allowed" for any "applicable taxpayer." 26 U.S.C. § 36B(a). The Act then provides that the amount of the tax credit depends in part on whether the taxpayer has enrolled in an insurance plan through "an Exchange *established by the State* under section 1311 of the Patient Protection and

13

> Affordable Care Act [hereinafter 42 U.S.C. § 18031]." 26 U.S.C. §§ 36B(b)-(c) (emphasis added). The IRS addressed the availability of tax credits by promulgating a rule that made them available on both State and Federal Exchanges. 77 Fed. Reg. 30378 (2012). As relevant here, the IRS Rule provides that a taxpayer is eligible for a tax credit if he enrolled in an insurance plan through "an Exchange," 26 CFR § 1.36B–2 (2013), which is defined as "an Exchange serving the individual market ... regardless of whether the Exchange is established and operated by a State ... or by HHS," 45 CFR § 155.20 (2014).

Id. at 483.

Four Virginia residents who did not want to purchase healthcare coverage challenged the IRS Rule, arguing that because Virginia operated through a Federally Facilitated Exchange, the Exchange did not "qualify as an 'Exchange established by the State under [42 U.S.C. § 18031]," and therefore they should not receive any tax credits. Id. The residents made this argument because if they did not receive the tax credits, purchasing healthcare coverage would exceed eight percent of their income, exempting them from the ACA's coverage requirement. Id. at 484. The District Court dismissed the residents' complaint, holding that the ACA unambiguously made tax credits available to taxpayers enrolled through both Federally Facilitated and State Created Exchanges. Id. The Fourth Circuit affirmed, and certiorari was granted. Id.

The United States Supreme Court found that, when read in context, the phrase "an Exchange established by the State under [42 U.S.C. § 18031]" was ambiguous. Id. at 490. The Court explained that when a State chooses not to establish its own Exchange, the ACA directs the Secretary of Health and Human Services to establish "such Exchange." Id. By using that language, the Court reasoned that Congress intended for State and Federal Exchanges not to "differ in any meaningful way." Id. at 487. The Court noted that this conclusion was strengthened by the broader context and purposes of the ACA itself. Id. 492–93. If the Court accepted Petitioners' interpretation of the provision, it would "destabilize the individual insurance market in any State with a Federal Exchange" and essentially render one of the key reforms in the ACA (the tax credit

14

provision) completely useless. Id. at 492. The Court concluded that "[t]he phrase may be limited in its reach to State Exchanges. But it is also possible that the phrase refers to *all* Exchanges—both State and Federal—*at least for purposes of the tax credits*." (emphasis added). Id. at 490.

The question presented in King involved interpreting an IRS regulation rather than the ACA itself and pertained to specific contextual circumstances that are not applicable to the question before me. The provision analyzed in King was an IRS regulation governing tax credits under the ACA. Here, I am interpreting a provision of the ACA itself involving certification of qualified health plans to operate through an Exchange, which is entirely different.

Moreover, even if the principles illustrated in King were applicable, my analysis would not be affected. The fact that Congress intended for Federally Facilitated Exchanges and State Created Exchanges to generally function the same once they are established does not change the fact that there are different obligations when applying to operate through either one. And, the Supreme Court in King made clear that their interpretation of "an Exchange" was specific and limited to the question before them ("it is also possible that the phrase refers to *all* Exchanges—both State and Federal—*at least for purposes of the tax credits.*"). Id. The court also emphasized that any other interpretation of 42 U.S.C. § 18031 would frustrate the very purpose of the ACA by rendering a crucial reform in the Act meaningless. In sum, the King court was faced with a different question under different circumstances that involved concerns not applicable to the issue before me. For these reasons, I find King distinguishable.[5]

---

[5] Relator makes several other arguments regarding Defendants' alleged false certification of compliance with § 156.200(d) despite their failure to comply with N.J.A.C. § 11:22–5.5(a)(11). Mainly, Relator points to several specific representations Defendants made to the Centers for Medicare and Medicaid Services regarding compliance with N.J.A.C. § 11:22–5.5(a)(11). Because I find that § 156.200(d) did not require Defendants to comply with N.J.A.C. § 11:22–5.5(a)(11), I will not address these additional arguments.

15

2. <u>Express False Certification Through Attestation</u>

As an alternative to his implied false certification argument, Relator argues that Defendants made an express certification of compliance with N.J.A.C. § 11:22–5.5(a)(11) through a form attestation they submitted to the Centers for Medicare and Medicaid Services during their application process.[6] According to the Amended Complaint, the Centers for Medicare and Medicaid Services required all issuers seeking to operate through Federal Exchanges to fill out the attestation form in connection with their application to obtain QHP status. (FAC ¶ 67). This attestation includes multiple statements to which the issuer must respond with a "Yes" or "No." At the top of the form, it states that the Centers for Medicare and Medicaid Services may accept a "No" response along with a justification. The Centers for Medicare and Medicaid Services referenced this attestation in a guidance letter addressed to issuers like Defendants. The attestation states, in relevant part:

> Applicant attests that it will comply with all benefit standards, federal regulations and state laws regarding state mandated benefits for all services as applicable including: preventative services, emergency services, and formulary drug list.

Attestation at p. 2.

Relator argues that N.J.A.C. § 11:22–5.5(a)(11) is a "state law regarding state mandated benefits." Accordingly, Relator contends that Defendants' attestation allegedly provided to the Centers for Medicare and Medicaid Services expressly certified compliance with N.J.A.C. § 11:22–5.5(a)(11) in violation of the False Claims Act. Defendants respond that: (1) the attestation should not be considered because it is not referenced in the Amended Complaint, (2) if or how Defendants executed the form, when it was executed, or by whom is also not alleged, and (3) even

---

[6] Even though I find that § 156.200(d) did not require Defendants to comply with N.J.A.C. § 11:22–5.5(a)(11), I address this express certification argument because Relator apparently asserts it as a separate and independent basis for a False Claims Act claim.

if it were to be considered, the attestation does not attest compliance with N.J.A.C. § 11:22–5.5(a)(11) because the regulation itself is not a "benefit design standard" or a "state law regarding state mandated benefits."

Relator referenced the attestation in his Amended Complaint at paragraph 67, note 17. (FAC ¶ 67, n. 17). While the document itself is not attached to the Amended Complaint, it is a matter of public record published on a government website. Under Federal Rule of Evidence 201(b), I may take judicial notice of these kinds of documents when ruling on a 12(b)(6) motion to dismiss. See Sturgeon v. Pharmerica Corp., 438 F. Supp. 3d 246, 259 (E.D. Pa. 2020). Furthermore, even though Plaintiff does not allege exactly how the Attestation was executed, I find that the level of detail provided in the Amended Complaint is sufficient at this stage of the litigation.

However, for the following reasons, I agree with Defendants that the attestation does not expressly certify compliance with N.J.A.C. § 11:22–5.5(a)(11), and therefore cannot be a basis for a claim under the False Claims Act. First, N.J.A.C. § 11:22–5.5(a)(11) does not fall under the definition of "benefit standard" under the ACA. All of the standards listed under 45 CFR § 156.20's definition of "benefit standard" refer to federal ACA requirements. Accordingly, a state law limiting copays for specific services would clearly not be considered a "benefit standard" under the ACA. The question remains, however, whether N.J.A.C. § 11:22–5.5(a)(11) qualifies as a "state law regarding state mandated benefits" under § 156.20. Defendants argue it does not, asserting that "state mandated benefits" refers to actual benefits in the form of health care services and goods. Defendants explain that "[c]opays, by contrast, are expenditures with respect to essential health benefits, not the benefits themselves." (Def.'s Br. at p. 20).

17

Section 156.20 includes a general catchall word followed by specific terms in its definition of state mandated benefits. When interpreting statutory language that includes a general word followed by specific terms, the doctrine of *ejusdem generis* applies. United States v. Hardy, 707 F. Supp. 2d 597, 607 (W.D. Pa. 2010). This canon of interpretation instructs that when a general word is surrounded by specific terms, the general word is to be understood in light of the specific terms. Id. Section 156.20 specifically states: "Applicant attests that it will comply with . . . state laws regarding state mandated benefits for all services as applicable including: preventative services, emergency services, and formulary drug list."

Here, the specific terms listed after "state mandated benefits" only include actual health care goods and services, not expenditures associated with those benefits. Accordingly, I find that N.J.A.C. § 11:22–5.5(a)(11) is not a state law regarding state mandated benefits. Rather, it is a state law regarding expenditures and cost-sharing between insurance companies and their insureds. It follows that the attestation does not expressly certify compliance with N.J.A.C. § 11:22–5.5(a)(11), and therefore it cannot be a basis for Relator's False Claims Act claim.[7]

---

[7] The parties also raised several arguments regarding materiality, which is the second requirement Relator must plead under the False Claims Act. Because I find that Relator has failed to plead falsity, I will not address these arguments at length. However, I note that even if Relator were found to have properly pled falsity, his claim would still fail the materiality requirement. To plead materiality, Relator must allege that the misrepresentation Defendants made about compliance with N.J.A.C. § 11:22–5.5(a)(11) was "material to the government's payment decision." See Universal Health Servs., Inc. v. United States, 579 U.S. 176, 181 (2016). "Material" means "having a natural tendency to influence . . . the payment or receipt of money or property." Id.

This standard is demanding, as the False Claims Act is not "an all-purpose antifraud statute." Id. There are numerous instances in which courts have found a lack of materiality for violations more serious than the one alleged by Relator. See, e.g., United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481, 490 (3d Cir. 2017) (finding no materiality where defendants had engaged in a marketing campaign which systematically suppressed information about a drug's health risks and caused physicians to submit Medicare claims that were neither reasonable nor necessary); In re Plavix Mktg., Sales Prac. & Prod. Liab. Litig. (No. II), 332 F. Supp. 3d 927, 949 (D.N.J. 2017) (finding no materiality where defendants fraudulently marketed a drug to physicians as more effective than aspirin despite the drug being one-hundred times more expensive and no

IV. <u>**CONCLUSION**</u>

For the foregoing reasons, the Motion to Dismiss is granted.

An appropriate Order follows.

---

more effective, and in turn caused physicians to submit prescriptions to Medicaid for payment that were not cost-effective in violation of state law)